530

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name <u>Culler, Sr. Jerryal J.</u>
    (Last)       (First)       (Initial)

3              H-31082
Prisoner Number _____

4              P.O.Box 689 BW -111  Soledad, CA 93960
Institutional Address _____

**FILED**

MAR 1 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6

7    **UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

8    Jerryal J. Culler, Sr. _____
(Enter the full name of plaintiff in this action.)

CV 08 1524

9               vs.

Case No. _____

10   Board Of parole Hearing _____

(To be provided by the clerk of court)

11   _____

**PETITION FOR A WRIT
OF HABEAS CORPUS**

**WHA**

12   _____

13   _____

E-filing

**(PR)**

14   (Enter the full name of respondent(s) or jailor in this action)

15

16           <u>Read Comments Carefully Before Filling In</u>

17   <u>When and Where to File</u>

18           You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23           If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

1  | Who to Name as Respondent

2  | You must name the person in whose actual custody you are. This usually means the Warden or

3  | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  | respondents.

6  | If you are not presently in custody pursuant to the state judgment against which you seek relief

7  | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  | custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11 | 1. What sentence are you challenging in this petition?

12 | (a)  Name and location of court that imposed sentence (for example; Alameda

13 | County Superior Court, Oakland):

14 | Contra Costa County Superior Court, Martinez, CA

15 | Court                               Location

16 | (b)  Case number, if known _912998-2_

17 | (c)  Date and terms of sentence _3-6-92/ Life with poss. of pa_

18 | (d)  Are you now in custody serving this term? (Custody means being in jail, on

19 | parole or probation, etc.)              Yes _X_    No _____

20 | Where? Soledad State Prison

21 | Name of Institution: _Soledad State Prison_

22 | Address: P.O. Box 689  CW 212

23 | 2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | Aggravated Mayhem/ with uses of a deadly weapon

27 | P.C. 205/12022 (B)

28 | _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                      Yes __X__    No _____

    Preliminary Hearing:         Yes __X__    No _____

    Motion to Suppress:         Yes __X__    No _____

4. How did you plead?

    Guilty _____    Not Guilty __X__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?          Yes __X__    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment           Yes __X__    No _____

    (b)    Preliminary hearing    Yes __X__    No _____

    (c)    Time of plea          Yes __x__    No _____

    (d)    Trial               Yes __X__    No _____

    (e)    Sentencing          Yes __x__    No _____

    (f)    Appeal             Yes __X__    No _____

    (g)    Other post-conviction proceeding    Yes _____    No __X__

8. Did you appeal your conviction?      Yes __X__    No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal        Yes __X__    No _____

            Year: __1992__    Result: __Denied__

            Supreme Court of California    Yes __x__    No _____

            Year: __1993__    Result: __Denied__

            Any other court        Yes __x__    No _____

            Year: __1994__    Result: __Denied__

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

1      petition?           Yes __X__     No_____

2     (c)    Was there an opinion?      Yes __X__     No_____

3     (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                            Yes __X__     No_____

5           If you did, give the name of the court and the result:

6           California Supreme Court

7           Denied

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?        Yes __x__     No_____

10        [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition.  You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15 U.S.C. §§ 2244(b).]

16     (a)     If you sought relief in any proceeding other than an appeal, answer the following

17            questions for each proceeding.  Attach extra paper if you need more space.

18       I.      Name of Court: _____

19            Type of Proceeding: _____

20            Grounds raised (Be brief but specific):

21            a._____

22            b._____

23            c._____

24            d._____

25            Result: _____Date of Result:_____

26       II.     Name of Court: _____

27            Type of Proceeding: _____

28            Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS      - 4 -

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

III.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

IV.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No_____

Name and location of court: _____

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS    - 5 -

1  Claim One

2      For the fourth time due process was denied by B.P.T. failed

3      to establish criteria for Aggravated Mayhem (P.C. 1168/205)

4      pursuant to their duty p.c. 3041(a), 3041.5[6]. As a result

5      petitioner is being considered for parole under murder crite-

6      ria for a non-murder offense it is Arbitrary and Capricious.

7

8  Supporting Facts

9      The criteria the B.P.T. used is CCR§2281/2400 (B) (C) (D)and

10     (E) [duplicate citations] and dual punishment because these

11     the same elements that give rise or make Aggravated Mayhem

12     a life crime. It also reclassified/ recharaterize petitioner

13     as a murder. see, argument

14     It also violate ex post facto law (1) It violates legislator's

15     intent. (2) These criteria were establish in 1987 and

16     Aggravated Mayhem did not become a life crime until 1989,

17     see argument.

18

19  Supporting cases, rules, or other aurthorty

20     In re Ramirez, 80 cal. app. 4th at p.425, In re Rosenkrantz,

21     128 cal. rptr. 1044, In re Dennenburg, 34 cal. 4th 1061, 1100

22     Inre Minnis 7cal. 3d 639, Cal, Dept. of Corr. V Morales 514

23     US 499, 506, People v Shipman 62 cal. 2d 226, CCR§ 2284 CCR§

24     4.414 (a) (1) , In re Scott, 34 cal. rptr 3d at p. 917, P.C.

25     1203.1

26

27

28

6

Ground 3

The B.P.T. has arbitrary and capricious for the third time in a
roll violated the law governing p.c. 3041.(a), maximum 2 year
denial for parole. Thereby violating 6th and 14th amendment.


Supporting Facts

Petitioner was convicted of Aggravated Mayhem a non-murder
offense(p.c. 1168/205), the maximum parole denial for this
crime two year, not derectory but mandatory (see, EX.   )
For the third time the B.P.T. has failed to meet it's obligation
to hold my parole hearing in accordance with the law, it also
makes no attempt to hide it's vague disrespect for the law nor
will it give credit or incorperate it into the next hearing.



.Supporting cases, statues, and authority/

Weaver V Graham 450US 24,, Jones V Garner, (11th cir. 1999)
!¢$ F.3d 589, California Dept. Of Correction V Morales, 514 US
at p.504 Himes VThompson 336 F.3d 854 (9th cir, 2003), C.R.C.§
4.414 (a) (1), 4.420 (d), p.c. 1168/205, 3000 (b) (1), 3041 (a),
3041. 5[6], US Cont. art. 1§10

Ground Five

The B.P.T. arbitrary and capriciously violated petitioner's 1th, 6th, 14th amendment by denying parole based on trumpt up charge of assult on inmate with weapon ( cable card) that was not supported by " any " evidence.

Supporting Facts

There was overwhelming evidence that petitioner was not guilty of this alleged incident, (1) The evidence itself (2) A witness (that was not allowed ) (3) The investigating officer in his own words on the evidence (4) Petitioner' immediate request for a polograph examination in accordance with CCR§3292, in a letter written to Sgt. McGarvey of ISU (5) Statement from the alleged victim to the nurse immediately after the incident (6) The fact that A/W Dacanay did not fully accept his senior earing officer,s Lt. Kelly conjecture of the alleged incident and accessed 9 points instead of 18 points disciplinary infraction. However, A/W Dacanay did question the conflict in the evidences, ie: why was there no circular aburasion on the alleged victim neck, his statement to the nurse after the incident, YET A/W Danay would not reverse his senior hearing officer deciosion.

Supporting cases, statute, authority

Sandin v Conner, 132 L ed 2d at p. 431, Rhodes v Robinson, 408 f3d 559 (9th cir, 2005) Cleaving v Saxner 474 US 193, 203-04 In re Scott 34cal rpt 3d 905 (cal app 1 dist. 2005)

7

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:

4   _____

5   _____

6   _____

7   Do you have an attorney for this petition?                                    Yes_____        No_____

8   If you do, give the name and address of your attorney:

9   _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on ___3-12-08___

14              Date                                  Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

1           The court errored when it stated that petitioner was

2           not denied due process and equal protection because

3           the board failed to establish criteria for Aggravated

4           Mayhem.

5

6    The honorable CONTRA Costa Superior Court Judge incorrectly cited

7    CCR§2282 (d) AS a bases to deny petitioner's first claim. Stating,

8    the record does not establish any due process or other violation

9    in this regard.By this oversight and erroneous ruling it is

10   procedurally, statutory, constitutional and fundamentally flawed.

11   That turns due process, equal protection and legislative intent

12   on it's head.

13   The B.P.T. itself disagrees with conclusion (SEE, EX-Bp.1)

14   pointing out very clearly that conclusion is incorrect in a

15   letter to petitioner in 1994. B.P.T. state the matrix that the

16   board would use to determine the length of prisoners sentence

17   who has committed my offense, once found suitable for parole. How-

18   ever, the matrix is only applicatable to prisoners who have been

19   found suitable for parole. Therefore, the matrix is not relevant

20   in my situation until me or any other prisoner is found suitable

21   for parole.

22   Petitioner stated facts correctly on what procedures, statutes,

23   and penal law that B.P.T. must follow in order to comply with

24   legislative intent. P P,C. §3041; Parole release,date, Setting,

25   Criteria, Review] it also reads,and direct the B.T.P. after esstabl-

26   ishing a criteria for Aggravated Mayhem the next step; the board

27   "shall" set a parole date in the manner that would provide unform

28   term for offenses of similar gravity and magnitude in respest to

3

1  their threat to the public. The court in In re Ramirez, 80 cal.
2  app. 4th 425 , states, a life term offense or any other offenes
3  underlyòng an indeterminate sentence (2057 1168 p.c.) must be
4  particularly egregious to deny parole. In order to comply with the
5  parole policy establish by the legislature in p.c. §3041 the board
6  must weigh the inmate criminal conduct not against ordinary social
7  norms but against other instances of tòhe crime or crimes. [Murder
8  is not one them] This is the approach made by Judical Council
9  Sentence Rule provideing the criteria for probation determination;
10 Cal. R, C. §§.414 (a) (1).

11 The incorrect criteria used by the B.P.T. (seeEX-B p.2) CCR§2281/
12 2400 (a)-(e) [duplicated citations] are dual punishment and the
13 circumstances done before, during, and after a murder is committed
14 within CCR§2281 (a)- (e) are the same elements that give rise or
15 make Aggravated Mayhem a life crime, it also reclassifies or
16 recharaterize petitioner'as a murder.

17 At this time this case is ripe for this honorable court consideration in
18 accordancewith p.c. §1203,1 suspension of sentence, imprisonment or
19 modification.

20

21 There is no criteria or matrix for Aggravated Mayhem, yet the
22 Legislator's mandate that there be one and this court address this
23 issue in In re Scott, 34 cal. rptr. 3d at p.917 (cal. app. 1Dist.
24 2005) where you state, in part, a decision must reflect an
25 individualized consideration of the specific criteria and cannct
26 be arbitrary and capricious,(id ) P.C. §3041 and board reg. (pro-
27 mulgated pursuant to sub. (a) of §3041) ESTABLISHING CRITERIA FOR
28 DETERMINING SUITABILITY FOR RELEASE ON PAROLE. The board is to look

1  and set criteria for Aggravated Mayhem with somethhing compartive

2  and murder is not one of them. see, In re Minnis (1972) 7 cal. 3d 639,

3  645,  the Minnis court declared,  this court has traditionally accepted

4  it's responsibility to prevent an authority vested with decretion

5  from implementing a policy which defeat the Legislative motive for

6  enacting a system of laws. This court, also adressed the issue of

7  reclassifing, or recharaterizing and disproportionality in, In Re

8  Ramirez, (2001) 94 cal.app.4th 549,559-560, In Re Rosenkrantz, 128 cal

9  rptr. 104, In Re Dannenberg, (2005) 34 cal. 4th 1061, 1100.  which

10 would increase punishment for crimals acts, (Aggravated Mayhem),see,

11 California Dept. of Corrections v. Morales (1995) 514 US 499, 506.

12 There is also the proability that this failure to establish a criteria

13 for Aggravated Mayhem may violate ex post facto, see, People v.

14 Frazer, 21 cal. 4th 711, 755, Beazell 269 US 167, 169-70

15 THE California Code of Regulations/Division 2 Rules were written in

16 1987, altough many were ratified thereafter, ie; Attempted Murder,

17 see, People v. Bright (1996) 12 cal. 4th 652. will not negate the

18 fact that Aggravated Mayhem didnot become a life crime until 1989.

19 To say now, as the Cal. dept. of Corr. and Reb./ B.P.T. appears to

20 do , that we anticipated, or incorporated [clairvoyancy] this new

21 law prior to 1989 is absured. Or to say we have constructed a new

22 rule or policy thereafter without the legislature impact or imput of

23 a individualized criteria for a specified crime mandated by legisla-

24 tive intent is a clear violation of ex post facto. According to

25 ex post facto it can NOT " shall not" be a broad sweeping rule or

26 policy that covers an unforseeable radical change in laws[ such as

27 the three stri ks law, or Aggravated Mayhem] to which CCR§2281 is

28 suppose to cover thereafter. also see, People v. Shipman, (1965) 62 cal2d 226

⑤

2

The court errored when it stated the record does not
support petitioner's contention that I suffer a due
process and equal protection violation because I was
not allow enough time with my attorney to discuss and
prepare for parole hearing.

Under penal code §3041.7, state at any parole hearing for purpose
of setting, postponing or rescinding a parole release date of a
prisoner under a life sentence, such prisoner shall be entitled
to be represented by counsel and the prevision of sec. 3041.5 shall
apply.
Under CCR§2247, a prisoner is entitled to review nonconfidential
documents in the department C. file.
On the morning of April 26,2005 I was schedule for my B.P.T. hearing
about ten minute before the hearing Attorney Bill Schmidt introduce
introduce himself as my attorney. He then proceeded to decuss the
procedural and asked where was I when he came on friday, I explain
that was in the hospital. He then stated, I need to go talk to
commissioner to see if I can get us a room so we have some privercy
so we discuss your case. When he return, he stated, they would not
allow us to have a private room because of a new policy, he had
spoke with their attorney in Sacramento and the hearing would proceed.
AttorneySchmidt then said, I can't represent you like this, I said,
so what I am I suppose to do. He then responded, I am sorry, I can't
be your attorney under these conditions, we don't have time to discuss
or prepare for this hearing and they want you in there now. I said so

1  I amgoing in there without an attorney, he said, I am sorry " I can't
2  do my job, I will go see if I can get a potponment. When he returned,
3  he said, they won't postpone it. I said, I have to go in there but
4  they have already made up their minds, to give me a two year denial,
5  so I need to get this on record, will you write a letter for me
6  explaining what happen. He then said, I will go in there with you and
7  make an objection on this new policy because I meet with other cilents
8  in a private room, but I don't like it. (see, EX- D p. 6 L. 1-22)
9  By attorney Schmidt not being afforded a fair oppotunity to effectiv-
10 ely do his duty I suffered due process and equal protection by this
11 illegal policy. See, In re Minnis, 7 cal. 3d at 643-46, ( Petitioner
12 reinterates this citation)  The Minnis court declared, this court
13 has traditionly accepted it's responsability to prevent an authority
14 vested with decretion from implementing a policy which defeat the
15 legislative motive for enacting a system of law. This illegal
16 policy was retracted when petitioner file under the Freedom of
17 information Act a letter to the Director of Correction Jeanne
18 Woodford, for investigative inquiry. ( see, EX-B p. 4  ) I also file
19 under the above act to the B.P.T. who fail to respond, see, letter
20 ( EX-B p. 2   )

21 Also regarding this illegal policy petitioner was denied my rights
22 to review documents in my C file, see, CCR§2247, states, a prisoner
23 is entitled to review nonconfidential document in the department
24 C file. It also must be noted, that in an interview with your
25 attorney you have the opportunity to review and discuss al adverse
26 or postive documents in a prisoner C file this was denied by this
27 illegal policy it violated due process and equal pretection, see,
28 People v Shipman (1965) 7 cal. 2d 226,Morrissey v Brewer (1972) 408

1 | US 474.

2

3 |                                    3

4

5 |        The Court errored when it stated the fact that petitioner's

6 |        hearing was late does not support relief upon a petition for

7 |        Writ fo Habeas Corpus.

8

9 | Petitioner irinterates his prior contention, petitioner was convicted

10 | of Aggravated Mayhem a non- murder offense ( P.C. 1168/205), the

11 | maximum parole denial for this crime is 2 years, mandatory not

12 | derectory. see, p.c.§3041.5 (2) (A) , also see, In re Rutherford

13 | case no. SC 135399A) (2-15- 2006)

14 | For the third time the B.P.T. has failed to meet it's obligations

15 | to hold my parole hearing in accordance with the law p.c. 3041.5 (2)

16 | (A), and it makes no attempt to hide it's vague disregard for the

17 | law, court's nor will it give credit or incorperate it into the next

18 | hearing. (see, EX- B p.10-12 ) .

19 | The issue of whether relief is available on petition for Writ of

20 | Habeas Corpus because the B.P.T. fail to meet it's obligations to

21 | hold parole hearing in accordance to the law, p.c. 3041. 5 (2) (A).

22 | Many courts thoughout this state has granted relief on Wrrit of Habeas

23 | Corpus for this failure. Marin County Superior Court Judge, the

24 | honorable Judge Verna A. Adams recently issued an order May 5, 2006

25 | against the B.P.T. in, In re Ruthford, case no. SC 135399A addres-

26 | sing this and many other issues regarding the B.TP.T. failure to

27 | comply with p.c. 3041.. So relief is available though petition for

28 | Writ of Habeas Corpus. Petitioner is only asking this honorable

                                    8

1  court to hold the B.P.T. accountable for violating the law p.c.
2  3041.5 (2) (A), see, People v Shipman ( 1965) 62 f2d 226, Himes v
3  Thompson 336 f3d 854 (9th cir. 2003 ) California Dept. of Correct-
4  ion v Morales, 514 US at p. 504, Jones v Garner, 164 f3d 589,
5  Weaver v Graham, 450 US 24.·

6

7                                    4

8       The B.P.T. continue to violate ADA, due process, equal
9       protection, and the N/D court ordered stipulation covertly
10      and overtly by using petitioner's medical condition as an
11      element to deny parole plan,When there are Federal and
12      State laws to assist petitioner in his re-entry transistion.
13      ie; SSDI, p.c. 3068(a), 3070, 5068, 5069 (c) (d), CCR§
14      3705, DOM§ 81070.1, 81070.2, and 81070.1

15

16  Commissioner Lawin asknowledge the court order stipulation and
17  dismissal at the beginning of his adress of the parole plans,
18  (see, B.P.T transcript at  p. 29  L.23-25 ) However, Commissioner
19  Lawin would soon violate the court ordered stipulation and adress
20  the issue of employment, id; at p. 31 L 7-9. The court in the
21  instant matter fail to adress Commissioner Lawin violation of the
22  court ordered stipulation, by doing so it overlooked his propensity
23  to abuse his discretion. What petitioner was trying to demonstrate
24  was to bring to light a covert tactic of denial done by the B.P.T.
25  When life prisoners (pro-se litigants ) challenge the B.P.T. regarding
26  their prior behavior and the court rules in a prisoner favor, The
27  B.P.T. shows it contempt but is deceitful enough not to put it on the
28  record. Commissioner Lawin establish a pattern of abuse of decretion

1  And made no attempt to hide his displeasure with petitioner for
2  seeking relief from the courts. His contempt became so overwhelming
3  that attorney Schmidt tried to clarify the cort order and he, himself
4  was rebuffed by Commissioner Lawin who was bend on circuventing the
5  court order. , see, Rhodes v Robinson, 408 f3d 559 (9th cir.2005),
6  Armstrong v Schwarzenegger,( case no. 489-9   Bogovich v Sandovol, 189
7  f3d 999.

8

9                                    5

10        The B.P.T arbitrary and capriciously violated petitioner's
11        1th, 6th and 14th amendments by denying parole based on
12        trumpt up charge of assult on inmate with weapon ( cable cord)
13        that was not supported by any evidence.

14

15  There was overwhelming evidence that petitioner was not guilty of this
16  alleged incident of assult on a inmate with a weapon, ie; the evidence
17  itself (2) a witness (that was not allow) (3) the investigating
18  officer in his own words on the evidence (4) petitioner immedeate
19  request for a polograph examination in accordance with CCR§3292, in a
20  letter to ISU sgt. McGarvey. (5) statement from the alleged victim to
21  the nurse right after the alleged incident. (6) petitioner for several
22  days prior to this incident with i/m Thompson tried unsuccessfully to
23  get him moved out the cell because he was triple CMS with a serious
24  attitude problm and understanding was less than zero. (7) the fact
25  that A/W Dacanay did not fully accept his senior hearing officer's
26  conjecture of the alleged incident and accessed 9 points instead of 18
27  points for disciplinary infraction. However, although A/W Dacanay
28  question the conflict in the evidence ie; as stated above, he would

1  not reverse his senior officer's decision. (SEE EX-C)

2  The court errored when it stated petitioner claim of the B.P.T.

3  relied on a trumpt charge, of assult on an imate with a weapon is

4  with merit The court appeared to overlook the cruial part of this

5  incident **assult on an inmate with a weapon ( cable cord)** in stating

6  this claim is without merit. The whole case in chef revolved around

7  the weapon charge, for the court to state petitioner presented

8  inadequate reasons for this trumpt up charge is fundamentally flawed.

9  see, **Mike Ngo v Jeanne Woodford, 403 f3d at p. 628**, it states in part,

10  holding that members of a disciplinary committe are not entitled to

11  the absolute immunity accorded juges because they were not " profess-

12  ional hearing officer as are administrative law judges [ put another

13  **way they are not trained  to handle the intricacies of the legal**

14  **issues they hear]**. For the court to state to cite **In re Scott, (2005)**

15  **133cal. app. 4th 573** , to base it's ruling that the B.P.T. has some

16  indicial of reliability is to overlook  p. 45 L. 7-27 of the B.P.T.

17  transcript. Where commissioner Lawin  agreed that the evidence did

18  not support it's finding, but would not go against the hearing officer.

19  see, **Sandin v Conner, 132 Led 2d at p.431, Rhodes v Robinson, 408 f3d**

20  **559 (9th cir. 2005) Cleaving v Saxner 474 US 193, 203-04**

21

22                                    6

23      The B.P.T. panel has repeatly since 1998, 2001, 2002, and 2005

24  used petitioner committing offense as bases to deny parole. By doing

25  so continuly it has violated the law governing p.c. §3041 and a

26  disproportionality of legislative intent, Thereby reclassifing the

27  committing offense a crime that carrier a more serve penality, such

28  murder ( p.c. 187/ 190) on a non- murder offense.

11

1    The B.P.T. panel has repeatly , four time denied parole for
2    petitioner committing offense. By doing so, my incarceration has
3    become disproportionate to the crime in which I was charged, Agga-
4    vated Mayhem. Although there is no creteria or matrix for this
5    offense, according to p.c205, Aggavated Mayhem carries a life
6    sentence, petitioner MEPD date is 5-6-99. Penal Code §3041, states,
7    the B.PT. must make a determination in a manner that will provide
8    uniform terms for offenses of similar gravity and magnitute in
9    repect to thier treat to the public.see, In re Ramirez(2001) 94 cal.
10   app.4th 549, 559-560., the court states, when weighing the seri-
11   ousness of his crimal conduct to determine whether Ramirez would
12   pose a threat to public safety if paroled, the B.P.T. is not free to
13   disregard his 15 year minimum term [petitioner reinterate, Aggav-
14   ated Mayhem, carries what would be a 7 to life, and it is less than
15   Attempt Murder] for murder and the concurrent 7- year terms for
16   robbery. These sentences reflect both a legislative determination of
17   proportionality, and the trial court's assesment of the seriousness
18   of the offenses. The Board's broad discretion over parole suitability
19   determinations is not a license to recharaterize the committment
20   offenses as a crime carrying a more severe penality

21   Petitioner reinterates my contention, that the B.P.T. used of CCR
22   §2281 as an illegal criteria for Aggravated Mayhem only to establish
23   an oning abuse of decretion and a propensity for arbitrary and
24   capricious denial of parole., see, Terhune v Superior Court, (1998)
25   65 cal. app. 4th 864, Ramirez, 94 cal. app. 4th at p. 559, The board
26   attempt to read it's regulations to avoid the need to consider
27   proportionality is unavailing. Regulation must be consistent with
28   statutory requirment.

1  By the B.P.T. repeatly uses of petitioner's committment offense in
2  refusal to set a release parole date in accordance with p.c. 3041 is
3  arbitrary and capricious. see, In re Rodriguez (1975) 14 cal. 3d 639
4  646, the Rodriguez court declared, the indeterminate sentence law
5  is not now being administered in the manner which offers accurance
6  that prisoners subject thereto will have thier terms will be fixed
7  at a number of years proportionate to thier individual calpability
8  or that terms will be fixed with sufficient promptness to permit any
9  requested review of thier proportionality to be accomplished before
10 the affected individuals have been imprisoned beyond the constitu-
11 tionally permitted terms (id at p. 650). The state of affairs in
12 refrable demonstrated the error of the asserted assumption that the
13 indeterminate sentencing law has oporated constitutionally with
14 respect to term-fixing since it s inception (ibid).
15 Here, the trial court refrained from making a finding on whether the
16 board is following a policy of  dening parole to all life term
17 inmates. We alsopass on judgment on that question. Clearly, however,
18 the boardreading of  section 3041 would permit it to repeatedly
19 refuse to set release date, indefinitely avoiding it's duty to fix
20 uniform terms. This strained interpretation of the statue opens the
21 door to abuse similar to the practice criticized by the Rodriguez
22 court. If the board disagrees with the parole policy establish by
23 law, it is free to take it's grievance to the legislature and lobby
24 for a statutory amendment. It is not freeto ignore the plain meanir
25 of the statute. see In ere Minnis (1972) 7 cal 3d 630, People v
26 Shipman ( 1965) 62 cal. 2d 226

27     I declare under penality of perjdry that foregoing is true and
28 correct.

Date 3-12-08

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _Jeremyah J. Culler, Sr_, declare:

I am over 18 years of age and I am party to this action. I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California. My prison address is:

_Soledad State Prison_ CDCR #: _H31082_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _BW-111_
SOLEDAD, CA 93960-0689.

On _3-12-08_, I served the attached:

_Writ of Habeas Corpus_

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined. The envelope was addressed as
follows:

_Attorney Gen. Offices for CA_
_455 Golden Gate Ave. Suite 11000_
_SF. CA 94102_

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on _3-12-08_.

Declarant

EXHIBIT INDEX

CV 08    1524

Exhibit A                    Appellate Court,

(1)  Contra Costa County Superior Court Denial, Appeal
                Exhibit B  California Supreme Court

(2)  Evidence in support;  Letter from B.P.T. on matrix,

Memorandum from Director of Corrections, B.P.T . 1998 decision,

Parole denial from  1998- 2005.

Exhibit C

(3)  602 grievance, and Incident Report


Exhibit D

(4) B.P.T. Transcript


Exhibit E

(5) Psychological Report


Exhibit F


(6) Life Prisoner Evaluation. and N D Stipulation  (F-75 -76)

# EXHIBIT   A

S145131

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re JERRYAL JEROME CULLER on Habeas Corpus

---

Petition for writ of habeas corpus is DENIED.

SUPREME COURT
**FILED**

FEB − 7 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

A-1

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1



FILED
COURT OF APPEAL FIRST APPELLATE DISTRICT

In re JERRYAL J. CULLER Sr. on Habeas Corpus.

A114173
Contra Costa County No. 912998

'JUN 2 8 2006

DIANA HERBERT, CLERK
BY_____
DEPUTY CLERK

BY THE COURT:

The petition for writ of habeas corpus is denied.

The justices participating in this matter were:

Acting Presiding Justice Stein, Justice Swager and Justice Margulies

JUN 2 8 2006

Date: _____

STEIN, J.

_____Acting P.J.

orcc1a

$\mathcal{A}-2$

IN THE SUPERIOR COURT OF CALIFORNIA
CONTRA COSTA COUNTY

In re Jerryal J. Culler, Sr.,                              No. 06 0043-7
On Petition for Writ of Habeas Corpus.

_____/

Petitioner Jerryal J. Culler Sr. is serving a term of life with the possibility of parole following his 1992 conviction for aggravated mayhem with use of a deadly weapon. In April 2005, the Board of Prison Terms (now Board of Parole Hearings; hereafter Board) determined that Petitioner was not suitable for parole and deferred further consideration of parole for two years on the ground that it was unreasonable to expect Culler to be found suitable within that period.

Petitioner's commitment offense occurred on September 2, 1991. On that date, Petitioner threw a cup of gasoline on Fred Eugene Upton and set Upton on fire. Mr. Upton sustained extremely serious injuries as a result.

At the April 2005 hearing, the Board articulated numerous reasons for finding Petitioner unsuitable for parole and that he would pose an unreasonable threat to public safety if released from prison. The Board assessed that Petitioner's commitment offense was especially heinous and cruel. The Board relied on Petitioner's continued negative behavior in prison, as evidenced by a recent CDC-115 for a battery on an inmate with a weapon, among other things. The Board believed that Petitioner had not participated in sufficient levels of self-help. Dr. Blanchard's November 19, 2004 report on Petitioner found that Petitioner would present an above average risk if he were to be released on parole.[1] Petitioner had no realistic residence plans in that he had no residence plans if he were to be paroled. Finally, the Board found that Petitioner's extensive prior criminal history and his unstable social history both rendered him unsuitable for parole.

Petitioner now challenges the Board's decision on six different grounds. As set forth below, none of these grounds have any merit.

**1. Petitioner Has Not Been Denied Due Process or Equal Protection Because the Board Has Failed To Establish Criteria for Aggravated Mayhem:**

As articulated by Petitioner, Petitioner's first ground for relief is far from clear and does

_____

[1]"That's clearly too high a risk for this Panel to take." Petitioner's Exhibit F, page 68, lines 21-22.

not appear to be supported by any authority he cites.[2]

Cal. Code.Regs., tit. 15, Section 2282(d) states:

"In considering crimes for which no matrix is provided, the panel shall impose a base term by comparison to offenses of similar gravity and magnitude in respect to the threat to the public, and shall consider any relevant Judicial Council rules and sentencing information as well as any circumstances in aggravation or mitigation of the crime."

Petitioner was received in CDC on April 13, 1992 and was determined to have a minimum eligible parole date of May 15, 1999. Petitioner's Exhibit F, page 1.

The record does not establish any due process or other violation in this regard.

**2. The Record Does Not Support Petitioner's Contention that He Suffered a Due Process Violation Because He Was Not Allowed Enough Time to Discuss His Case With His Attorney:**

See Exhibit F, page 6, lines 21-22.

**3. The Fact that Petitioner's Hearing Was Late Does Not Support Relief Upon a Petition for Writ of Habeas Corpus:**

Neither the authorities cited by Petitioner nor other known authority hold that Petitioner is entitled to relief upon a Petition for Writ of Habeas Corpus on the ground that although Petitioner was given a two year denial in April 2002, his next hearing was not held until April, 2005.

**4. Petitioner's Contention that the Board Improperly Considered Petitioner's Medical Condition is Belied by the Record:**

The Board's reasons for considering Petitioner unsuitable did not include that Petitioner had no employment plans. See Petitioner's Exhibit F, pages 66-70. The record otherwise reflects that the Board did not consider Petitioner's employment plans or his medical condition in determining whether Petitioner was suitable. See, for example, Petitioner's Exhibit F, page 54.

**5. Petitioner's Contention that the Board Relied on a "trumped up charge" that Petitioner had Assaulted Another Inmate Is Without Merit:**

The record reflects that in 2003, Petitioner received a CDC-115 for assaulting another inmate.

---

[2]Among other things, Petitioner cites "Rosenkrantz 80 Cal. App 4th at p. 425, Dannenberg, 102 Cal. App. 4th 95." Both of these cases were depublished upon orders by the California Supreme Court.

Petitioner suggests that he is innocent of this "trumped up" charge.

The Board's suitability decision must be based on information which has some indicia of reliability. In re Scott (2005) 133 Cal. App. 4th 573, citations omitted. Petitioner presents inadequate reason to believe that the information before the Board concerning Petitioner's prison violation lacked the requisite indicia of reliability.

**6. Petitioner's Complaint that the Board Considered the Facts of His Commitment in Finding Him Unsuitable is Without Merit:**

There is no merit to Petitioner's final contention that the Board erred in assessing that the facts of the commitment offense disfavored a finding of suitability.

The Petition is denied.

DATED: 3/2/06

Judge of the Superior Court

cc: Petitioner

A-5

# EXHIBIT   B

STATE OF CALIFORNIA--YOUTH AND ADULT CORRECTIONAL AGENCY                                GRAY DAVIS, *GOVERNOR*

# BOARD OF PRISON TERMS

428·J Street, 6th Floor
Sacramento, CA 95814
(916) 445-4071



November 4, 1999

Mr. Jerryal J. Culler, Sr., H-31082
San Quentin State Prison
P. O. Box H-31082, #2-N-94
San Quentin, CA 94974

Dear Mr. Culler:

I am in receipt of your letter, dated October 11, 1999, in which you request a copy of the
regulations that pertain to parole consideration, a copy of the Larry Singleton mandate and any
other pertinent information regarding the mandate's adoption into Penal Code section 1168.
You also ask for statistical information regarding the number of prisoners who have been
convicted of aggravated mayhem with the use of a deadly weapon. Finally, you ask what
matrix the Board uses to determine the length of the sentence for a person sentenced to your
offense.

Any regulations and statutes that relate to the Board of Prison Terms (Board) can be found in
your institution's law library. The guidelines and procedures that the Board follows are found
in Title 15, Division 2 of the California Code of Regulations and the California Penal Code.

The Department of Corrections would keep the statistical information you seek regarding the
number of persons who have been convicted of aggravated mayhem with the use of a deadly
weapon.

The matrix that the Board would use to determine the length of a prisoner's sentence who
committed your offense, once found suitable for parole, would be located in Title 15 of the
California Code of Regulations, section 2282(d). This section allows the hearing panel some
discretion in deciding whether or not to apply the matrix located in section 2282(b) or (c).

However, I just want to remind you that the matrix is only applicable to prisoners who have
been found suitable for parole. The matrix is only used by the Board to determine the length of
a prisoner's sentence once that prisoner has been found suitable for parole. Therefore, the
matrix is not relevant to your situation or any other prisoner's situation until you or any
prisoner is found suitable for parole. The maximum sentence for your crime is life, not the
amount of time stated in the matrix.

Sincerely,

DANIEL J. KOSSICK
Chief Counsel                                    13-1

D

STATE OF CALIFORNIA--YOUTH AND ADULT CORRECTIONAL AGENCY          ARNOLD SCHWARZENEGGER, GOVERNOR

**BOARD OF PRISON TERMS**
1515 K Street, 6th Floor
Sacramento, CA 95814



March 17, 2005

# INMATE COPY

Mr. Bill Schmidt
Attorney at Law
791 Price Street
PMB # 170

3AO1-250U

Pismo Beach, CA 93449

Re : CULLER,JERRYAL,JEROME
H31082

Dear Mr. Schmidt :

This is your confirmation to represent the above individual as follows:

          Type of Hearing:  Subsequent #3
          Date of Hearing:  Tuesday, April 26, 2005
                     Time:  09:45 AM
                    Place:  California State Prison, Corcoran
                            Corcoran
       Attorney Retained by:  State

Please make arrangments to interview your client and review his/her file at
least two weeks prior to the hearing. To ensure that arrangements will be
made for your client to report promptly for the interview, contact the
Institution Hearing Coordinator no later than 48 hours before the
interview.

Institution Hearing Coordinator:          (559) 992-8800 ext. 6244

You should anticipate that a representative from the district
attorney's office will participate in the hearing, either by sending a
representative to the institution or via video conference. In
addition, participation by the victim of the crime or the victim's
next of kin may also occur with their appearance at the hearing or via
video conference.

If you have any questions regarding this matter, please contact Linn
Austen, BPT Hearing Coordinator at (916) 324-1492.

Sincerely,

Margarita E. Perez
Chairwoman

BY:
Sandra D. Maciel, Manager
Hearing Support Unit

cc: C-File, Inmate

B-2

J. PRISON TERMS                                                                          STATE OF CALIFORN

## LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION (BPT §2041)

I.  [✓]  PAROLE DENIED

If this proposed decision denying parole is approved, the Board will send you a copy of the approved
decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

A. Base Period of Confinement ......................................... _____ Months

| Case No. | Count No. | Offense | |

B. Firearm Enhancement............................................+ _____ Months

C. Other Crimes Total ...............................................+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |

| Case No. | Count No. | Offense | _____ mos. |

| Case No. | Count No. | Offense | _____ mos. |

D. Total Term ...........................................= _____ Months

E. Postconviction Credit From _____ To _____ — _____ Months
                              (Date)              (Date)

F. Total Period of Confinement.................................... = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed
pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days.
At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-
ponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed
decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be
scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | | |
|---|---|---|
| Name | | Date |
| Name | | Date |
| Name | | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| CULLER, JERRYAL | H-31082 | SAN QUENTIN | 06/16/98 |

B - 3

Distribution: White—C. F

INMATE COPY

...RD OF PRISON TERMS

STATE OF CALIFOR

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I.   [X]   PAROLE DENIED   $ONE$   $YEAR$

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]   PAROLE GRANTED

A. Base Period of Confinement ..................................................... _____ Months

| Case No. | Count No. | Offense |
|----------|-----------|---------|

B. Firearm Enhancement............................................+ _____ Months

C. Other Crimes Total ..............................................+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------|

D. Total Term ..............................................= _____ Months

E. Postconviction Credit From _____ To _____ − _____ Months
                              (Date)          (Date)

F. Total Period of Confinement............................... = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-ponement of your parole date.

III. If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | | |
|---|---|---|
| Name | | Date _____ |
| Name | | Date _____ |
| Name | | Date _____ |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|------|------------|-------------|--------------|
| CULLER, JERRYAL | H-31082  B-4 | SQ | 02/26/01 |

Distribution: White 0 File

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................................... |  |  |  |
| Date Life Terms Begins ........................................................................... + |  |  |  |
| At Large Time ........................................................................................ + |  |  |  |
| PAROLE DATE ...................................................................................... = |  |  |  |

## MISCELLANEOUS

*2 year Denial*

Panel Recommendations and Requests:
_____ Become _____✔ Remain Disciplinary Free.
_____ Work Towards Reducing His/Her Custody Level.
_____ Upgrade _____ Vocationally _____ Educationally.
✔ Participate In ✔ Self-Help (and) ✔ Therapy.
_____ Transfer To _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES  ☒ SENT  (Date) __03-19-02__

COMMITTMENT OFFENSE

| 205/12022(B) | AGGRAVATED MAYHEM W/USE OF DEADLY WEAPON |
|---|---|
| (Code Section) | (Title) |
| CC 9129982 | 3 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 04-13-92 | 04-13-92 | 05-04-99 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL   ☒ SUBSEQUENT (Hearing No.) _2_ | 02-26-01 |

Department Representative

| Counsel for Prisoner | Address |
|---|---|
| JOHN STRINGER |  |

| District Attorney Representative | County |
|---|---|
| JACK WADDELL | CONTRA COSTA |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:
Presiding (Name)                                              Date

Concurring (Name)                                             Date  4-23-02

Concurring (Name)                                             Date

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CULLER, JERRYAL | B-5 H-31082 | SAN QUENTIN | SUBSEQUENT | 04-23-02 |

BPT 1001 (Rev. 1/91)

BOARD OF PRISON TERMS                                         STATE OF CALIFORNIA
LIFE PRISONER:  PAROLE CONSIDERATION PROPOSED DECISION:
                                DENY PAROLE

[ ] PAROLE DENIED FOR:          1      ②      3      4      5      YEARS

Place the prisoner on the _____ 04/07 _____ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled.  The Board will send you a copy of the decision.  It will indicate the reasons you did not get paroled.  If this decision is not final, the Board will set up another hearing.  You can read the laws about your hearing.  You can find the laws at California Code of Regulations, Title 15, section 2041.

## RECOMMENDATIONS

**The Board Recommends:**
[ ⎵ ] No more 115's or 128A's            [ ] Learn a trade*
[ ] Work to reduce custody level          [ ] Get therapy*
[ ⎵ ] Get self-help*                      [ ⎵ ] Earn positive chronos
[ ⎵ ] Stay discipline free                [ ] Get a GED* _Therapy_

[ ] Recommend transfer to _____
[ ] Other _____

*  These programs are recommended if they are offered at your prison and you are eligible/able to participate.

## HEARING PANEL

Name _____    Date _____

Name _____    Date  04/26/05

~~Name~~                                   ~~Date~~

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| CULLER, JERRYAL, JEROME | H-31082 | CSP- CORCORAN | 04-26-05 |

BPT 1005(b)
(REV 04/04)

Distribution: White-C File
Canary-BPT
Pink-Prisoner

Director Of Corrections          Jerryal J. Culler,SR # H-3'082

c/o Jenny Woodford, Dir.         P.O.Box 689 # XW-110

P.O.Bow 942889                   Soledad, CA 93960

Sacramento, CA 94283


Deart Madam Woodford


Under the freedom of information act§1798.1, 1798.14-1798.23,

1798.32. Iam respectfully requesting the followimg information.

(10 A rule, statute or authority grantimg the Dept. Of Correction

&Reh. power to prôvide Life inmates with housing, cash assistent

and work supplies for re-entry transition.

(2) A rule, statute or authority that grants the B.P.T. power to

deny parole base on a Life inmate inability to aquire, maintaint

a support system and housing.

(3) " Investigàtive inquiry" Under what law or security issue

granted the B.P.T. and Corcoran State Prison authority to violate

my civil rights by denying me meaningful access to attorney to

discuss parole issuesand failing to allow personal time to prepar

for parole hearing 4-26-05. ( see, B.P.T. transcript)

                    Thank you


Date // - 3 - 0 5                    Respectfully Requested

                                     Jerryal Culler, Sr.

                                  ++  H31082   X W -110


                        B - 6      # Q

State of California
Department of Corrections and Rehabilitation

# Memorandum

Date:       February 6, 2006

To:         **Inmate CULLER, J., H-31082**
            XW-110
            CTF-Central Facility

Subject:    **INFORMATION REQUEST**

Inmate Culler, your letter dated November 3, 2005 to J. Woodford, then Director of Corrections, has been forwarded to my office for response. In this correspondence, under the freedom of information act, you are requesting information on the rule or statute granting the Department of Corrections and Rehabilitation the power to provide life term inmates with housing, cash assistance and work supplies for re-entry transition. You are also requesting to know the authority that grants the Board of Prison Terms (B.P.T.) the power to deny parole, due to a life prisoners inability to acquire and maintain a support system in the outside community. Finally, you are requesting an investigation of the B.P.T. and CSP-Corcoran for denying you access to your attorney prior to your scheduled board hearing.

Penal Code Section §5060 (Assistance to Persons discharged, paroled or released from employment) states in part, that the Director <u>may</u> provide assistance to persons discharged, paroled or otherwise released from confinement and <u>may</u> purchase tool or supplies as deemed proper. CCR # 3705 (Cash Assistance) states in part, that cash assistance <u>may</u> be loaned to qualified parolees. However, due to budgetary issues Unit Parole Offices are currently only provide assistance with housing for high profile cases (i.e.: sex offenders and inmates paroled at EOP level of care). Be advised, there is no statutory requirement for the department to provide housing, cash assistance above release fund amounts or work supplies. Neither is the department budgeted to provide the aforementioned assistance. Nonetheless, each parole office will provide each parolee upon request information regarding shelters and resource information for potential employment. To obtain said information, you are encouraged to correspond with your future regional parole office.

Secondly, you requested information on the authority that delegates the Board of Prison Terms the power to deny parole. Penal Code Section § 5075 (Board of Prison Term) grants the board the authority to conduct hearings for the purpose of considering the parole suitability of a life prisoner. The reasons for denying parole are strictly left up to the board.

Finally, you requested an investigative inquiry to determine the reasons your civil rights were denied and/or violated by the B. P. T. and CSP-Corcoran, by denying you

Mental Health Outpatient Program

Inmate Culler, H-31082
Information Request
Page #2

access to your attorney prior to your scheduled hearing.    As noted in the transcripts attached to this correspondence, when you were originally scheduled to meet with you attorney you were unavailable due to being in the hospital.  I have confirmed with the CSP-Corcoran Records Department that they have not changed their policy of allowing attorneys to meet with their inmate clients.  In fact, those meeting are and continue to be conducted face to face.

As stated above, the information you have requested is readily available in the inmate Law Library.    Should you have any additional questions, I recommend that you contact Mr. Schmidt, your attorney of record.

A. P. KANE
Warden (A)
Correctional Training Facility

CC:    Division of Adult Institution

B-8

BOARD OF PRISON TERMS                    Jerryal J. Culler, Sr. #H31082

1515 K. St. suite 6000                   P.O.Box 689 XW 110

Sacramento. CA95814                      Soledad, CA 93960


To Whom It May Concern

Dear Sir/ Madam


Under The Freedom Act sec. 1798.1,1798.14-1798.23,1798.32 I am
respectfully requesting the following information
(1)Name and title of representive sent to represent the Board
during Settlement in the Northern District CCourt regarding
Disability Discrimination Complaint. (see attachment) Court order
(2) A rule, statute or authority that mgives the Board rights to
deny parole based on an inmate's inability to have houssing or
support system.
(3) A rule statute or authority granting the B.P.T., Agent, or
Parole Officer under the care of C.D.C.R. to provide Life prisons
with housing, vcash assistent and work equipment for re-entntry
transition.
(4) A rule, statute or authority giving the B.P.T. rights to
violate p.c. 3041 (A), 3041.5[6]., 1168, rules governing
Aggravated Mayhem to surpass the maximum of 2 years denial by
1 year without granting ceedit for it.
(5) Under what law or security issue did the B.P.T. use to
deny meaning access to attorney to discuss parole isses by
failing to allow me time to prepare for for parole hearing
on 4-26-05 (see attachment) B.P.T. trunscript.
                    Thank you.

date 11-3-05                   B-9        Respectfully Requested
                               8          Jerryal Culler, Sr.
                               8          #H31082    XW-110

**BOARD OF PRISON TERMS**                    **STATE OF CALIFORNIA**
**Page 2: DECISION ON APPEAL**

## REASONS FOR DECISION

### Introduction

Title 15 of the California Code of Regulations (15 CCR), § 2280 et seq., sets forth parole suitability criteria and procedures for life prisoners. Prisoner rights are specified at 15 CCR §§ 2245 – 2256. Appeals from parole consideration hearings are governed by 15 CCR §§ 2050-2057.

### Decision on Appeal

1. The prisoner contends that his due process rights have been violated when the Board failed to establish criteria for Aggravated Mayhem..

**Appeal Denied:** In the prisoner's case, the criteria for determining his suitability for parole is found in Title 15 CCR § 2281.

2. The prisoner contends that the panel abused its discretion when it failed to provide a "fair assessment" of the 1998 and 2000 psychiatric reports.

**Appeal Denied:** The hearing panel, when it reviews a psychiatric or psychological report, uses the information in that report to determine its view of whether the report is totally supportive of release from a psychiatric standpoint and as part of an overall picture of whether the prisoner is ready to be given a release date. The hearing panel may find current statements in the report more important to their deliberations than the conclusions. The conclusions of the clinician though important are not binding on the panel since it has the power to grant parole not the clinician. The conclusions of the hearing panel regarding the psychiatric readiness of the prisoner could reasonably be drawn from the clinical evidence available to the hearing panel.

3. The prisoner contends that the panel failed to find evidence that he needs therapy.

**Appeal Granted:** A review of the psychological reports does not reveal any form of mental health disorder, neither are there any recommendations for mental health treatment or therapy. Therefore, all references in the decision that the prisoner needs therapy will be stricken from the record.

4. The prisoner contends that the panel violated the Americans with Disabilities Act (ADA) when it considered his past substance abuse and current medical condition.

**Appeal Denied:** The prisoner's history reveals that he has been addicted to alcohol and cocaine "for several years" until approximately 1989/90. The prisoner has not had a substance abuse problem for the past twelve years. The prisoner currently has a renal (kidney) disorder that, according to the prisoner, did not prevent him from fully participating in his hearing. (HT p. 4). The prisoner's appeal is without merit and is denied.

5. The prisoner contends that the decision was arbitrary and capricious.

**Appeal Denied:** The primary consideration of the panel in setting a parole release date is the consideration of public safety (see PC § 3041(b)). The elements upon which that consideration is based are vast. The discretion

**CULLER, Jerryal**          **H-31082**

13-10                    FEB 1 1 2003

**BOARD OF PRISON TERMS**                                         **STATE OF CALIFORNIA**
**Page 3: DECISION ON APPEAL**

to weigh these factors is vested in the Board and, therefore, in the hearing panel. Even an "amazing in-prison record" does not, in and of itself, demonstrate what the prisoner's behavior might be out of prison or mandate a finding of suitability.

PC § 304l(b) provides as follows: The panel or Board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Board regulations provide in part as follows (Title 15 CCR § 2281):

(a) Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before during, and after the crime; past and present attitude toward the crime; and conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability. (Emphasis added)

The Board's discretion in determining parole suitability has been described in the California Supreme Court case of *In re Powell* ((l988) 45 Cal.3d 894) as follows (page 902):

> The Board's discretion in parole matters has been described as 'great' (Falk, *The Supreme Court of California* 1971-l972 (1973) 61 Cal. L. Rev. 273, 427-428) and 'almost unlimited' (Note, *The California Adult Authority* (1972) 5 U.C. Davis L. Rev. 360, 368, 376-377). The Board's exercise of its broad discretion 'involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and the public.' (*Fain I, supra*, 65 Cal.App.3d at 389.)

In summary, the decisions of the Board on life parole consideration are essentially subject to the discretion of the Board and are only subject to being overturned if they are completely arbitrary and capricious and based on no credible evidence whatsoever. The prisoner by his appeal seeks to substitute his judgment for that of the Board. The law of this state puts the responsibility for that judgment in the hands of the Board that in turn entrusts it to the panel that hears his case.

The hearing panel considered the testimony of the prisoner and the statements of all other persons who appeared at the hearing along with all available written documentation before finding the prisoner unsuitable for parole. In the prisoner's case that panel clearly documented its reasons in determining that the prisoner would pose an unreasonable risk to the public if released. The decision was based on the commitment offense where the prisoner felt threatened by the victim so threw gasoline on him which ignited causing second and third degree

**CULLER, Jerryal**          **H-31082**

B-11

FEB 1 1 2003

**BOARD OF PRISON TERMS**                                      **STATE OF CALIFORNIA**
**Page 4: DECISION ON APPEAL**

burns.  Further his previous criminal history child molestation, auto thefts and burglary.  The Appeals Unit finds that there are clearly sufficient findings to support a finding of unsuitability under PC § 3041(b) and 15 CCR § 2281(c).  The prisoner has presented no information that would invalidate the reasons for denial and the finding of unsuitability.

<u>Exhaustion of Remedies</u>

Since all grounds for appeal must be included in the same appeal (l5 CCR § 2052(a)(2)), this decision is the final administrative decision on all issues from the decision in question.  No further appeals or requests for review based on the issues from this decision will be accepted.

**CULLER, Jerryal**          **H-31082**

1    CALIFORNIA BOARD OF PRISON TERMS.

2    D E C I S I O N

3    COMMISSIONER GUADERRAMA:  We're back on record.

4    PRESIDING COMMISSIONER GILLIS:  We're back on

5    record and all those who were previously identified

6    have returned.  The Panel has unanimously determined,

7    Mr. Culler, that you're not suitable for parole and

8    that you would pose an unreasonable risk of danger and

9    a threat to public safety if released.  We based our

10   finding on the following:  The commitment offense was

11   cruel and callous.  It was dispassionate.  The victim

12   was mutilated during the offense.  These conclusions

13   are drawn from the Statement of Facts wherein the

14   prisoner, after an argument with the victim, tossed

15   gasoline on the victim and that gasoline was ignited,

16   causing severe burns to the victim.  Under Previous

17   Record, the prisoner had an escalating pattern of

18   criminal conduct evidenced by aggressive behavior, and

19   that was both in prior relationships with his wife.

20   Also, the prisoner has evidence of an unstable social

21   history in that he used drugs and alcohol and dropping

22   out of school at an early age.  He also had been

23   convicted of prior crimes.  Under Institutional

24   Behavior, the prisoner has not participated in

25   sufficient beneficial self-help and therapy

26   programming.  The Psychiatric Factors:  The report

27   JERRYAL CULLER    H-32082

THE WITHIN INSTRUMENT IS A CORRECT
COPY OF THE ORIGINAL ON FILE IN THIS OFFICE
ATTEST:

CALIFORNIA DEPARTMENT OF CORRECTIONS

BY _____
CASE RECORDS OFFICE

13-13

53

1    dated March of '98 by Dr. Les Carr is not totally
2    supportive of release.  Under Remarks, the Panel finds
3    that the prisoner is in need of therapy in order to
4    come to grips with his actions in the commitment
5    offense, and until progress is made, he continues to
6    be unpredictable and a threat to others.  Also, in
7    view of the prisoner's aggressive history and his
8    assaultive history and negative behavior since coming
9    into the institution, there is no indication that the
10   prisoner would behave differently if paroled.  We do
11   commend him for being a good worker; however, this
12   will not outweigh the factors of unsuitability.  In a
13   separate finding, we find that it is not reasonable to
14   expect that parole would be granted within the next
15   two years.  This is a non -- The victim did not die,
16   and this is the maximum amount that we can deny you.
17   The reason for that denial is that the commitment
18   offense was just cruel and callous.  It showed total
19   disregard for the suffering of another.  Secondly, the
20   prisoner has a history of aggressive and assaultive
21   behavior; also, an escalating pattern of criminal
22   conduct which included thefts and other assaultive
23   behavior.  And since coming into the institution the
24   prisoner has demonstrated that he's not able to abide
25   by the rules.  He has not abided by the rules in the
26   institution, and that has THE WITHIN INSTRUMENT IS A CORRECT and
     COPY OF THE ORIGINAL ON FILE IN THIS OFFICE
27   JERRYAL CULLER         ATTES DECISION PAGE 2      6/16/98

CALIFORNIA DEPARTMENT OF CORRECTIONS

BY _____  DD

CASE RECORDS OFFICE

54

1    approximately 14 128(a)'s. Also, the prisoner has not

2    participated in self-help and therapy programming;

3    specifically substance abuse, since he has a long

4    history of substance abuse. Recommendations to the

5    prisoner for the next hearing is that you become

6    disciplinary free, that you upgrade educationally, and

7    that you participate in self-help and therapy

8    programming and take advantage of any self-help and

9    therapy programming that may become available to you.

10   That concludes the formal reading. I'll give you a

11   copy of the decision and we'll see you in three years.

12       **INMATE CULLER:** (Inaudible) my self-help

13   program that I been in?

14       **PRESIDING COMMISSIONER GILLIS:** You need

15   substance abuse --

16       **INMATE CULLER:** I'm in AA.

17       **PRESIDING COMMISSIONER GILLIS:** Okay, that's a

18   self-help program, but you want to (inaudible).

19       **INMATE CULLER:** Substance abuse? Oh, okay,

20   (inaudible).

21       **PRESIDING COMMISSIONER GILLIS:** Yes, and

22   anything --

23       **INMATE CULLER:** I am in AA.

24       **PRESIDING, COMMISSIONER GILLIS:** But you just

25   got started.

26       **INMATE CULLER:** Yes

27   **JERRYAL CULLER**

THE WITHIN INSTRUMENT IS A CORRECT
COPY OF THE ORIGINAL ON FILE IN THIS OFFICE
ATTEDECISION PAGE 3    6/16/98

CALIFORNIA DEPARTMENT OF CORRECTIONS

BY _____    >D

CASE RECORDS OFFICE

13-15

55

1          PRESIDING COMMISSIONER GILLIS:  Okay.  Thank

2     you.  Let's go off record.

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17                              THE WITHIN INSTRUMENT IS A CORRECT
                                COPY OF THE ORIGINAL ON FILE IN THIS OFFICE
18                              ATTEST:

19                              CALIFORNIA DEPARTMENT OF CORRECTIONS

20                              BY _____
21                                    CASE RECORDS OFFICE

22

23

24

25     PAROLE DENIED TWO YEARS
                                        JUL 3 0 1998
26     EFFECTIVE DATE OF THIS DECISION _____

27     JERRYAL CULLER   H-31082   DECISION PAGE 4   6/16/98

# EXHIBIT C

# INMATE/PAROLEE APPEALS SCREENING FORM

NAME: _Culler_    NUMBER _H 31082_    SQP LOG No:_____

(OTHER LOG NO)_____    ISSUE:_____    AREA OF ORIGIN:_____

HOUSING UNIT _2 Ey 48_    NOTE _____

## YOUR APPEAL IS BEING RETURNED TO YOU FOR THE FOLLOWING REASON(S):

____ 1. The action or decision being appealed is not within the jurisdiction of the Department.
_____ a. BPT Issue, file BPT 1040 form & submit to C&PR    ____ b. Other, see comments

____ 2. You have submitted a duplicate appeal on the same issue. Check one:
_____ Your first appeal was screened out on _____ for _____
_____ Your appeal is currently under review at the _____ level.
_____ Your first appeal has been completed at the _____ level.

____ 3. You are appealing an action not yet taken.

____ 4. You may not submit an appeal on behalf of another inmate.

____ 5. You have not adequately completed the Inmate/Parolee Form (CDC 602) or attached the proper documents.
_____ CDC-115 Hearing Officer's or Disciplinary Committee Results    ____ Supplemental Reports to CDC-115.
_____ CDC-115A with I.E./D.A. info.    ____ CDC-128B1 Hearing Notif.    ____ CDC-839/840 Class/Reclass Score Sheet
_____ CDC-128G ICC/UCC Clas.Com.    ____ CDC-128G Init. Clas. Com.    ____ CDC-128G CSR Endorsement Chrono
_____ Lab Results Sheet    ____ CDC-114D Lock Up Order    ____ CDC-1030 Confidential Disclosure
_____ CDC-7219 Medical Report    ____ Legal Status Summary    ____ CDC-128C Medical Chrono
_____ Board of Control Claim Form (attached)    ____ Property Inventory Slip
_____ Receipts:    Qtr.Pkg. Inventory Slip    ____ CDC-143 Property Transfer Slip    ____ Cell Search Slip
_____ You have failed to complete Section_____    ____ Sign & Date Section_____
_____ Other:_____

____ 6. There has been too great a time lapse between when the action or decision occurred and when you filed your appeal.

____ 7. This issue has been appealed under the assigned SQP Appeal Log No._____    Per DOM section 54100.10.1,
a copy of the reviewer's response;    ____ Is attached    ____ Will be forwarded to you upon completion

____ 8. Abuse of the Appeal Procedure. See Comments.

Comments: _Even if it is true that you requested additional_
_documents from counselor on Jan 6th, you have exceeded_
_all time constraints for filing 602 per CCR 3084.4 (a),_
_Besides, its obvious from attach'mets you ~~have~~ the documents_
_had_

R. CHANDLER-DACANAY    W. Jepperson 20-04 time constraints exceeded
CC-II, Appeals Coordinator    **W. JEPPESON**    3084.
    CC-II, Appeals Coordinator    Date _2-11-4_    3(6)

This screening action may not be appealed unless you allege that the above reason is inaccurate. In such case, please return this form to the Appeals Coordinator with the necessary information.

## PERMANENT APPEAL ATTACHMENT-DO NOT REMOVE.

C-1

CDC-695 (REVISED 9/03)

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE**
**APPEAL FORM**
CDC 602 (12/87)

| | Location: Institution/Parole Region | Log No. | Category |
|---|---|---|---|
| | 1. _____ | 1. _____ | _____ |
| | 2. _____ | 2. _____ | _____ |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Jerryal J. Culler, Sr. | H31082 | N/A | |

**A. Describe Problem:** On or About Jan 6-2004 I submitted a 602 to East block Counselor who is Assigned to me, (I did not know is assigned to me) for the necessary documents your office stated I need to continue my 602 Against the bogus charge of Battery of an inmate with weapon., I have not received an response from anyone nor have they given the D.A.'s information. This violates my due process As well As equal protection under the Law. Also Title 15 sec. 3084.1 thru 3085.

If you need more space, attach one additional sheet.

**B. Action Requested:** That all necessary documents be given to said writer in compliance with 5th, 6th and 14 Amendments and Penal Code sec. 5058, 5054 D.O.M 54100.12, 54100.17, 54100.22, 54100.22, 77010.24 54100.08 and 54100.2

Inmate/Parolee Signature: _Jerryal Culler, Sr._     Date Submitted: 2-10-04

**C. INFORMAL LEVEL** (Date Received: _____)                FEB 11 REC'D

**Staff Response:**

_____

_____

_____

Staff Signature: _____     Date Returned to Inmate: _____

**D. FORMAL LEVEL**
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Dissatisfied with Madam K. Dacanay's response. this time restrain was not violated by me from Oct, 6, 2003. I have asked class worker Woodford for the D.A. Report, he repeatly stated he hadn't get it. yet now your office is penalizing me for C. D. C's error. _Jerryal Culler, Sr._       SEE ATTACHMENT      Date Submitted: 2-13-04

Signature: _Jerryal Culler, Sr._

Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim                    CDC Appeal Number:

_[handwritten notes at bottom]_ 2-20-04  3084.3(b)

C-2

# INMATE/PAROLEE APPEALS SCREENING FORM

NAME: Culler    NUMBER K31082    SQP LOG No: _____

(OTHER LOG NO)_____   ISSUE: _____   AREA OF ORIGIN:_____

HOUSING UNIT 2EVA   correction 2-EV-50 NOTE _____

## YOUR APPEAL IS BEING RETURNED TO YOU FOR THE FOLLOWING REASON(S):

_____1. The action or decision being appealed is not within the jurisdiction of the Department.
     _____a. BPT Issue, file BPT 1040 form & submit to C&PR       _____b. Other, see comments

_____2. You have submitted a duplicate appeal on the same issue. Check one:
     _____ Your first appeal was screened out on _____ for _____
     _____ Your appeal is currently under review at the _____ level.
     _____ Your first appeal has been completed at the _____ level.

_____3. You are appealing an action not yet taken.

_____4. You may not submit an appeal on behalf of another inmate.

XXXX 5. You have not adequately completed the Inmate/Parolee Form (CDC 602) or attached the proper documents.
     ✓ CDC-115 Hearing Officer's or Disciplinary Committee Results    ✓ Supplemental Reports to CDC-115.
     ✓ CDC-115A with I.E./D.A. info.    _____ CDC-128B1 Hearing Notif.    _____ CDC-839/840 Class/Reclass Score Sheet
     _____ CDC-128G ICC/UCC Clas.Com.    _____ CDC-128G Init. Clas. Com.    _____ CDC-128G CSR Endorsement Chrono
     _____ Lab Results Sheet    _____ CDC-114D Lock Up Order    _____ CDC-1030 Confidential Disclosure
     _____ CDC-7219 Medical Report    _____ Legal Status Summary    _____ CDC-128C Medical Chrono
     _____ Board of Control Claim Form (attached)    _____ Property Inventory Slip
     _____ Receipts: _____ Qtr.Pkg. Inventory Slip    _____ CDC-143 Property Transfer Slip    _____ Cell Search Slip
     _____ You have failed to complete Section_____    _____ Sign & Date Section_____
     _____ Other:_____

_____6. There has been too great a time lapse between when the action or decision occurred and when you filed your appeal.

_____7. This issue has been appealed under the assigned SQP Appeal Log No._____. Per DOM section 54100.10.1,
     a copy of the reviewer's response: _____ Is attached    _____ Will be forwarded to you upon completion

_____8. Abuse of the Appeal Procedure. See Comments.

Comments: Attach a copy of the completed CDC-128-A/CDC-115 showing the final disposition.

**If you need help, see your counselor.**

R. CHANDLER-DACANAY      W. JEPPESON
CC-II, Appeals Coordinator      CC-II, Appeals Coordinator      Date 11-4-3

This screening action may not be appealed unless you allege that the above reason is inaccurate. In such case, please return this form to the Appeals Coordinator with the necessary information.

## PERMANENT APPEAL ATTACHMENT-DO NOT REMOVE.

C-3

CDC-695 (REVISED 9/03)

## INMATE/PAROLEE APPEALS SCREENING FORM

NAME: Culler    NUMBER H 3/082     SQP LOG No:_____

(OTHER LOG NO)_____    ISSUE:_____    AREA OF ORIGIN:_____

HOUSING UNIT 2 C S0       NOTE_____

## YOUR APPEAL IS BEING RETURNED TO YOU FOR THE FOLLOWING REASON(S):

____1. The action or decision being appealed is not within the jurisdiction of the Department.
____a. **BPT Issue**, file BPT 1040 form & submit to **C&PR**     ____b. Other, see comments

____2. You have submitted a duplicate appeal on the same issue. / Check one:
____Your first appeal was screened out on _____ for _____
____Your appeal is currently under review at the _____ level.
____Your first appeal has been completed at the _____ level.

____3. You are appealing an action not yet taken.

____4. You may not submit an appeal on behalf of another inmate.

**XXXX** 5. You have not adequately completed the Inmate/Parolee Form (CDC 602) or attached the proper documents.
____CDC-115 Hearing Officer's or Disciplinary Committee Results. ____Supplemental Reports to CDC-115.
____CDC-115A with I.E./D.A. info. ____CDC-128B1 Hearing Notif. ____CDC-839/840 Class/Reclass Score Sheet
____CDC-128G ICC/UCC Clas. Com. ____CDC-128G Init. Clas. Com. ____CDC-128G CSR Endorsement Chrono
____Lab Results Sheet ____CDC-114D Lock Up Order ____CDC-1030 Confidential Disclosure
____CDC-7219 Medical Report ____Legal Status Summary ____CDC-128C Medical Chrono
____Board of Control Claim Form (attached) ____Property Inventory Slip
____Receipts:____Qtr. Pkg. Inventory Slip ____CDC-143 Property Transfer Slip ____Cell Search Slip
____You have failed to complete Section_____ ____Sign & Date Section
____Other:_____

____6. There has been too great a time lapse between when the action or decision occurred and when you filed your appeal.

____7. This issue has been appealed under the assigned SQP Appeal Log No._____. Per DOM section 54100.10.1,
a copy of the reviewer's response: ____Is attached ____Will be forwarded to you upon completion

____8. Abuse of the Appeal Procedure. See Comments.

Comments: Attach a copy of the completed CDC-128-A/CDC-115 showing the final disposition.

**If you need help, see your counselor.**

R. CHANDLER-DACANAY    A. A. READ
CC-II, Appeals Coordinator    CC-II, Appeals Coordinator      Date 10.27.3

This screening action may not be appealed unless you allege that the above reason is inaccurate. In such case, please return this form to the Appeals Coordinator with the necessary information.

## PERMANENT APPEAL ATTACHEMENT-DO NOT REMOVE.

C-4

Attn: Warden, Jenny Woodford, Oppizen Complaint
STATE OF CALIFORNIA  Penal Code 832.5 and 840.0, 851.8.    DEPARTMENT OF CORRECTIONS

## INMATE/PAROLEE
## APPEAL FORM
CDC 602 (12/87)

| Location: Institution/Parole Region | Log No. | Category |
|---|---|---|
| 1. _____ | 1. _____ | _____ |
| 2. _____ | 2. _____ | _____ |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Serrual J. Cullicec SR | H31082 | Medically Disable | 2-C-50 |

A. Describe Problem: On or about Sept. 31, 2003 I want to set. Drewnis to inform him that MG and inmate Thomas weres having problem and could not cell togethec. Could he move him. He stats He would talke care of it. That same euening I asked the third watch t. Perez to move inmate Thomas because he make an aggressive stance to me and we almost came to blows. I also asked frees Lt Kelly who stated find you a cell. And I will If you need more space, attach one additional sheet. (sers attachment)

B. Action Requested: That I am exonarated of said Charges and no further harresssment, or reprisals be done against said writer by staff, your agents or inmates informers preval law per 851.8 D.O.M., sec. 510803. Title 15 sec. 3871, 3287, 3391

Inmate/Parolee Signature: _Serrual Cullicec Jr._    Date Submitted: 10-21-03.

NOV 04 RECD    OCT 27 RECD

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim    CDC Appeal Number: _____

C-5

move him in. I tried to explain to Lt. Kelly the inmate that was schedule to move in was move to H-unit and if inmate Thomas stayed in my cell any longer it is a possibility we are going to come to blows. He stated, you are an O.G. and a lifer you should be able to deal with a youngest. And you can last until I get him out because I have no place to put him. I said he is a youth authority reject and he has no understanding "please get him out". He stated, I will see if I can do a switch.

Each watch I would asked both Sgt. Dennis, Lt. Kelly, and Lt. Perez for the next 7 days to move inmate Thomas because he appeared to be building his courages. On Friday Oct. 3, 2003, I went to North block capt. Williams and explained my situation to him about inmate Thomas. He stated he would take care of it, in the mean time Lt. Kelly step into the capt. Office, capt William instructed to move inmate Thomas

On Sunday Oct 5, 2003 things appeared to be friendly between inmate Thomas and myself, we watch T.V. and had some laughts.

However on Monday Oct. 6, 2003 I reinterated to both Sgt. Dennis and Lt. Kelly during the morning meal at North block back door regarding having inmate Thomas moved. After the morning meal I did my routine morning walk on the upper yard (Dr. order physio- therapy). I step just inside the back door (our cell was directly in front of the door) inmate Thomas was standing outside the cell, I asked him to pass me down my water container. He and a friend was talking he looked at me real strange, then said come get it yourself, I immediately walked up to the cell, step in without saying anything to inmate Thomas begun to turn off my t.v. and radio. As I was turning off the t.v. inmate Thomas step in the cell, I then heard him say to the friend watch the door. Before I could respond he hit me near the lower part of my head, my first reaction was to grab him by both arms. I asked him what was his fucking problem. He said bitch get your shit and get up out here. We wrestled our way to the back of the cell, where I gain advantage by stepping up on the toilet placing my foot on the wall, I then said to him welcome to a man's world, (pushing off as I said it) At this time we both had each other by the neck, inmate Thomas hit his head on the

C-6

opposite wall, then after I was losing this threat, I calm so I regained
its composure he yell to his look out for help saying I was choking
him. The look open the cell door and said let him go O. G. it's over.
I release him, he walked toward the door, as I started to pick
up scattered papers, he turn and tried to kick me in the face,
I blocked it and we begun to wrestle again. Again because
of the smallness of the cell we each grabbed eachother neck.
My back against the wall his against the bunk, which again
gave me the advantage, I straddle him and step up on the
bottom bunk, pushing his neck back. At this time inmate
Janduburg open the cell door and said a C/o is on the tier.
the closed the door. At the same time inmate Thomas called out
to his look out for help again, who step in saying cool it
O. G. a C/o is coming. I said to inmate Thomas are you going
to stop "he said yeah, just let me go," I let him go and they both
walked out and down the back tier. I guess they left the cell
door open because as I was clearing up the mess, the cell door
open wider, C/o Grace said what's being going on in here, before
I could respond, he said what is that blood on your shirt. I said
my celli fired on me when I came in the cell and we got into it,
he said who is your celli, he paused for a moment, he called
down to Sgt Dennis to stop them inmates (inmate Thomas and look out)
I immediately said to C/o Grace the other wasn't in it, it was just
me and my celli, C/o Grace then escorded me to Lt. Kelly office
where he did a body search, then step out the office, a few
minutes later he return, stated I am going to have to lock
you up." I said he fired on me first why am I being lock up,"
he responded this is procedure you will be out in a couple
of days.

I would later find out that I was being charged with battery
on a inmate with a weapon (which is not supported by the evidence)
that C/o Grace what he had witness (He also came to my cell in lock
up stating he was going to recommend that the charge be dropped)
and so had Sgt Dennis. I immediately wrote to Capt. Williams
explaining what had happen and advising him of what

2  C-7

We had talked about in his office Friday 3, 2003. I also wrote
Sgt. McCravey of Investigation (where I was assigned as a porter)
asking to take a polygraph examination in accordance with CO RS 3293
to exonarate myself from said charge.

It is said writes opinion this trump up charge is retaliatory
confinement for a civil complaint I filed against North block's
Capt. Nunez and Lt. Crayton for disability discrimination,
retaliation and deliberate Indifference.

I declare under penality of prejury of the State of California
that the foregoing statment is true and correct.

Origially Dated
   10-23-03 / Redated
                  12-27-04

                                    Dwight Creelsjohn
                                    H31082        2-C-50

                          C-8

                                    Resubmitted  3A08/281
                                    Corcoran, s:P.

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS
CDC 1030 (12/86)

## CONFIDENTIAL INFORMATION DISCLOSURE FORM

INMATE NUMBER: _H-31082_                    INMATE NAME: _Culler_

1) Use of Confidential Information.

   Information received from a confidential source(s) has been considered in the:

   a) CDC-115, Disciplinary Report dated ____ _10-6-03_ ____ submitted by

   _C. Grace        Correctional      Officer_ .
   STAFF NAME, TITLE

   b) CDC-114-D, Order and Hearing for Placement in Segregated Housing dated __ _10-6-03_ __ .

2) Reliability of Source.

   The identity of the source(s) cannot be disclosed without endangering the source(s) or the security of the institution.

   This information is considered reliable because:

   a) ☐  This source has previously provided confidential information which has proven to be true.

   b) ☐  This source participated in and successfully completed a Polygraph examination.

   c) ☐  More than one source independently provided the same information.

   d) ☐  This source incriminated himself/herself in a criminal activity at the time of providing the information.

   e) ☒  Part of the information provided by the source(s) has already proven to be true.

   f) ☐  Other (EXPLAIN) _____

   _____

3) Disclosure of information received.

   The information received indicated the following: _On   10-6-03   you   were_
   _involved   in   a   Physical   Altercation   with_
   _Inn. Thomas  T-64219  inside  of  cell  2N36._
   _During  the  Altercation  you wrapped  a  T.V. Cable_
   _around  Thomas  neck  and  were  using  it  to_
   _strangle  him._
   (If additional space needed, attach another sheet.)

4) Type and current location of documentation, (for example: CDC-128-B of 5-15-86 in the confidential material
   folder). _Confidential    report    Dated    10-6-03_
   _in   Confidential  section  of  C-file_
   _____

   _____          _10-7-03_
   STAFF SIGNATURE, TITLE                    DATE DISCLOSED

DISTRIBUTION: WHITE — Central File; GREEN — Inmate; YELLOW — Institution Use

OSP 98 14546

C-9

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS

# CRIME/INCIDENT REPORT
# PART A - COVER SHEET

*AMENDED*

PAGE: 1 OF 3

CDC 837-A (11/91)

| INCIDENT LOG NUMBER |
|---|
| SQP-003-03-10-0338 |

| INSTITUTION/FACILITY | INCIDENT SITE/LOCATION | DATE OF INCIDENT | TIME INCIDENT |
|---|---|---|---|
| CSP-San Quentin | NORTH BLOCK  Cell 2N36 | 10-06-03 | 0730 HRS. |

| SPECIFIC CRIME/INCIDENT | D.A. REFERRAL | SECTION/CODE/RULE NUMBER |
|---|---|---|
| BATTERY ON AN INMATE WITH WEAPON | ☒ YES  ☐ NO | 3005 (c); Force and Violence |

| SERT ACTIVATED? (ENTER Y OR N) | NEGOTIATION TEAM ACTIVATED? (ENTER Y OR N) | MUTUAL AID REQUESTED? (ENTER Y OR N) | MEDIA NOTIFIED? (ENTER Y OR N) |
|---|---|---|---|
| N | N | N | N |

## RELATED INFORMATION (CHECK ALL THAT APPLY)

| DEATHS | CAUSE OF DEATH | ASSAULT/BATTERY | TYPE OF ASSAULT/BATTERY | |
|---|---|---|---|---|
| ☐ STAFF | ☐ HOMICIDE | ☐ ON STAFF | ☐ BEATING | ☐ STRANGLING |
| ☐ VISITOR | ☐ SUICIDE | ☐ ON VISITOR | ☐ SHOOTING | ☐ SLASHING |
| ☐ INMATE | ☐ ACCIDENTAL | ☐ ON INMATE | ☐ STABBING | ☐ SEXUAL |
| N/A | ☐ NATURAL  N/A | ☐ OTHER | ☐ SPEARING | ☒ OTHER: |
| | | | ☐ POISONING | |

| SERIOUS INJURY | INMATE WEAPONS | | SHOTS FIRED | TYPE WEAPON (STAFF |
|---|---|---|---|---|
| ☐ STAFF | ☐ FIREARM | ☐ STABBING INSTRUMENT | ☐ YES ☒ NO | ☐ 38 CAL |
| ☐ VISITOR | ☐ KNIFE | ☐ HANDS/FEET | NUMBER FIRED | ☐ MINI 14 |
| ☐ INMATE | ☐ SPEAR | ☐ CLUB/BLUDGEON | | ☐ H&K 94 |
| | ☐ EXPLOSIVE | ☐ OTHER: | | ☐ SHOTGUN |
| | ☐ PROJECTILE | | ESCAPES | |
| ☐ ACCIDENTAL | ☐ SLASHING INSTRUMENT | | ☐ WITH FORCE | ☐ 37 MM |
| ☐ ATTEMPTED SUICIDE | | | ☐ WITHOUT FORCE | ☐ TASER |
| | ☐ COMMERCIAL ☐ INMATE MANUFACTURED | | ☐ ATTEMPTED | ☐ PR 24  N/A |
| ☐ OTHER  N/A | | | | ☐ OTHER |

| SUSPECTED CONTROLLED SUBSTANCE | LOCKDOWNS | EXCEPTIONAL ACTIVITY | |
|---|---|---|---|
| ☐ HEROIN/OPIATES | | ☐ MAJOR DISTURBANCE | ☐ EMPLOYEE JOB ACTION |
| ☐ COCAINE | ☐ YES ☒ NO | ☐ INMATE STRIKE | ☐ MAJOR POWER OUTAGE |
| ☐ MARIJUANA | | ☐ PUBLIC DEMONSTRATION | ☐ EXPLOSION |
| ☐ AMPHETAMINE | IF YES, LIST AFFECTED | ☐ INMATE DEMONSTRATION | ☐ FIRE |
| ☐ BARBITURATE | PROGRAMS BELOW: | ☐ NATURAL DISASTER | ☐ HOSTAGE |
| ☐ LSD  N/A | | ☐ ENVIRONMENTAL HAZARD | ☐ GANG INVOLVED |
| ☐ PCP | | ☐ "SPECIAL INTEREST INMATE" | ☐ OTHER |
| ☐ METHAMPHETAMINE | | ☐ WEATHER | |
| ☐ OTHER | | | N/A |

NARRATIVE:

On Monday, October 6, 2003, Correctional Officer C. Grace, observed inmate Culler, H-31082, 2-N-36L, step out of his assigned cell with signs of being exhausted and in a state of confusion. As Officer Grace approached inmate Culler, he noticed what appeared to be spots of blood on inmate Culler's state issued shirt. Due to inmate Culler's unsual behavior, Offcier Grace asked inmate Culler what had happened to him? Inmate Culler stated, "Me and my cellie just got into it." As Officer Grace was about to acttvate his personal alarm device, he realized that inmate Thomas, T-64219, 2-N-36U, had just passed him. Officer Grace observed inmate Thomas attempting to exit the unit. Officer Grace imediately yelled to Correctional Sergeant K. Dennis, who was monitoring the unit lock-up at the back door to detain inmate Thomas. Officer Grace proceeded to escort inmate Culler the Sergeant's Office, where he performed an unclothed body search of inmate Culler. Officer Grace observed several scratches and abrasion to the right sided of Culler's face. Officer Grace proceeded to escort inmate Culler to the Urgent Care Clinic, where he was examined, treated, and he was medically cleared for Administrative Segregation placement for having injuries that are consistent with being involved in a physical altercation. Sgt. Dennis instructed Correctional Officer D. A. Moore to place inmate Thomas in handcuffs, and escort him to the North Block committee room, where he performed an unclothed body search of inmate Thomas. Officer Moore noticed several places around Thomas' neck where there appeared to be scratches and abasions. Confidential information was received that identified inmate Culler as using a TV cable to choke inmate Thomas. Officer Moore notified Sgt. Dennis of this information and Officer Moore was instructed to escort inmate Thomas to the Urgent Care Clinic, where inmate Thomas' injuries were examined, treated, and he was medically cleared for Adminstrative Segregation. Officer D. Sung, Institution Services Unit, searched Cell 2N36. During this search

☒ CHECK HERE IF DESCRIPTION IS CONTINUED ON PART C

| NAME/TITLE/SIGNATURE OF REPORTING STAFF | BADGE/I.D.# | SERVICES (INSTITUTION USE) | DATE |
|---|---|---|---|
| J. W. Reid, Correctional Lieutenant | 5146 | YEARS: 27 MONTHS: 07 | 10-06-03 |

| AUTHORIZED SIGNATURE/TITLE (INSTITUTION USE) | DATE |
|---|---|
| K. J. Williams, Associate Warden Unit III (a) | 10-7-03 |

C-10

**CRIME/INCIDENT REPORT**
**PART C-SUPPLEMENT**

| | | PAGE: 2 | OF 3 |

CDC 837-C(11/91)

| | INCIDENT LOG NUMBER |
| | SQP-003-03-10-0338 |

| INSTITUTION/FACILITY | | DATE INCIDENT | TIME INCIDENT |
| CSP-San Quentin | BATTERY ON AN INMATE, WITH WEAPON | 10-06-03 | 0730 HRS. |

TYPE OF INFORMATION

☒ CONTINUING DESCRIPTION OF INCIDENT (PART A)  ☐ SUPPLEMENTAL INFORMATION  ☐ CLOSURE REPORT

NARRATIVE

Officer Sung discovered a 60 ½ inch piece of coax TV cable on the upper bunk. The coax cable was photographed and processed as evidence. Both inmates were ordered re-housed in Administrative Segregation per orders of Lieutenant Reid.

The following administrative staff was notified of this incident: Lt. S. Szmaciarz, Watch Commander; K. J. Williams, Associate Warden Unit III: T. Goughnour, Chief Deputy Warden.

SUSPECT(S)

Inmate Culler, H-31082
Inmate Thomas, T-64219

STAFF INJURIES:

None

USE OF FORCE

None

ESCORT(S)

C. Grace, Correctional Officer, escorted inmate Culler.
D. A. Moore, Correctional Officer, escorted inmate Thomas

CRIME SCENE/EVIDENCE:

Photos of the TV cable, inmate Thomas' injuries were taken, and a blood stained shirt was collected. All items were processed into evidence in accordance with established institutional procedures.

MEDICAL/MENTAL HEALTH EVALUATION:

CDC-7219: Medical Report of injury authored by Karen Harrell, Registered Nurse

Inmate Culler, H-31082, sustained superficial abrasion/scratches to the right side of his face.
Inmate Thomas, T-64219, Sustained superficial abrasions/scratches to the right side of neck, left side of neck, collar bone, left shoulder blade, and small of back.

THIS INCIDENT WILL BE REFERRED TO THE MARIN COUNTY DISTRICT ATTORNEY'S OFFICE FOR FELONY PROSECUTION.

| NAME/TITLE/SIGNATURE OF REPORTING STAFF | BADGE/I.D # | SERVICES (INSTITUTION USE) | DATE |
| J. W. Reid, Correctional Lieutenant | 5146 | YEARS: 26 MONTHS: 07 | 10-06-03 |
| AUTHORIZED SIGNATURE/TITLE (INSTITUTION USE) | | | DATE |
| K. J. Williams, Associate Warden Unit III (a) | | | 10·7·03 |

C-11

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS

**CRIME / INCIDENT REPORT**
**PART C-1 - SUPPLEMENT**

CDC 837 C-1 (1/99)

PAGE 1 OF 2

| NAME (LAST, FIRST, MI) | | BADGE NUMBER | INCIDENT DATE | INCIDENT LOG NUMBER |
|---|---|---|---|---|
| Grace C. | | 46259 | 10-6-03 | SQP-003-03/0-0338 |

| LENGTH OF SERVICE | POST DESCRIPTION | INCIDENT TIME | REPORT DATE |
|---|---|---|---|
| 16.3 | North Block | 07:30 | 10-6-03 |

| RDOs | DUTY HOURS | INCIDENT LOCATION |
|---|---|---|
| Sat-Sun | 0600-1400 | North Block |

| DESCRIPTION OF INCIDENT / CRIME | CCR SECTION / RULE |
|---|---|
| Mutaul Combat with Weapon | 3005 C |

YOUR ROLE — WITNESSES (PREFACE S-STAFF, V-VISITOR, O-OTHER) — INMATES INVOLVED (PREFACES-SUSPECT, V-VICTIM, W-WITNESS)

- [X] PRIMARY — C Grace (P) STEER — Culler #31087
- [X] RESPONDER — K. Dennis (S) — Thomas T-64219
- [ ] WITNESS — D. Morre (S)
- [ ] VICTIM
- [ ] CAMERA

FORCE USED BY YOU: [X] NONE ... OTHER N/A

LETHAL WEAPONS: MINI-14, SHOTGUN, HANDGUN, OTHER N/A

NUMBER OF ROUNDS FIRED: N/A

LESS THAN LETHAL WEAPONS: 37MM, BATON, OC, OTHER N/A

FORCE OBSERVED BY YOU: NONE N/A

EVIDENCE COLLECTED: [X] YES — EVIDENCE DESCRIPTION: State issued Blue Shirt

DISPOSITION: — WEAPON: NO — BIO HAZARD: NO

REPORTING STAFF INJURED: [X] NO — DESCRIPTION OF INJURY: N/A — LOCATION TREATED: DIC — BODILY FLUID EXPOSURE: [X] YES, NO Blood — SCIF3301 / 3067 COMPLETED: NO

**NARRATIVE:**
On October 6, 2003. at Approximately 07:30 while assigned to position 490 3RD tier officer, while securing the 2ND tier after the unit in and out movement. I observed and inmate identifies as Culler #31087 housed in 2N36L step out of his assign cell with sign of Exhaustion and Confusion. As I Approach Culler from About 20 to 25 FEET away from him on the 2ND tier. I observed what Appeared to be spots of blood on Culler State issued Shirt. Which indicated sign of unusual behavior, I asked Culler what had happen to him, Culler Stated, "ME AN my cellie just got into it." As I was About to Activate my personal alarm, and I Realized that Culler Cellmate Thomas T-64219 had just Past me.

| NAME / TITLE / SIGNATURE OF REPORTING STAFF | BADGE / I.D. # | DATE |
|---|---|---|
| C. Grace Correctional officer | 46259 | 10-6-03 |
| REVIEWER SIGNATURE | APPROVED C-12 [X] | CLARIFICATION NEEDED [ ] | DATE 10-6-03 |

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS

**CRIME / INCIDENT REPORT**
**PART C-2-SUPPLEMENT**

PAGE _2_ OF _2_

CDC 837 C-2 REV.(1/99)

INCIDENT LOG NUMBER
SQP-003-03-10-0338

| NAME (LAST, FIRST, MI) | BADGE NUMBER | INCIDENT DATE | INCIDENT TIME |
|---|---|---|---|
| GRACE C. | 46259 | 0730 HRS. ±10-6-03 | |

TYPE OF INFORMATION
[X] CONTINUATION OF REPORT    [ ] ADDITIONAL INFORMATION    [ ] CLARIFICATION REQUEST

NARRATIVE:

I observed Inmate Thomas T-64219 attempting to exit the unit. I signaled Sergeant K. Dennis when was monitoring the unit lockup at the unit back door area to detain Thomas, I then proceed to Escort Culler to the Sergeants office were a unclothed body search, was conducted which reveled scratches an scrapes that are consisted with being involved in a physical alteration. I escorted culler to the medical Department for Clearance for Rehousehny. Addition Information was received that Inmate Culler had used a weapon during the physical Altercation. Culler was medically cleared with Scartchies A² Abrasia, to his Left Cheak area. Inmate Thomas was medically Cleared with Abrasins, Scratches and Reddenen to the neck area. Both Thomas and Culler were Rehoused in Ad Seg. Without Further Incident. Evidence collected From Culler was turn over to SQ Squad unit, % A Zemo, % D. Sung By % C. Grace on 10-6-03.

| NAME / TITLE / SIGNATURE OF REPORTING STAFF | | BADGE / I.D. # | DATE |
|---|---|---|---|
| C. Grace C/O | | 46259 | 10-6-03 |
| REVIEWER'S SIGNATURE | APPROVED | CLARIFICATION NEEDED | DATE |
| | [ ] | [ ] | |

**Crime/Incident Report**
**PART C-1 - SUPPLEMENT**

CDC 837 C-1

| Last Name, First Name Initial | | Badge / ID # | Incident Date | | Incident Log Number |
|---|---|---|---|---|---|
| Dennis, K | | 8171 | 10-6-03 | | SQP-003-03-10-0338 |
| Length of Service | Post Description | | Incident Time | | Report Date |
| 20yrs7m | 146 North Block SGT | | 0730 | | 10-6-03 |
| RDOs | Duty Hours | | Incident Location | | |
| F/S | 0600-1400 | | NORTH BLOCK 2-N-36 | | |

| Description of Incident/Crime | | | CCR Section Rule |
|---|---|---|---|
| BATTERY ON AN INMATE WITH A WEAPON | | | 3005 (C) |

| Your Role | Witnesses (preface S-Staff, V-Visitor, O-Other) | | Inmates Involved (preface S-Suspect, V-Victim, W-Witness) | |
|---|---|---|---|---|
| ☐ Primary | C. GRACE (S) | | CULLER H-31082 (S) | |
| ☒ Responder | D. MOORE (S) | | THOMAS T-64219 (V) | |
| ☐ Witness | D. SUNG (S) | | | |
| ☐ Victim | J. THOMPSON (S) | | | |
| ☐ Camera | | | | |

| Force Used by You | Less Lethal Weapons | Lethal Weapons | Number of Rounds Fired | Force Observed by You |
|---|---|---|---|---|
| ☐ Lethal | ☐ 37mm | ☐ Mini-14 | ☐ | ☐ Lethal |
| ☐ Less Lethal | ☐ Baton N/A | ☐ Shotgun N/A | ☐ N/A | ☐ Less Lethal |
| ☐ Physical | ☐ OC | ☐ Handgun | ☐ | ☐ Physical |
| ☒ None | ☐ Other: | ☐ Other | ☐ | ☒ None |

| Evidence Collected | Evidence Description | Disposition | Weapon | BIO Hazard |
|---|---|---|---|---|
| ☐ Yes | N/A | N/A | ☐ Yes | ☐ Yes |
| ☒ No | | | ☒ No | ☒ No |

| Reporting Staff Injured | Description of Injury | Located Treated | Bodily Fluid Exposure | SCIF 3301/3067 Completed |
|---|---|---|---|---|
| ☐ Yes | N/A | N/A | ☐ Yes | ☐ Yes |
| ☒ No | | | ☒ No | ☒ No |

Narrative:

On October 6, 2003 at approximately 0730 hours while monitoring inmate movement during the unit in and out thur the back door, Officer C. Grace who was on the second tier in the area of cell 2-N-36, informed me to stop a inmate later indentified as Thomas T-64219 housed in cell 2-N-36U as he was about to exit the unit. I stopped Thomas, and instructed officer D. Moore to place him in handcuffs. Officer grace escorted inmate Culler H-31082 housed in 2-N-36L down to the sergeant office and conducted an uncolthed body search. Office Grace informed me that he had discover scrapes and scratches on Culler during the search and that Culler had stated that he and his cellie inmate Thomas had just got into it. Office Grace escorted Culler to the Urgent Care Clinic, where he was medically cleared with a abrasion/scratch noted to his right cheek. Officer Moore,informed me that he had conducted an uncolthed body search on inmate Thomas and discovered abrasion/scrathes on both sides of his neck. Office Moore escorted Thomas to the Urgent Care Clinic, where he was medically cleared with abrasions/scratches noted to both sides of his neck. I was informed that confidential information had been received indicating that inmate Culler had wrapped a t.v. cable around inmate Thomas neck and was using it to strangle him. I contacted Investigative Service Unit Officers D. Sung and J. Thompson and requested that they report to North Block to process cell 2-N-36 as a crime scene. Officer Sung conducted the crime scene investigation on cell 2-N-36. Officer Thompson took photos of inmate Thomas injuries. Both inmates were rehoused in Administrative Segregation.

| Reporting Staff's Signature | | | | Date |
|---|---|---|---|---|
| K. Dennis | | | | 10-6-03 |
| Reviewer's Signature | | Approved | Clarification Needed | Date |
| | | ☐ | ☐ | |

**Crime/Incident Report**
**PART C-1 - SUPPLEMENT**

Page: 1 of 2

CDC 837 C-1

| Last Name, First Name Initial | | Badge / ID # | Incident Date | Incident Log Number |
|---|---|---|---|---|
| Sung, D. | | 48720 | 10-06-03 | SQP-003-03-10-0338 |
| Length of Service | Post Description | | Incident Time | Report Date |
| 9 Years 8 Months | #292 Investigations | | 1130 Hours | 10-08-03 |
| RDOs | Duty Hours | | Incident Location | |
| F/S/H | 0600-1400 Hours | | North Block, 2N36 | |

| Description of Incident/Crime | | CCR Section Rule |
|---|---|---|
| Battery on an inmate with a weapon | | 3005 (c) |

| Your Role | Witnesses (preface S-Staff, V-Visitor, O-Other) | Inmates Involved (preface S-Suspect, V-Victim, W-Witness) | |
|---|---|---|---|
| ☐ Primary | S - K. Dennis | S-Culler H-31082 | |
| ☐ Responder | | V-Thomas T-64219 | |
| ☐ Witness | | | |
| ☐ Victim | | | |
| ☒ Camera | | | |

| Force Used by You | Less Lethal Weapons | Lethal Weapons | Number of Rounds Fired | Force Observed by You |
|---|---|---|---|---|
| ☐ Lethal | ☐ 37mm | ☐ Mini-14 | ☐ | ☐ Lethal |
| ☐ Less Lethal | ☐ Baton  N/A | ☐ Shotgun | N/A | ☐ Less Lethal |
| ☐ Physical | ☐ OC | ☐ Handgun | ☐ | ☐ Physical |
| ☒ None | ☐ Other: | ☐ Other  N/A | ☐ | ☒ None |

| Evidence Collected | Evidence Description | Disposition | Weapon | BIO Hazard |
|---|---|---|---|---|
| ☒ Yes | (1) black coaxial television cable | Retained in ISU evidence room | ☒ Yes | ☐ Yes |
| ☐ No | (8) 35-mm photographs | | ☐ No | ☒ No |

| Reporting Staff Injured | Description of Injury | Located Treated | Bodily Fluid Exposure | SCIF 3301/3067 Completed |
|---|---|---|---|---|
| ☐ Yes | N/A | N/A | ☐ Yes | ☐ Yes |
| ☒ No | | | ☒ No | ☒ No |

Narrative:

On Monday, October 6, 2003, at approximately 1130 hours, I received a phone call from Correctional Sergeant K. Dennis, North Block Sergeant, requesting that I report to North Block to photograph cell 2N36. Sergeant Dennis, informed me that the cell needed to be processed as a crime scene because of allegations that inmate Culler H-31082 had strangled inmate Thomas T-64219 with a television cable.

Upon entering the cell, I observed food items, clothing items and other personal property scattered around the cell. I observed a black coaxial television cable located on the center of the upper bunk. I took a series of 35-mm photographs as evidence. The photos are as follows:

1. Photo identifier (ISU-03-056A)

2. Overall picture of cell (low)

3. Overall picture of cell (high)

| Reporting Staff's Signature | Date |
|---|---|
| | 10-08-03 |

| Reviewer's Signature | Approved | Clarification Needed | Date |
|---|---|---|---|
| | ☐ | ☐ | |

C-15

STATE OF CALIFORNIA
**Crime/Incident Report**                                **Page: 2 of 2**
PART G-2 - SUPPLEMENT
CDC 837 C-2                                    Incident Log Number SQP-003-03-10-0338

| Last Name, First Name Initial | Badge / ID # | Incident Date | Incident Time |
|---|---|---|---|
| Sung, D. | 48720 | 10-06-03 | 1130 Hours |

| ☒ Continuation Report | ☐ Additional Information | ☐ Clarification Request |
|---|---|---|

Narrative:

4.   Item #1 - black coaxial television cable

5.   Close-up item #1

6.   Close-up item #1 with ruler

7.   Close-up item #1 taken from rear of cell

8.   Cell floor, rear of cell

I took control of item #1, television cable and placed it in a brown paper bag and retained the item for evidence.  I returned to the Investigative Service Unit evidence room where I processed item #1 as evidence.  Item #1 was a black coaxial, television cable measuring approximately 60 ½ inches long and ¼ inch in diameter with silver colored threaded connectors on each end.  All photographs and evidence items were taken and processed as evidence per institutional procedure.

| Reporting Staff's Signature | | Date |
|---|---|---|
| | | 10-08-03 |

| Reviewer's Signature | Approved | Clarification Needed | Date |
|---|---|---|---|
| | ☐ | ☐ | |

$C$-$/$ $k$

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS

# CRIME / INCIDENT REPORT
## PART C-1 - SUPPLEMENT
CDC 837 C-1 (1/99)

PAGE _____ OF _____

| NAME (LAST, FIRST, MI) | | BADGE NUMBER | INCIDENT DATE | INCIDENT LOG NUMBER |
|---|---|---|---|---|
| Moore, D. A. | | 36063 | 10/6/03 | SQP-003-03-10-0533 |
| LENGTH OF SERVICE | POST DESCRIPTION | INCIDENT TIME | | REPORT DATE |
| 14 y 11 mos | North Block Floor S/o | 0730 HOURS | | 10/6/03 |
| RDOs | DUTY HOURS | INCIDENT LOCATION | | |
| F/S | 0600-1400 | NORTH BLOCK 2N36 | | |
| DESCRIPTION OF INCIDENT / CRIME | | | | CCR SECTION / RULE |
| MUTUAL COMBAT WITH WEAPON | | | | 3005 FORCE & VIOLENCE |

| | YOUR ROLE | WITNESSES (PREFACE S-STAFF, V-VISITOR, O-OTHER) | INMATES INVOLVED (PREFACES-SUSPECT, V-VICTIM, W-WITNESS) |
|---|---|---|---|
| ☐ | PRIMARY | S-K.R. DENNIS | Cullen, H-31082 |
| ☒ | RESPONDER | S-C. GRACE | Thomas, T-64219 |
| ☐ | WITNESS | | |
| ☐ | VICTIM | | |
| ☐ | CAMERA | | |

| FORCE USED BY YOU | LETHAL WEAPONS | NUMBER OF ROUNDS FIRED | LESS THAN LETHAL WEAPONS | FORCE OBSERVED BY YOU |
|---|---|---|---|---|
| ☐ LETHAL | ☐ MINI - 14 | | ☐ 37MM | ☐ LETHAL |
| ☐ LESSLETHAL | ☐ SHOTGUN | | ☐ BATON | ☐ LESSLETHAL |
| ☐ PHYSICAL | ☐ HANDGUN | | ☐ OC | ☐ PHYSICAL |
| ☒ NONE | ☐ OTHER N/A | N/A | ☐ OTHER N/A | ☒ NONE |

| EVIDENCE COLLECTED | EVIDENCE DESCRIPTION | DISPOSITION | WEAPON | BIO HAZARD |
|---|---|---|---|---|
| ☐ YES | | | ☐ YES | ☐ YES |
| ☒ NO | N/A | N/A | ☒ NO | ☒ NO |

| REPORTING STAFF INJURED | DESCRIPTION OF INJURY | LOCATION TREATED | BODILY FLUID EXPOSURE | SCIF3301 / 3067 COMPLETED |
|---|---|---|---|---|
| ☐ YES | | | ☐ YES | ☐ YES |
| ☒ NO | N/A | N/A | ☒ NO | ☒ NO |

NARRATIVE:

ON 10/6/03 AT APPROXIMATELY 0730 HOURS I WAS ORDERED BY SGT K.R. DENNIS NORTH BLOCK FACILITY SGT. TO PLACE INMATE THOMAS T64219 2N36U IN WRIST RESTRAINTS. I THEN ESCORTED THOMAS TO THE NORTH BLOCK COMMITTEE ROOM AND PERFORMED AN UNCLOTHED BODY SEARCH. I NOTICED SEVERAL PLACES AROUND HIS NECK WHICH APPEARED TO BE SCRATCHES AND ABRASIONS. I NOTIFIED THE UNIT SGT. AND WAS TOLD TO ESCORT THOMAS TO THE MAIN INFIRMARY FOR MEDICAL EVALUATION. HE WAS EXAMINED AND ALL HIS INJURIES NOTED ON THE ATTACHED 7219. HE WAS TREATED AND WAS MEDICALLY CLEARED FOR REHOUSING IN ADSEG.

| NAME / TITLE / SIGNATURE OF REPORTING STAFF | | BADGE / I.D. # | DATE |
|---|---|---|---|
| C/o D. Moore | | 36063 | 10/2/03 |
| REVIEWERS SIGNATURE | C-17 | APPROVED ☒ | CLARIFICATION NEEDED ☐ | DATE 10/2/03 |

## SUPPLEMENTAL REPORT
(Evidence Receipt)

ident: _3005. (c) Force and violence. Attempted_

_gelation._

cident Date: _10-6-03_ _____ CDC 837 LOG # : _____

aff
ed: _1/m - Culler - H31082. (5)_ _____

_1/m - Thomas - T64219 (V1)_ _____

_____ _____

_____ _____

ation: _Unit III North Block. 2N36._

_Item #2 one state issued Blue shirt with_

_Blood stains, on Right collar, and Right_

_Shoulder, from I/m Culler H-31082._

_____

_____

_____

Retrieved by: _C.P. Grace  C/o_____ Date: _10-6-03_ Time: _12.30_ pts

Received by: _C.O. J. Lemos_____ Date: _10-6-03_ Time: _13:08_

Received by: _____ Date: _____ Time: _____

Received by: _____ Date: _____ Time: _____

Received by: _____ Date: _____ Time: _____

Received by: _____ Date: _____ Time: _____

of Evidence:   SECURITY SQUAD EVIDENCE ROOM _____

LOGGED:
TO DOJ :
BACK FROM DOJ:
DISPOSITION:
EVIDENCE LOG #:

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS

PAGE    1    OF    2

| CDC NUMBER<br>H-31082 | INMATE'S NAME<br>CULLER | LOG NUMBER<br>03-03-NB-10-002 | INSTITUTION<br>SQSP | TODAY'S DATE<br>11/6/03 |
|---|---|---|---|---|

| ☐ SUPPLEMENTAL | ☑ CONTINUATION OF: | ☐ CDC 115 CIRCUMSTANCES | ☑ HEARING | ☐ I.E .REPORT | ☐OTHER |
|---|---|---|---|---|---|

The hearing was convened on October 29, 2003, at approximately 1200 hours when I introduced myself to Inmate Culler H-31082 as the Senior Hearing Officer for this disciplinary.

**Staff Assistant**: Inmate Culler is not a participant in the Mental Health Delivery System.  Assignment of a Staff Assistant was considered unnecessary, as his current mental health does not impair his ability to comprehend either the charges or the disciplinary process.  In the hearing, Inmate Culler agreed that he speaks English, is literate, the issues are not complex and a confidential relationship is not required.  Staff Assistant will not be assigned.

**Hearing**: Inmate Culler stated he was in good health with normal vision and hearing.  Inmate Culler acknowledged that he received copies of the following documents more than 24 hours in advance of the hearing: CDC-115, CDC-115A, CDC-1030 and Incident Report.  These reports as well as the disciplinary charge of "BATTERY ON INMATE WITH WEAPON" were reviewed with inmate Culler in the hearing.  He stated that he understood both and that he was prepared to begin the hearing.

SHO reviewed the confidential report by Officer Moore dated October 6, 2003.  In this report, the confidential informant stated when inmate Culler returned from the morning meal on October 6, 2003, inmate Culler, without provocation, attacked inmate Thomas by rapping a TV coax cable around his neck and started choking him.

SHO notes inmate Culler received a Confidential Disclosure Form, CDC-1030 which disclosed, "inmate Culler was involved in a physical altercation with inmate Thomas inside of cell 2N36.  During the altercation inmate Culler wrapped a TV cable around inmate Thomas's neck and used it to strangle him."  SHO finds this to be an accurate disclosure of the confidential information.

**RELIABILITY:**  SHO finds the information reliable based on the informant was in a position to have first hand knowledge of the attack and the injuries received by inmate Thomas are consistent with having been choked.

**CONFIDENTIALITY:**  SHO finds the report meets the criteria of confidentiality based on releasing the name of the informant would jeopardize the safety of the informant.

**District Attorney:** Inmate Culler was advised in the hearing that this has been referred for possible prosecution and he can postpone his hearing pending resolution of prosecution.  He was informed that any statements he makes in this hearing could be used against him in a court of law.  Inmate Culler stated that he understood and he wanted to continue the hearing.

**Due Process:** The disciplinary was served on the inmate within 15 days of discovery and the hearing was held within 30 days of service.  The inmate received his copies of all documents more than 24 hours in advance of the hearing.  There are no due process issues.

**Investigative Employee**: Investigative Employee was assigned.    IE was reviewed in hearing.    Inmate Culler acknowledges receiving and reviewing the completed IE report more than 24 hours in advance of the hearing.  In the hearing, Inmate Culler stated that he is satisfied with the completed report.

**Request for Witnesses**: Inmate Culler waived all witnesses and the SHO requested none.

| SIGNATURE OF WRITER<br><br>V. Kelley | TITLE<br><br>**Correctional Lieutenant** | DATE NOTICE SIGNED<br>11/6/03 | |
|---|---|---|---|
| COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | DATE SIGNED: | TIME SIGNED: |

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                       PAGE    1    OF    2

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|------------|---------------|------------|-------------|--------------|
| H-31082 | CULLER | 03-03-NB-10-002 | SQSP | 11/6/03 |

| ☐ SUPPLEMENTAL | ☑ CONTINUATION OF: | ☐ CDC 115 CIRCUMSTANCES | ☑ HEARING | ☐ I.E .REPORT | ☐OTHER |
|---|---|---|---|---|---|

The hearing was convened on October 29, 2003, at approximately 1200 hours when I introduced myself to Inmate Culler H-31082 as the Senior Hearing Officer for this disciplinary.

**Staff Assistant**: Inmate Culler is not a participant in the Mental Health Delivery System. Assignment of a Staff Assistant was considered unnecessary, as his current mental health does not impair his ability to comprehend either the charges or the disciplinary process. In the hearing, Inmate Culler agreed that he speaks English, is literate, the issues are not complex and a confidential relationship is not required. Staff Assistant will not be assigned.

**Hearing**: Inmate Culler stated he was in good health with normal vision and hearing. Inmate Culler acknowledged that he received copies of the following documents more than 24 hours in advance of the hearing: CDC-115, CDC-115A, CDC-1030 and Incident Report. These reports as well as the disciplinary charge of "BATTERY ON INMATE WITH WEAPON" were reviewed with inmate Culler in the hearing. He stated that he understood both and that he was prepared to begin the hearing.

SHO reviewed the confidential report by Officer Moore dated October 6, 2003. In this report, the confidential informant stated when inmate Culler returned from the morning meal on October 6, 2003, inmate Culler, without provocation, attacked inmate Thomas by rapping a TV coax cable around his neck and started choking him.

SHO notes inmate Culler received a Confidential Disclosure Form, CDC-1030 which disclosed, "inmate Culler was involved in a physical altercation with inmate Thomas inside of cell 2N36. During the altercation inmate Culler wrapped a TV cable around inmate Thomas's neck and used it to strangle him." SHO finds this to be an accurate disclosure of the confidential information.

**RELIABILITY:** SHO finds the information reliable based on the informant was in a position to have first hand knowledge of the attack and the injuries received by inmate Thomas are consistent with having been choked.

**CONFIDENTIALITY:** SHO finds the report meets the criteria of confidentiality based on releasing the name of the informant would jeopardize the safety of the informant.

**District Attorney**: Inmate Culler was advised in the hearing that this has been referred for possible prosecution and he can postpone his hearing pending resolution of prosecution. He was informed that any statements he makes in this hearing could be used against him in a court of law. Inmate Culler stated that he understood and he wanted to continue the hearing.

**Due Process**: The disciplinary was served on the inmate within 15 days of discovery and the hearing was held within 30 days of service. The inmate received his copies of all documents more than 24 hours in advance of the hearing. There are no due process issues.

**Investigative Employee**: Investigative Employee was assigned.    IE was reviewed in hearing.    Inmate Culler acknowledges receiving and reviewing the completed IE report more than 24 hours in advance of the hearing. In the hearing, Inmate Culler stated that he is satisfied with the completed report.

**Request for Witnesses**: Inmate Culler waived all witnesses and the SHO requested none.

| SIGNATURE OF WRITER | | TITLE | | DATE NOTICE SIGNED | |
|---|---|---|---|---|---|
| V. Kelley | | **Correctional Lieutenant** | | 11/6/03 | |
| COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | | DATE SIGNED: | | TIME SIGNED: |
| | | | | | |

C-19

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

# CRIME / INCIDENT REPORT
## PART B - INVOLVED PARTIES
CDC 837-B (11/91)

PAGE _1_ OF _1_

| INSTITUTION / FACILITY | DATE OF INCIDENT | TIME OF INCIDENT | INCIDENT LOG NUMBE |
|---|---|---|---|
| SAN QUENTIN | 10/06/2003 | 0730 | SQP-003-03-10-0338 |

### INMATES

| NAME(LAST, FIRST, MI) | | | | | SEX | ETHNICITY | CLASS. SCORE |
|---|---|---|---|---|---|---|---|
| , | | | | | | | |

| CHECK ONE | CDC NUMBER | CII # | FBI # | SSN # | | PV - RTC? | |
|---|---|---|---|---|---|---|---|
| ☐ VICTIM | | | | | | ☐ YES  ☐ NO | |
| ☐ SUSPECT | DATE REC'D BY CDC | DATE REC'D BY INST. | ANTICIPATED RELEASE DATE | DATE OF BIRTH | HOUSING ASSIGNMENT | | |
| ☐ WITNESS | | | | | | | |

| COMMITMENT OFFENSES (OPTIONAL) | COUNTY OF COMMITMENT |
|---|---|
| | |

| DESCRIPTION OF INJURIES | PRISON GANG / DISRUPTIVE GROUP (VALIDATED) |
|---|---|
| | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | |

| NAME(LAST, FIRST, MI) | | | | | SEX | ETHNICITY | CLASS. SCORE |
|---|---|---|---|---|---|---|---|
| , | | | | | | | |

| CHECK ONE | CDC NUMBER | CII # | FBI # | SSN # | | PV - RTC? | |
|---|---|---|---|---|---|---|---|
| ☐ VICTIM | | | | | | ☐ YES  ☐ NO | |
| ☐ SUSPECT | DATE REC'D BY CDC | DATE REC'D BY INST. | ANTICIPATED RELEASE DATE | DATE OF BIRTH | HOUSING ASSIGNMENT | | |
| ☐ WITNESS | | | | | | | |

| COMMITMENT OFFENSES (OPTIONAL) | COUNTY OF COMMITMENT |
|---|---|
| | |

| DESCRIPTION OF INJURIES | PRISON GANG / DISRUPTIVE GROUP (VALIDATED) |
|---|---|
| | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | |

### STAFF, VISITORS, OTHERS

| NAME(LAST, FIRST, MI) | | TITLE | SEX | ETHNICITY | REGULAR DAYS OFF |
|---|---|---|---|---|---|
| SUNG, D. | | Correctional Officer | M | OTHER | F/S/H |

| CHECK ONE | CHECK ONE | BADGE / I.D. # | POST ASSIGNMENT | ID NUMBER |
|---|---|---|---|---|
| ☐ VICTIM | ☑ STAFF | 48720 | ISU | 234425 |
| ☐ SUSPECT | ☐ VISITOR | DESCRIPTION OF INJURIES | | |
| ☑ WITNESS | ☐ OTHER:____ | N/A | | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | N/A |

| NAME(LAST, FIRST, MI) | | TITLE | SEX | ETHNICITY | REGULAR DAYS OFF |
|---|---|---|---|---|---|
| THOMPSON, J. | | Correctional Officer | M | WHITE | S/S |

| CHECK ONE | CHECK ONE | BADGE / I.D. # | POST ASSIGNMENT | ID NUMBER |
|---|---|---|---|---|
| ☐ VICTIM | ☑ STAFF | 58585 | ISU | 2361198 |
| ☐ SUSPECT | ☐ VISITOR | DESCRIPTION OF INJURIES | | |
| ☑ WITNESS | ☐ OTHER:____ | N/A | | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | N/A |

| NAME(LAST, FIRST, MI) | | TITLE | SEX | ETHNICITY | REGULAR DAYS OFF |
|---|---|---|---|---|---|
| , | | | | | |

| CHECK ONE | CHECK ONE | BADGE / I.D. # | POST ASSIGNMENT | ID NUMBER |
|---|---|---|---|---|
| ☐ VICTIM | ☐ STAFF | | | |
| ☐ SUSPECT | ☐ VISITOR | DESCRIPTION OF INJURIES | | |
| ☐ WITNESS | ☐ OTHER:____ | | | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | |

C-20

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                              PAGE    2    OF    2

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H-31082 | CULLER | 03-03-NB-10-002 | SQSP | 11/6/03 |

| ☐ SUPPLEMENTAL | ☑ CONTINUATION OF: | ☐ CDC 115 CIRCUMSTANCES | ☑ HEARING | ☐ I.E .REPORT | ☐ OTHER |
|---|---|---|---|---|---|

**Plea**: Not Guilty.

**Hearing testimony**: Inmate Culler gave the following testimony as his defense: "My cellie fired on me first. He wouldn't stop. I choked him with my hands to take the wind out of him to make him stop. I did not use any cord as a weapon."

**Finding**: Guilty of the Div. A-1 (4) offense BATTERY WITH A DEADLY WEAPON. *Battery* means the deliberate use of force or violence on the person of another. In this case, the charge requires a preponderance of evidence that a deadly weapon was used to commit the battery. *Deadly weapon* means any object or substance reasonably capable of causing serious or lethal injury. Battery can be shown by witness testimony that the victim was struck by a weapon or circumstantial evidence. For example, if the most reasonable explanation of the wounds sustained by the victim is that the victim was struck with a deadly weapon, this can be considered sufficient evidence that the victim was struck with a weapon. This finding is based upon the following preponderance of evidence:

A. The testimony of OFFICER GRACE in the disciplinary report of October 6, 2003 wherein OFFICER GRACE testifies that on October 6, 2003 he observed inmate Culler exit his cell with signs of exhaustion and confusion.
B. Officer Grace observed what appeared to be spots of blood on inmate Culler shirt.
C. Inmate Culler's spontaneous statement of, "Me and my cellie just got into it."
D. Inmate Cullers statement in this hearing where he admitted to choking inmate Thomas T-64219.
E. The confidential report by Officer Moore dated October 6, 2003, wherein the confidential informant testified that Inmate Culler rapped a coax TV cord around inmate Thomas' neck and strangled him with the cable
F. The CDC-837C report by Officer D. Sung, ISU, that he located a TV coax cable on the center of the upper bunk of cell 2N36 and processed the cable as evidence.
G. The CDC-7219 on inmate Thomas shows that inmate Thomas suffered bruising on his neck.
H. The CDC-7219 on inmate Culler reflects one small scratch to his right cheek which is inconsistent with the statement made my inmate Culler in this hearing that he was defending himself from an attack from inmate Thomas.
I. The CDC-7219 on inmate Thomas reflects no injuries to his hands, which is inconsistent with the statement made by inmate Culler in this hearing.
J. SHO finds the coax TV cable was used as a weapon to batter inmate Thomas.

**Disposition**: Assessed **360** day credit forfeiture for this Div. A-1 offense. Per CCR 3327 (a)(1), credit restoration is not available for this offense. Referred to classification for SHU assessment. Appeal rights were explained. Inmate Culler was referred to CCR §3084.1 and following for additional information on appeal procedures.

**ENEMY SITUATION;** SHO find an **enemy situation does exist between inmates Culler and Thomas** and that each inmate should be denoted on the other inmate's CDC-812 as an enemy.

| SIGNATURE OF WRITER | | TITLE | | DATE NOTICE SIGNED | |
|---|---|---|---|---|---|
| **V. Kelley** | | **Correctional Lieutenant** | | 11/6/03 | |
| COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | | DATE SIGNED: | | TIME SIGNED: |

C-21

STATE OF CALIFORNIA
## CRIME/INCIDENT REPORT PART B
## - INVOLVED PARTIES

*AMENDED*

DEPARTMENT OF CORRECTIONS

CDC 837-B (11/91)

PAGE:  3  OF  3

| INSTITUTION / FACILITY | DATE INCIDENT | TIME INCIDENT | INCIDENT LOG NUMBER |
|---|---|---|---|
| CSP-San Quentin | 10-06-03 | 0730 Hrs. | SQP-003-03-10-0338 |

### INMATES

| NAME (LAST, FIRST, MI) | | | | | SEX | ETHNICITY | CLASS. SCORE |
|---|---|---|---|---|---|---|---|
| Culler, Jerryal Jerome | | | | | Male | Black | N/A |

| CHECK ONE | CDC NUMBER | CII# | FBI# | SSN# | | PV - RTC? |
|---|---|---|---|---|---|---|
| ☐ VICTIM | H-31082 | A070007624 | 0904740W5 | 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 | | ☐ YES  ☒ NO |

| ☒ SUSPECT | DATE RECEIVED BY CDC | DATE RECEIVED BY INST. | ANTICIPATED RELEASE DATE | DATE OF BIRTH | HOUSING ASSIGNMENT |
|---|---|---|---|---|---|
| ☐ WITNESS | 04-15-92 | 04-15-92 | Lifer | 2/27/58 | 2-N-36L |

| COMMITMENT OFFENSES (OPTIONAL) | COUNTY OF COMMITMENT |
|---|---|
| PC 205; Aggravated Mayhem | Contra Costa |

| DESCRIPTION OF INJURIES | PRISON GANG / DISRUPTIVE GROUP (VALIDATED) |
|---|---|
| Superficial abrasion/scratched to the right side of face | None |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☒ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | Urgent Care clinic |

| NAME (LAST, FIRST, MI) | | | | | SEX | ETHNICITY | CLASS. SCORE |
|---|---|---|---|---|---|---|---|
| Thomas, Jamie E. | | | | | Male | Black | N/A |

| CHECK ONE | CDC NUMBER | CII# | FBI# | SSN# | | PV - RTC? |
|---|---|---|---|---|---|---|
| ☐ VICTIM | T-64219 | A11196748 | 694492AB2 | 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 | | ☒ YES  ☐ NO |

| ☒ SUSPECT | DATE RECEIVED BY CDC | DATE RECEIVED BY INST. | ANTICIPATED RELEASE DATE | DATE OF BIRTH | HOUSING ASSIGNMENT |
|---|---|---|---|---|---|
| ☐ WITNESS | 08-19-02 | 08-19-02 | 03-31-04 | 03-28-83 | 2-N-36U |

| COMMITMENT OFFENSES (OPTIONAL) | COUNTY OF COMMITMENT |
|---|---|
| H&S 1351; Transport/Sales of a Contrlled Substance | Alameda |

| DESCRIPTION OF INJURIES | PRISON GANG / DISRUPTIVE GROUP (VALIDATED) |
|---|---|
| Superficial abrasions/scratches to neck and back | None |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☒ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | Urgent Care Clinic |

### STAFF, VISITORS, OTHERS

| NAME (LAST, FIRST, MI) | | TITLE | | SEX | ETHNICITY | REGULAR DAYS OFF |
|---|---|---|---|---|---|---|
| Grace, C. | | Correctional Officer | | Male | Black | Sat/Sun |

| CHECK ONE | CHECK ONE | BADGE / ID# | POST ASSIGNMENT | ID NUMBER |
|---|---|---|---|---|
| ☐ VICTIM | ☒ STAFF | 46259 | #490; North Block Floor | 236630 |
| ☐ SUSPECT | ☐ VISITOR | DESCRIPTION OF INJURIES | | |
| ☒ WITNESS | ☐ OTHER | None | | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | N/A |

| NAME (LAST, FIRST, MI) | | TITLE | | SEX | ETHNICITY | REGULAR DAYS OFF |
|---|---|---|---|---|---|---|
| Moore, D. A. | | Correctional Officer | | Male | White | Fri/Sat |

| CHECK ONE | CHECK ONE | BADGE / ID# | POST ASSIGNMENT | ID NUMBER |
|---|---|---|---|---|
| ☐ VICTIM | ☒ STAFF | 36063 | #48; North Block Floor | 2362734 |
| ☐ SUSPECT | ☐ VISITOR | DESCRIPTION OF INJURIES | | |
| ☒ WITNESS | ☐ OTHER | None | | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | N/A |

| NAME (LAST, FIRST, MI) | | TITLE | | SEX | ETHNICITY | REGULAR DAYS OFF |
|---|---|---|---|---|---|---|
| Dennis, K. | | Corrctional Sergeant | | Male | White | Fri/Sat |

| CHECK ONE | CHECK ONE | BADGE / ID# | POST ASSIGNMENT | ID NUMBER |
|---|---|---|---|---|
| ☐ VICTIM | ☒ STAFF | 8171 | #146; North Block Sergeant | 236233 |
| ☐ SUSPECT | ☐ VISITOR | DESCRIPTION OF INJURIES | | |
| ☒ WITNESS | ☐ OTHER | None | | |

| CHECK ALL THAT APPLY | LOCATION OF HOSPITAL / TREATMENT |
|---|---|
| ☐ HOSPITALIZED  ☐ TREATED AND RELEASED  ☐ REFUSED TREATMENT  ☐ DECEASED | N/A |

C-22

STATE OF CALIFORNIA                                                                          DEPARTMENT OF
CORRECTIONS
ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE

CDC 114-D (Rev 9/98)

| DISTRIBUTION: | | | |
|---|---|---|---|
| WHITE | CENTRAL FILE | CANARY | WARDEN |
| BLUE | INMATE (2ND COPY) | PINK HEALTH | CARE MGR |
| GREEN | ASU | GOLDENROD | INMATE (1ST COPY) |

| INMATE'S NAME | CDC Number |
|---|---|
| CULLER | H-31082 |

## REASON(S) FOR PLACEMENT (*PART A*)

[X] PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

[ ] JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

[ ] ENDANGERS INSTITUTION SECURITY    [ ] UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT

On October 6, 2003, you, inmate Culler H-31082, were placed in Administrative Segregation based on your suspected involvement in mutual combat with inmate Thomas T-64219. Further investigation into this incident revealed you used a weapon, TV coax cable, to strangle inmate Thomas. Based on this information you are being charged with "Battery With a Weapon." This charge will be referred to the District Attorney's Office and carries a potential SHU term. Your placement in general population represents a threat to the safety of other inmates and you will be retained in Administrative Segregation pending ICC review. ICC may elect to retain you pending adjudication of the disciplinary process and possible transfer to another institution in keeping with your custody and security needs.

| CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL) | | IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE: | / / |
|---|---|---|---|
| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | TITLE |
| October 9, 2003 | M.D. Thompson | *M.D. Thompson* | Lieutenant |
| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
| October 9, 2003 | | | |
| [✓] INMATE REFUSED TO SIGN | | INMATE SIGNATURE | | CDC NUMBER |

## ADMINISTRATIVE REVIEW (*PART B*)

*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (IE) | |
|---|---|---|---|
| STAFF ASSISTANTS NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |

### IS THIS INMATE:

| | | | | | |
|---|---|---|---|---|---|
| LITERATE? | [ ] YES [ ] NO | EVIDENCE COLLECTION BY IE UNNECESSARY | | [ ] YES | [ ] NO |
| FLUENT IN ENGLISH? | [ ] YES [ ] NO | DECLINED ANY INVESTIGATIVE EMPLOYEE | | [ ] YES | [ ] NO |
| ABLE TO COMPREHEND ISSUES? | [ ] YES [ ] NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS | | [ ] YES | [ ] NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | [ ] YES [ ] NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED | | [ ] YES | [ ] NO |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | [ ] YES [ ] NO | | | | |

Any "NO" requires SA assignment

[ ] NOT ASSIGNED

Any "NO" may require IE assignment

[ ] NOT ASSIGNED

## INMATE WAIVERS

[ ] INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER    [ ] INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

| [ ] NO WITNESSES REQUESTED BY INMATE | INMATE SIGNATURE | | DATE |
|---|---|---|---|

## WITNESSES REQUESTED FOR HEARING

| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC UMBER |
|---|---|---|---|
| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |

**DECISION:** [ ] RELEASE TO UNIT/FACILITY _____ [ ] RETAIN PENDING ICC REVIEW [ ] DOUBLE CELL [ ] SINGLE CELL PENDING ICC

REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|
| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | | DATE OF REVIEW |

See Chronological Classification Review document (CDC 128-G) for specific hearing information

STATE OF CALIFORNIA

MEDICAL REPORT OF INJURY
OR UNUSUAL OCCURRENCE

DEPARTMENT OF CORRECTIONS

| NAME OF INSTITUTION | FACILITY/UNIT | | INJURY | ON THE JOB INJURY | DATE |
|---|---|---|---|---|---|
| | | | UNUSUAL OCCURRENCE | PRE AD/SEG. ADMISSION | |
| THIS SECTION FOR INMATE ONLY | NAME | | CDC NUMBER | HOUSING LOC. | NEW HOUSING LOC. |
| THIS SECTION FOR STAFF ONLY | NAME | | BADGE # | RANK/CLASS | ASSIGNMENT/RDOs |
| THIS SECTION FOR VISITOR ONLY | NAME | | MIDDLE | DOB | OCCUPATION |
| | HOME ADDRESS | | STATE | ZIP | HOME PHONE |

| PLACE OF OCCURRENCE | | WITNESS(ES) | |
|---|---|---|---|
| TIME NOTIFIED | TIME SEEN | BEEP OR | LITTER    WHEELCHAIR |

| | AGE | RACE | SEX |
|---|---|---|---|
| LITTER    WHEELCHAIR | 21 | | |
| ON SITE | | | |

BRIEF STATEMENT IN SUBJECT'S WORDS OF THE CIRCUMSTANCES OF THE INJURY OR UNUSUAL OCCURRENCE

| INJURIES FOUND?    YES / NO | |
|---|---|
| Abrasion/Scratch | 1 |
| Active Bleeding | 2 |
| Broken Bone | 3 |
| Bruise/Discolored Area | 4 |
| Burn | 5 |
| Dislocation | 6 |
| Dried Blood | 7 |
| Fresh Tattoo | 8 |
| Cut/Laceration/Slash | 9 |
| O.C. Spray Area | 10 |
| Pain | 11 |
| Protrusion | 12 |
| Puncture | 13 |
| Reddened Area | 14 |
| Skin Flap | 15 |
| Swollen Area | 16 |
| Other | 17 |
| | 18 |
| | 19 |

| O.C. SPRAY EXPOSURE? | YES / NO |
|---|---|
| DECONTAMINATED? | YES / NO |
| Self-decontamination instructions given? | YES / NO |
| Refused decontamination? | YES / NO |
| Q 15 min. checks | |
| Staff issued exposure packet? | YES / NO |

| RN NOTIFIED/TIME | PHYSICIAN NOTIFIED/TIME |
|---|---|

| TIME/DISPOSITION | |
|---|---|

| | | | EMPLOYEE/TITLE    (PRINT AND SIGN) | BADGE # | RDOs |
|---|---|---|---|---|---|

(noted in progress note or emergency care record filed in UHR)

C-24

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

## MEDICAL REPORT OF INJURY
## OR UNUSUAL OCCURRENCE

| NAME OF INSTITUTION | FACILITY/UNIT | REASON FOR REPORT *(circle)* | INJURY | ON THE JOB INJURY | DATE |
|---|---|---|---|---|---|
| S.Q. | UCC | USE OF FORCE / UNUSUAL OCCURRENCE | | PRE AD/SEG ADMISSION | 10/6/03 |

| THIS SECTION FOR INMATE ONLY | NAME | LAST Culler | FIRST | CDC NUMBER H31082 | HOUSING LOC. 2N36L | NEW HOUSING LOC. |
|---|---|---|---|---|---|---|
| THIS SECTION FOR STAFF ONLY | NAME | LAST | FIRST | BADGE # | RANK/CLASS | ASSIGNMENT/RDOs |
| THIS SECTION FOR VISITOR ONLY | NAME | LAST | FIRST | MIDDLE | DOB | OCCUPATION |
| | HOME ADDRESS | | CITY | STATE | ZIP | HOME PHONE |

| PLACE OF OCCURRENCE | DATE/TIME OF OCCURRENCE 10/6/03  0730 | NAME OF WITNESS(ES) |
|---|---|---|

| TIME NOTIFIED 0750 | TIME SEEN 0750 | ESCORTED BY Grace | MODE OF ARRIVAL *(circle)*  LITTER  WHEELCHAIR  AMBULATORY  ON SITE | AGE | RACE | SEX |
|---|---|---|---|---|---|---|

BRIEF STATEMENT IN SUBJECT'S WORDS OF THE CIRCUMSTANCES OF THE INJURY OR UNUSUAL OCCURRENCE

"have a young cellie."

| INJURIES FOUND? YES / NO | |
|---|---|
| Abrasion/Scratch | 1 |
| Active Bleeding | 2 |
| Broken Bone | 3 |
| Bruise/Discolored Area | 4 |
| Burn | 5 |
| Dislocation | 6 |
| Dried Blood | 7 |
| Fresh Tattoo | 8 |
| Cut/Laceration/Slash | 9 |
| O.C. Spray Area | 10 |
| Pain | 11 |
| Protrusion | 12 |
| Puncture | 13 |
| Reddened Area | 14 |
| Skin Flap | 15 |
| Swollen Area | 16 |
| Other | 17 |
| | 18 |
| | 19 |

eyes are red

| O.C. SPRAY EXPOSURE? | YES / NO |
|---|---|
| DECONTAMINATED? | YES / NO |
| Self-decontamination instructions given? | YES / NO |
| Refused decontamination? | YES / NO |
| Q 15 min. checks | |
| Staff issued exposure packet? | YES / NO |

| RN NOTIFIED/TIME 0750 | PHYSICIAN NOTIFIED/TIME |
|---|---|

TIME/DISPOSITION

MTC 0755

| REPORT COMPLETED BY/TITLE   (PRINT AND SIGN) Karen Harvell RN | BADGE # #2362555 | RDOs 5/5 |
|---|---|---|

*(Medical data is to be included in progress note or emergency care record filed in UHR)*

CDC 7219 (Rev. 11/02)

DISTRIBUTION:  ORIGINAL - UHR     CANARY - CUSTODY     PINK - HEALTH AND SAFETY/RTW COORDINAT

C-25

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE
CDC 114-D (Rev 10/98)

NN5353-010-114D(DC)

DISTRIBUTION:
WHITE - CENTRAL FILE
BLUE - INMATE (2ND COPY)
GREEN - ASU
CANARY - WARDEN
PINK - HEALTH CARE MGR
GOLDENROD - INMATE (1ST COPY)

| INMATE'S NAME | | CDC NUMBER |
|---|---|---|
| CULER | CSP-San Quentin | K-31082 |

## REASON(S) FOR PLACEMENT (PART A)

[X] PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

[ ] JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

[X] ENDANGERS INSTITUTION SECURITY    [ ] UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:
On Monday, October 06, 2003, Inmate CULER, K-31082 2N36L you are being placed in Administrative Segregation Status based on confidential information received that you were involved in a cell fight / Force/Violence With Weapon with another Inmate later to be identified as Inmate THOMAS, T-64219, CELL, 2N36L. Based on this information your continued presence in the mainline general population presents a threat to the safety and security of the institution, and other inmates. You will remain in Administrative Segregation pending further investigation into this matter and/or review by the Institution Classification Committee for your program/housing needs. Inmate CULER is not a participant in the Mental Health Delivery System. This Ad/Seg placement is ordered by J.W. Reid, Correctional Lieutenant. Refer to Confidential report written by Correctional Officer D. Moore.

[ ] CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL) [X] IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE: 10/6/03

| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | TITLE |
|---|---|---|---|
| 10-06-03 | J.W. Reid | | Correctional Lieutenant |

| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
|---|---|---|---|---|
| 10-6-03 | 1150 | R. Downs | | C.O. C65 |

[X] INMATE REFUSED TO SIGN    INMATE SIGNATURE    CDC NUMBER

## ADMINISTRATIVE REVIEW (PART B)
*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement*

### STAFF ASSISTANT (SA)                    INVESTIGATIVE EMPLOYEE (IE)

| STAFF ASSISTANT NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |
|---|---|---|---|

### IS THIS INMATE:

| | | | | | |
|---|---|---|---|---|---|
| LITERATE? | [ ] YES | [ ] NO | EVIDENCE COLLECTION BY IE UNNECESSARY | [ ] YES | [ ] NO |
| FLUENT IN ENGLISH? | [ ] YES | [ ] NO | DECLINED ANY INVESTIGATIVE EMPLOYEE | [ ] YES | [ ] NO |
| ABLE TO COMPREHEND ISSUES? | [ ] YES | [ ] NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS | [ ] YES | [ ] NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | [ ] YES | [ ] NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED | [ ] YES | |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | [ ] YES | | | | |

Any "NO" requires SA assignment    Any "NO" may require IE assignment

[ ] NOT ASSIGNED    [ ] NOT ASSIGNED

### INMATE WAIVERS

[ ] INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER    [ ] INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

[ ] NO WITNESSES REQUESTED BY INMATE    INMATE SIGNATURE    DATE

### WITNESSES REQUESTED FOR HEARING

| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| | | | |
| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |

**DECISION:** [ ] RELEASE TO UNIT/FACILITY ____ [ ] RETAIN PENDING ICC REVIEW [ ] DOUBLE CELL [ ] SINGLE CELL PENDING ICC

REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|

| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | DATE OF REVIEW |
|---|---|---|

See chronological Classification Review document (CDC 128 - G) for specific hearing information

C-26

CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if

ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE
CDC 114-D (Rev 10/98)

| DISTRIBUTION: | |
|---|---|
| WHITE - CENTRAL FILE | CANARY - WARDEN |
| BLUE - INMATE (2ND COPY) | PINK - HEALTH CARE MGR |
| GREEN - ASU | GOLDENROD - INMATE (1ST COPY) |

HH5353-010-114D(DC)

| INMATE'S NAME | | CDC NUMBER |
|---|---|---|
| CULLER | CSP-San Quentin | K-31082 |

## REASON(S) FOR PLACEMENT (PART A)

☐ PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

☐ JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

☒ ENDANGERS INSTITUTION SECURITY     ☐ UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:
On Monday, October 16, 2003, Inmate CULLER, K-31082 THOMAS, you are being placed in Administrative Segregation Status based on confidential information received that you were involved in a cell fight / Force/Violence With Weapon with another Inmate later to be identified as Inmate THOMAS, T-64219, CELL, 2N3GN. Based on this information your continued presence in the mainline general population presents a threat to the safety and security of the institution, and other inmates. You will remain in Administrative Segregation pending further investigation into this matter and/or review by the Institution Classification Committee for your program/housing needs. Inmate CULLER is not a participant in the Mental Health Delivery System. This Ad/Seg placement is ordered by J.W. Reid, Correctional Lieutenant. Refer to Confidential report written by Correctional Officer D. Moore.

☐ CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL) ☒ IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE: 10-16-03

| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | TITLE |
|---|---|---|---|
| 10-06-03 | J.W. Reid | | Correctional Lieutenant |

| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
|---|---|---|---|---|
| 10-16-03 | 1150 | R. Peoples | | C/O BSO |

☒ INMATE REFUSED TO SIGN        INMATE SIGNATURE              CDC NUMBER

## ADMINISTRATIVE REVIEW (PART B)
*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (IE) | |
|---|---|---|---|
| STAFF ASSISTANT NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |

### IS THIS INMATE:

| | | | | |
|---|---|---|---|---|
| LITERATE? | ☐ YES ☐ NO | EVIDENCE COLLECTION BY IE UNNECESSARY | ☐ YES ☐ NO |
| FLUENT IN ENGLISH? | ☐ YES ☐ NO | DECLINED ANY INVESTIGATIVE EMPLOYEE | ☐ YES ☐ NO |
| ABLE TO COMPREHEND ISSUES? | ☐ YES ☐ NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS | ☐ YES ☐ NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | ☐ YES ☐ NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED | ☐ YES |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | ☐ YES | | |

Any "NO" requires SA assignment        Any "NO" may require IE assignment

☐ NOT ASSIGNED        ☐ NOT ASSIGNED

### INMATE WAIVERS

☐ INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER  ☐ INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

☐ NO WITNESSES REQUESTED BY INMATE     INMATE SIGNATURE              DATE

### WITNESSES REQUESTED FOR HEARING

| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| | | | |
| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |
| | | | |

**DECISION:** ☐ RELEASE TO UNIT/FACILITY    ☐ RETAIN PENDING ICC REVIEW  ☐ DOUBLE CELL    ☐ SINGLE CELL PENDING ICC

REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|
| | | | | |

| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | DATE OF REVIEW |
|---|---|---|

**See chronological Classification Review document (CDC 128 - G) for specific hearing information**

C-26

STATE OF CALIFORNIA                                                          DEPARTMENT OF CORRECTIONS
**ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE**
**CDC 114-D (Rev 10/98)**

NB5353-010-114D(DC)

| DISTRIBUTION: | |
|---|---|
| WHITE - CENTRAL FILE | CANARY - WARDEN |
| BLUE - INMATE (2ND COPY) | PINK - HEALTH CARE MGR |
| GREEN - ASU | GOLDENROD - INMATE (1ST COPY) |

| INMATE'S NAME | | CDC NUMBER |
|---|---|---|
| CULLER | CSP-San Quentin | H-31082 |

## REASON(S) FOR PLACEMENT *(PART A)*

[✓] PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

[ ] JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

[✓] ENDANGERS INSTITUTION SECURITY     [ ] UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:

On Monday, October 06, 2003, inmate CULLER, H-31082 2N036L you are being placed in administrative Segregation Status based on confidential information received that you were involved in a cell fight / Force/Violence With Weapon with another Inmate later to be identified as Inmate THOMAS, T-64219, CELL, 2N036U. Based on this information your continued presence in the mainline general population presents a threat to the safety and security of the institution, and other inmates. You will remain in Administrative Segregation pending further investigation into this matter and/or review by the Institution Classification Committee for your program/housing needs. Inmate CULLER is not a participant in the Mental Health Delivery System. This Ad/Seg placement is ordered by J.W. Reid, Correctional Lieutenant. Refer to Confidential report written by Correctional Officer D. Moore.

[ ] CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL) [✓] IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE: 10/06/03

| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | TITLE |
|---|---|---|---|
| 10-06-03 | J.W. Reid | | Correctional Lieutenant |

| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
|---|---|---|---|---|
| 10-6-03 | 1150 | K. Dennis | | C/SGT |

[✓] INMATE REFUSED TO SIGN     INMATE SIGNATURE     CDC NUMBER

## ADMINISTRATIVE REVIEW *(PART B)*
*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement.*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (IE) | |
|---|---|---|---|
| STAFF ASSISTANT NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |

### IS THIS INMATE:

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| LITERATE? | [✓] | [ ] | EVIDENCE COLLECTION BY IE UNNECESSARY | [ ] | [ ] |
| FLUENT IN ENGLISH? | [✓] | [ ] | DECLINED ANY INVESTIGATIVE EMPLOYEE | [✓] | [ ] |
| ABLE TO COMPREHEND ISSUES? | [✓] | [ ] | ASU PLACEMENT IS FOR DISCIPLINARY REASONS | [✓] | [ ] |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | [✓] | [ ] | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED | [✓] | |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | | [ ] | | | |

Any "NO" requires SA assignment         Any "NO" may require IE assignment

[✓] NOT ASSIGNED                         [✓] NOT ASSIGNED

### INMATE WAIVERS

[ ] INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER [ ] INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

[✓] NO WITNESSES REQUESTED BY INMATE     INMATE SIGNATURE     DATE 10-7-03

### WITNESSES REQUESTED FOR HEARING

| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| | | | |
| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |

**DECISION:** [ ] RELEASE TO UNIT/FACILITY____ [✓] RETAIN PENDING ICC REVIEW [ ] DOUBLE CELL [ ] SINGLE CELL PENDING ICC

REASON FOR DECISION: Retain pending review by ICC.
endangers institutional security

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|
| P.A. Blanson | Capt | 10-1-03 | 0940 | P.A. Blanson |
| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | | DATE OF REVIEW |

**See chronological Classification Review document (CDC 128-G) for specific hearing information**

C-27

DEPARTMENT OF CORRECTIONS

**LATION REPORT**    IA    U⁻⁻⁻⁻ A13 10⁻612

| INMATE'S NAME | | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|
| CULLER | | | CSP-S.Q. | 2N036L | |

| 5(c) | SPECIFIC ACTS BATTERY ON INMATE WITH WEAPON | LOCATION North Block | DATE 10-06-03 | TIME 0730 |
|---|---|---|---|---|

...ctober 06, 2003, at approximately 0730 hours, while assigned to position #490, 3rd tier officer. I was
...2nd tier after the unit in and out movement, I observed an inmate identified as CULLER H-31082 housed
...tep out of his assigned cell with signs of exhaustion and confusion. As I approached CULLER from about
...t away from him, on the 2nd tier, I observed what appeared to be spots of blood on CULLER state issued
...a indicated signs of unusual behavior, I asked CULLER what had happened to him, CULLER stated, "ME AND
...UST GOT INTO IT." I realized that CULLER's cellie THOMAS T-64219 had just passed by me. I then observed
...AS T-64219 attempting to exit the unit. I yelled down to Sergeant K. Dennis who was monitoring the unit
...the back door to detain inmate THOMAS. I proceed to escort inmate CULLER to the sergents office were
...1 a unclothed body search, which revealed scratches and scrapes that are consistent with being involved
...cal altercation. Additional confidential information was received indicating that you, inmate CULLER wrapped
...around your cellie (inmate Thomas's) neck, and were using it to strangle him. Inmate Thomas was medically
...th injuries to his neck area which consist with being strangled.

| PLOYEE (Typed Name and Signature) | | DATE 10-7-03 | ASSIGNMENT Pos. #490, N/B | RDO'S S/S |
|---|---|---|---|---|
| ...ce Correctional Officer | | | | |

| PERVISOR'S SIGNATURE | | DATE | ☐ INMATE SEGREGATED PENDING HEARING | |
|---|---|---|---|---|
| IS, CORRECTIONAL SERGEANT | | DATE _____ LOC. _____ | | |

| RATIVE | OFFENSE DIVISION: ..../.. | DATE 10/13 | CLASSIFIED BY (Typed Name and Signature) ▶ S. Williams (signature) | HEARING REFERRED TO ☐ HO ☒ SHO ☐ SC ☐ FC |
|---|---|---|---|---|

COPIES GIVEN INMATE BEFORE HEARING

| | BY: (STAFF'S SIGNATURE) | DATE 10/14 | TIME 1035 | TITLE OF SUPPLEMENT 1030 Instr.9 10-7-03 |
|---|---|---|---|---|
| T REPORT MBER: 43-35 | BY: (STAFF'S SIGNATURE) | DATE 10/14/03 | TIME 10.30 | BY: (STAFF'S SIGNATURE) ▶ Grace J | DATE 10/14/03 | TIME |

| ...D TO ☐ CLASSIFICATION ☐ BPT/NAEA | | | | | |
|---|---|---|---|---|---|
| Y: (TYPED NAME) | | SIGNATURE ▶ | | DATE | TIME |
| ...D BY: (SIGNATURE) | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE ▶ D. DACANAY, ASSOCIATE WARDEN, UNIT III | | DATE | |
| ... WILLIAMS, FACILITY CAPTAIN N/B | | | | | |
| | | BY: (STAFF'S SIGNATURE) ▶ | | DATE | TIME |
| OF CDC 115 GIVEN INMATE AFTER HEARING | | | | | |

# S RULES VIOLATION REPORT

| ER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| 2 · | CULLER | S3005(c) | | CSP-S.Q. | |

. FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT  ☑ YES  ☐ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| **NOT REQUEST** my hearing be postponed pending ome of referral for prosecution. | ▶ | |
| **QUEST** my hearing be postponed pending outcome ferral for prosecution. | ▶ | |

| ICE OF OUTCOME RECEIVED | DISPOSITION |
|---|---|
| | |

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| **VOKE** my request for postponement. | ▶ | |

## STAFF ASSISTANT

| SSISTANT UESTED  ☐ WAIVED BY INMATE | INMATE'S SIGNATURE  ▶ | DATE |
|---|---|---|

| IGNED | DATE | NAME OF STAFF |
|---|---|---|
| ASSIGNED | REASON | |

## INVESTIGATIVE EMPLOYEE

| GATIVE EMPLOYEE QUESTED  ☐ WAIVED BY INMATE | INMATE'S SIGNATURE  ▶ | DATE |
|---|---|---|

| SIGNED | DATE | NAME OF STAFF |
|---|---|---|
| T ASSIGNED | REASON | |

CE/INFORMATION REQUESTED BY INMATE:

## WITNESSES

SSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)
EPORTING EMPLOYEE  ☐ STAFF ASSISTANT  ☐ INVESTIGATIVE EMPLOYEE  ☐ OTHER _____  ☐ NONE

| SSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |

TIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, enting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

| | INVESTIGATOR'S SIGNATURE  ▶ | DATE |
|---|---|---|

| OPY OF CDC 115-A GIVEN INMATE | BY: (STAFF'S SIGNATURE)  ▶ | TIME | DATE |
|---|---|---|---|

15-A (7/88)                    — *If additional space is required use supplemental pages* —                    OSP 98 8819

# SERIOUS RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| H-31082 | CULLER | §3005(c) | | CSP-S.Q. | |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT   ☒ YES   ☐ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I DO NOT REQUEST my hearing be postponed pending outcome of referral for prosecution. | ▶ | |
| ☐ I REQUEST my hearing be postponed pending outcome of referral for prosecution. | INMATE'S SIGNATURE ▶ | DATE |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION | | |
|---|---|---|---|
| ☐ I REVOKE my request for postponement. | INMATE'S SIGNATURE ▶ | DATE |

## STAFF ASSISTANT

| STAFF ASSISTANT ☒ REQUESTED    ☐ WAIVED BY INMATE | INMATE'S SIGNATURE ▶ | DATE |
|---|---|---|
| ☐ ASSIGNED | DATE | NAME OF STAFF |
| ☐ NOT ASSIGNED | REASON | |

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE ☒ REQUESTED    ☐ WAIVED BY INMATE | INMATE'S SIGNATURE ▶ | DATE |
|---|---|---|
| ☐ ASSIGNED | DATE | NAME OF STAFF |
| ☐ NOT ASSIGNED | REASON | |

EVIDENCE/INFORMATION REQUESTED BY INMATE:

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)
☐ REPORTING EMPLOYEE   ☐ STAFF ASSISTANT   ☐ INVESTIGATIVE EMPLOYEE   ☐ OTHER _____   ☐ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |
| | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

**CDC—115-I.E. CONTINUED ON PART C.**

| | INVESTIGATOR'S SIGNATURE ▶ R. Thompson | DATE |
|---|---|---|
| ☒ COPY OF CDC 115-A GIVEN INMATE | BY: (STAFF'S SIGNATURE) ▶ | TIME | DATE |

CDC 115-A (7/88)  *— If additional space is required use supplemental pages —*

C-30

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H-31062 | CULLER | 03-03-NE-10-002 | CSP-S.Q. | 10-18-03 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☐ HEARING  ☒ IE REPORT  ☐ OTHER_____

**SERGEANT DENNIS'S ANSWER:** Inmate CULLER had not requested a bed move for him or his cellie within the last two weeks.

**QUESTION TO C/O MOORE:** OFFICER MOORE Did Inmate CULLER come to you and ask for some help in moving Inmate Thomas out of his cell?

**OFFICER MOORE'S ANSWER:** Inmate CULLER had not requested a bed move for him or his cellie within the last two weeks.

I then asked inmate CULLER if he had any witness (Inmates / Staff he would like for me to call upon that could provide any relevant facts and or information during this investigation, if so who are they and where do they work/or live. Inmate CULLER stated YES, and gave the following inmate names as witness. INMATE ROBINSON, J-66599 CELL 2N035 / INMATE JACKSON, H-99349 CELL 2N017 AND INMATE VANDEBURGH, T-60290 CELL 2N037.

**Inmate Witness(es) Comments:** Inmate Robinson, J-66599, CELL 2N035 Stated he didn't see anything; I work all day.

**Inmate Witness(es) Comments:** Inmate Jackson, H-99349, Cell 2N017 stated he didn't see anything either.

**Inmate Witness(es) Comments:** Inmate Vanduburgh, T-60290, cell 2N037 stated when passed by the cell both inmates were already involved in Mutual Combat, so I kept walking.

At this time I asked Inmate CULLER if he had any statements and or questions that I could answer for him at this time with this disciplinary process. I then reminded him that I could only gather information, questions and witness that have relevant information to this investigation and then submit my findings to the Senior Hearing Officer. Inmate CULLER stated that was pretty much it then. He then showed me a couple of peace's of paper with writing on both sides and said he was working on his own final statements that would be finished by the end of the week, that he will talk to the Senior Hearing Officer about it. I then said OK, and stated this concludes our interview for today.

**Additional Witnesses Requested at Hearing: No. Investigative Employee Requested at Hearing: No. Additional Information in Confidential Report's): No.**

**This concludes my report.**

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| R. Thompson, Correctional Officer | 10-18-03 |

| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| | | 10-23-03 | 10:00 |

CDC 115-C (5/95)                                                OSP 9t

C-31

STATE OF CALIFORNIA                                                                    DEPARTMENT OF CORREC...
# SERIOUS RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| H-31082 | CULLER | §3005(c) | | CSP-S.Q. | |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT ☐ YES ☐ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I DO NOT REQUEST my hearing be postponed pending outcome of referral for prosecution. | ▶ | |
| ☐ I REQUEST my hearing be postponed pending outcome of referral for prosecution. | INMATE'S SIGNATURE ▶ | DATE |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION |
|---|---|
| | |

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I REVOKE my request for postponement. | ▶ | |

## STAFF ASSISTANT

| STAFF ASSISTANT | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | ▶ | |
| ☐ ASSIGNED | DATE | NAME OF STAFF | |
| ☐ NOT ASSIGNED | REASON | | |

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | ▶ | |
| ☐ ASSIGNED | DATE | NAME OF STAFF | |
| ☐ NOT ASSIGNED | REASON | | |

EVIDENCE/INFORMATION REQUESTED BY INMATE:

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)
☐ REPORTING EMPLOYEE  ☐ STAFF ASSISTANT  ☐ INVESTIGATIVE EMPLOYEE  ☐ OTHER _____  ☐ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |
| | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

| | INVESTIGATOR'S SIGNATURE | DATE |
|---|---|---|
| | ▶ | |

| | BY: (STAFF'S SIGNATURE) | TIME | DATE |
|---|---|---|---|
| ☐ COPY OF CDC 115-A GIVEN INMATE | ▶ | | |

CDC 115-A (7/88)                    *— If additional space is required use supplemental pages —*                    OSP-98 8819 

C-32

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS

# RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|---|
| H-31082 | CULLER | | | CSP-S.Q. | 2N036L | |

| VIOLATED RULE NO(S). | SPECIFIC ACTS | LOCATION | DATE | TIME |
|---|---|---|---|---|
| CCR §3005(c) | BATTERY ON INMATE WITH WEAPON | North Block | 10-06-03 | 0730 |

CIRCUMSTANCES
On Monday, October 06, 2003, at approximately 0730 hours, while assigned to position #490, 3rd tier officer. I was securing the 2nd tier after the unit in and out movement, I observed an inmate identified as CULLER H-31082 housed in 2N036L step out of his assigned cell with signs of exhaustion and confusion. As I approached CULLER from about 20 to 25 feet away from him, on the 2nd tier, I observed what appeared to be spots of blood on CULLER state issued shirt. Which indicated signs of unusual behavior, I asked CULLER what had happened to him, CULLER stated, "ME AND MY CELLIE JUST GOT INTO IT." I realized that CULLER's cellie THOMAS T-64219 had just passed by me. I then observed inmate THOMAS T-64219 attempting to exit the unit. I yelled down to Sergeant K. Dennis who was monitoring the unit lock-up at the back door to detain inmate THOMAS. I proceed to escort inmate CULLER to the sergeants office were conducted a unclothed body search, which revealed scratches and scrapes that are consistent with being involved in a physical altercation. Additional confidential information was received indicating that you, inmate CULLER wrapped a TV cable around your cellie (inmate Thomas's) neck, and were using it to strangle him. Inmate Thomas was medically cleared with injuries to his neck area which consist with being strangled.

| REPORTING EMPLOYEE (Typed Name and Signature) | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|
| C. Grace, Correctional Officer | 10-7-03 | Pos. #490, N/B | S/S |

| REVIEWING SUPERVISOR'S SIGNATURE | DATE | ☐ INMATE SEGREGATED PENDING HEARING | |
|---|---|---|---|
| K. DENNIS, CORRECTIONAL SERGEANT | | DATE | LOC. |

| CLASSIFIED | OFFENSE DIVISION: | DATE | CLASSIFIED BY (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|---|
| ☐ ADMINISTRATIVE ☒ SERIOUS | 2-1-V | W/3 | ▶ Williams (pst) | ☐ HO  ☒ SHO  ☐ SC  ☐ FC |

COPIES GIVEN INMATE BEFORE HEARING

| ☐ CDC 115 | BY: (STAFF'S SIGNATURE) | DATE | TIME | TITLE OF SUPPLEMENT | | |
|---|---|---|---|---|---|---|
| | ▶ | 10-7 | 1030 | 1030 | | 10-7-03 |
| ☐ INCIDENT REPORT LOG NUMBER: 03-10-039c | BY: (STAFF'S SIGNATURE) ▶ | DATE 10-7-03 | TIME 10:30 | BY: (STAFF'S SIGNATURE) ▶ Grace | DATE | TIME |
| HEARING | | | | | | |

REFERRED TO ☐ CLASSIFICATION    ☐ BPT/NAEA

| ACTION BY: (TYPED NAME) | SIGNATURE ▶ | DATE | TIME |
|---|---|---|---|

| REVIEWED BY: (SIGNATURE) | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE | DATE |
|---|---|---|---|
| K. J. WILLIAMS, FACILITY CAPTAIN N/B | | ▶ D. DACANAY, ASSOCIATE WARDEN, UNIT III | |

| ☐ COPY OF CDC 115 GIVEN INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) ▶ | DATE | TIME |
|---|---|---|---|

CDC 115 (7/88)

C-33

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE __1__ OF __2__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H-31082 | CULLER | 03-03-NB-10-002 | CSP-S.Q. | 10-18-03 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☐ 115 CIRCUMSTANCES   ☐ HEARING   ☒ IE REPORT   ☐ OTHER _____

**CDC-115-I.E. CONTINUED**

I, Correctional Officer R. Thompson, was assigned as Investigative Employee for Inmate CULLER, CDC #H-31082, regarding a CDC-115, Log #03-03-NB-10-002, which originated on October 09, 2003, for violation of CCR §3005(c), BATTERY ON INMATE WITH WEAPON. On October 18, 2003, at approximately 0945 hours, I interviewed Inmate CULLER and explained to him my assignment as his Investigative Employee. Inmate CULLER had no objections to me being assigned as his Investigative Employee. Inmate CULLER stated NO. I then asked inmate CULLER to please refrain any of your questions until after this interview. I then asked inmate CULLER if he had received a copy of the CDC-115 report?. Inmate CULLER stated YES. (It should be noted that inmate CULLER received his copy of the CDC-115 Report on 10/14/03.) I then asked inmate CULLER if he knew how to read and / or understand the rules violation that you have been charged with during this Investigation?. Inmate CULLER stated YES. I then informed Subject of his rights to call witnesses and pose questions relevant to his case. I then asked inmate CULLER IF HE HAD ANY QUESTIONS OR STATEMENTS THAT HE WOULD LIKE TO MAKE AT THIS TIME. Inmate CULLER stated YES.

**Inmate CULLERS Statement:** Inmate CULLER stated that this incident (BATTERY ON AN INMATE WITH A WEAPON) and his actions of this particular incident was strictly self defense. He also stated that he hadn't gotten along with inmate Thomas and on this day everything came to a boiling point. He then stated that Thomas and myself started arguing when inmate Thomas turned around and swung at me (Threw a Punch) at me first; I was just trying to protect myself. He also stated YES I did choke Inmate Thomas But it was out of self defense because he kept coming after me and wouldn't stop trying to fight me. So I felt that by choking him, that it would take the breath out of him and that he wouldn't went to keep fighting with me, and I didn't use the TV cable on him either. At this time inmate CULLER showed me a copy of CDC-7219 Medical Clearance Report on Inmate THOMAS which stated that their was five (5) circular bruises on inmate THOMAS'S neck and not a line of bruising that would be consistent with a strangulation with a TV cord. Inmate CULLER went on and stated that he had been trying to move inmate THOMAS out of his cell and had asked Correctional Lieutenant V. Kelley, Correctional Lieutenant A. Perez, Correctional Sergeant K. Dennis and Correctional Officer D. Moore.

**QUESTION TO LIEUTENANT V. KELLEY:** Lieutenant Kelley Did Inmate CULLER come to you and ask for some help in moving Inmate Thomas out of his cell?

**LIEUTENANT KELLEY'S ANSWER:** Inmate CULLER had not requested a bed move for him or his cellie within the last two weeks.

**QUESTION TO LIEUTENANT A. PEREZ:** Lieutenant Perez Did Inmate CULLER come to you and ask for some help in moving Inmate Thomas out of his cell?

**LIEUTENANT PEREZ'S ANSWER:** Inmate CULLER had not requested a bed move for him or his cellie within the last two weeks.

**QUESTION TO SERGEANT K. DENNIS:** Sergeant Dennis Did Inmate CULLER come to you and ask for some help in moving Inmate Thomas out of his cell?

| SIGNATURE OF WRITER R. Thompson, Correctional Officer | DATE SIGNED 10-18-03 |
|---|---|
| COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |

CDC 115-C (5/95)

C-34

OSP 99 25082

STATE OF CALIFORNIA

**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS

PAGE____OF____

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| H-31082 | CULLER | 03-03-NB-10-002 | CSP-S.Q. | 10-23-03 |

☐ SUPPLEMENTAL  ☐ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☐ HEARING  ☐ IE REPORT  ☐ OTHER_____

### Staff Assistant Report

On **THURSDAY, October 23, 2003**, at approximately 0900 hours, I, Correctional Officer D. CARTER contacted and interviewed Inmate **CULLER**, H-31082, Cell #2C050, concerning CDC-115 Log #**03-03-NB-10-002**. I informed Subject that I have been assigned as his Staff Assistant. I then asked subject if he had any objections to my assignment. Subject Stated NO.

I explained the context of the CDC-115 and the specifics of the charges to inmate **CULLER**. I asked Subject if he understood the CDC-115. He answered, "**YES**."

I explained to Subject his due process rights and the hearing process. I then asked him if he had a clear understanding of his due process rights and the hearing process. He stated, "**YES**".

I informed Subject that I would present at the CDC-115 hearing to help explain the proceedings as they progress during the hearing.

I asked Subject if he had any additional questions at this time. Subject stated, "**No.**"

**End of Staff Assistant Interview.**

| | | |
|---|---|---|
| SIGNATURE OF WRITER  D. CARTER, Correctional Officer | | DATE SIGNED  10-23-03 |
| COPY OF CDC 115-C GIVEN TO INMATE ☑ | GIVEN BY: (Staff's Signature) | DATE SIGNED  10-23-03 | TIME SIGNED  10:00 |

# EXHIBIT  D

LIFE PRISONER EVALUATION
INITIAL PAROLE CONSIDERATION
HEARING FOR WEEK OF 04/25/05

I.     **COMMITMENT FACTORS**:

A.     LIFE CRIME:  Jerryal Culler was received into the California Department of Corrections (CDC) on April 13, 1992 for 1 count PC 205 Aggravated Mayhem with enhancement PC 12022(b) use of a deadly weapon.  The offense was committed in Contra Costa County, case #9129982.   The weapon utilized was flammable liquid (gasoline).  Culler was sentenced to life plus 1 year with a Minimum Eligible Parole Date (MEPD) of May 4, 1999.  There are no current legal challenges noted.
Victim: Fred Eugene Upton, age unknown (adult).

1.     Summary of Crime:  Remains the same as stated in the last hearing.

2.     Prisoner's Version:  During an interview on September 28, 2004, Culler declined to give his version of the offense.

3.     Aggravating/Mitigating Circumstances:

a.     Aggravating Factors:  Remains the same as stated in the last hearing.

b.     Mitigating Factors:  Remains the same as stated in the last hearing.

II.    **PRECONVICTION FACTORS**:

A.     JUVENILE RECORD:  Documents from previous hearings have been considered and that information remains valid.

B.     ADULT CONVICTIONS AND ARRESTS:   Documents from previous hearings have been considered and that information remains valid.

C.     PERSONAL FACTORS:  Documents from previous hearings have been considered and that information remains valid.

NAME: CULLER, JERRYAL
CDC NUMBER: H-31082

$P-1$

III.    **POSTCONVICTION FACTORS**:

    A.    SPECIAL PROGRAMMING/ACCOMMODATIONS: Noted is a Stipulation and Dismissal from the United States District Court for the Northern District of California dated May 5, 2004 which states in part, "Parole Board Panel members stipulate that they will not consider Plaintiff's (Culler's) disability, specifically his nephropathy as alleged in his complaint dated April 9, 2001, including any resulting inability to work, as a basis to deny his suitability for parole at any future parole hearings for which he may be eligible." However, there is no current documentation in the Central file to indicate any need for special accommodations.

    B.    CUSTODY HISTORY: Documents from previous hearings have been considered and that information remains valid. Culler remained housed at California State Prison, San Quentin (SQ). On 07-31-03, Culler was assigned to the security squad as a porter. He was unassigned on 10-06-03 due to placement in Administrative Segregation (ASU) for allegedly battering his cellmate with a weapon. Culler's custody and work group/privilege group (WGPG) increased to MAX and D2D. On 11-21-03, Institution Classification Committee (ICC) assessed and imposed a 15 month Security Housing Unit (SHU) term with a Minimum Eligible Release Date (MERD) of 09-14-04. A Classification Staff Representative (CSR) approved the SHU term on 01-13-04 and endorsed Culler for transfer to California State Prison, Corcoran (COR) SHU.

        02-20-04 Culler was received at COR-SHU. ICC of 03-02-04 conducted his Initial SHU review. Culler was retained in COR-SHU, MAX S, D2D. At Culler's Pre-MERD/CDC Annual Review on 08-25-04, ICC referred Culler's case to the CSR recommending retention in ASU pending BPT hearing. Retention on ASU is based on COR general population being unable to house Culler due to his Level II classification score and Close B custody upon transfer out of SHU. Culler's custody and WGPG remain MAX and D2D through his MERD with a reduced classification score of 26.

    C.    THERAPY & SELF-HELP ACTIVITIES: There is no documentation of participation in any therapy or self help activities since Culler's last hearing.

D.    DISCIPLINARY HISTORY:
  1. CDC 128A Counseling chronos:
       07-08-03 Violation of Grooming Standards
       07-26-03 Disobeying a Direct Order
       09-17-03 Leaving job assignment without approval

  2. CDC 115's-Rules Violation Reports
     10-06-03 Battery on Inmate with a weapon, guilty, Division
     A-1, 360 days LOC, 24 month SHU term.

E.    OTHER: Culler last appeared before the Board of Prison Terms
      (BPT) for a Subsequent hearing #3 held on April 23, 2002. The
      Board denied parole for two years and had the following
      recommendations:
      1. Remain disciplinary free
      2. Participate in self help and therapy programs. Culler has
         no current documented disability which would preclude
         him from participating in these programs. However, he has
         been housed in ASU/SHU since October 6, 2003 which
         may preclude him from participating in some programs.

IV.    **FUTURE PLANS**:

A.    RESIDENCE: Culler declined to state any current residence
      plans.

B.    EMPLOYMENT: Please refer to the stipulation and dismissal
      from the United States District Court dated May 5, 2004.

V.    **USINS STATUS:** Culler is a citizen of the United States.

VI.    **SUMMARY**:

A.    Prior to release, Culler could benefit from the following:
      remaining disciplinary free, maintaining a reduced classification
      level, participating in therapy/self help groups, and formulating
      residence plans.

$\wp - 3$

LIFE PRISONER EVALUATION
INITIAL PAROLE CONSIDERATION
HEARING FOR THE WEEK OF 12/27/04
NAME CULLER, JERRYAL   NUMBER H-31082
PAGE 4

B. This report is based on a complete review of the central file lasting approximately 2 hours. Inmate Culler declined to be interviewed on 09-28-04.

C. Culler was afforded an opportunity to examine his central file on 09-28-04, refer to CDC 128B general chrono dated 09-28-04, which he declined and refused to sign stating such.

D. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.


**Prepared by:**


D. L. FISHER

Correctional Counselor I


11-3-04
Date


**Reviewed by:**


D. MEANS

Correctional Counselor II


11-15-04
Date


D-5

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| cont.<br><br>07/01/02<br>to<br>06/30/03 | | | cont.<br><br>**WORK GROUP:** "S" was assigned as a security squad porter on 07-31-03. There are no work supervisor reports noted for this assignment.<br>**GROUP ACTIVITIES:** None noted during this period of review.<br>**PSYCHIATRIC TREATMENT:** None noted during this period of review.<br>**PRISON BEHAVIOR:** "S" was found guilty of a Rules Violation Report (RVR) dated 10-06-03 Battery on an Inmate with a weapon, Division A-1, 360 days forfeiture of credit. Institution Classification Committee (ICC) of 11-21-03 assessed/imposed a 15 month SHU term with a Minimum Eligible Release Date (MEPD) of 09-14-04.<br>**OTHER:** "S" received the following CDC 128A counseling chronos during this period:<br>07-08-03 Grooming standards; 07-26-03 Disobeying a Direct Order; 09-17-03 Leaving job assignment without approval. No laudatory chronos are noted. |
| 03/08/04<br>to present<br>10/27/04 | | | **PLACEMENT:** "S" remains housed at COR SHU.<br>**CUSTODY:** "S" custody remains at MAX S.<br>**VOCATIONAL TRAINING:** None noted during this period of review.<br>**ACADEMICS:** None noted during this period of review.<br>**WORK RECORD:** None noted during this period of review. |

**ORDER:**

☐ BPT date advanced by _____ months          ☐ BPT was affirmed without change

☐ PBR date advanced by _____ months.          ☐ PBR was affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institution calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CULLER | H-31082 | CSP-COR | WK OF 12/27/04 | |

*PAGE 2 of 3*

**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| | DOCUMENTATION HEARING |
|---|---|
| x | PAROLE CONSIDERATION HEARING |
| | PROGRESS HEARING |

**INSTRUCTIONS**

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY

ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 03/08/02 to 03/07/03 | | | **PLACEMENT:** "S" remained housed at California State Prison, San Quentin (SQ) in the General Population (GP) for this period of review. **CUSTODY:** "S" custody remained Medium A for this period of review. **VOCATIONAL TRAINING:** None noted during this period of review. **ACADEMICS:** None noted during this period of review. **WORK RECORD:** "S" was deemed medically disabled for this period of review. **GROUP ACTIVITIES:** None noted during this period of review. **PSYCHIATRIC TREATMENT:** None noted during this period of review. **PRISON BEHAVIOR:** "S" remained disciplinary free during this period of review. **OTHER:** No laudatory or counseling chronos noted for this period of review. |
| 03/08/03 to 03/07/04 | | | **PLACEMENT:** "S" began the period SQ-GP. "S" was placed in Administrative Segregation Unit (ASU) on 10-06-03 for involvement "in a cell fight." "S" transferred to California State Prison Corcoran (COR) Security Housing Unit (SHU) on 02-20-04. **CUSTODY:** "S" custody remained MED A until it was raised to MAX S as a result of ASU placement. **VOCATIONAL TRAINING:** None noted for this period of review. **ACADEMICS:** None noted during this period of review. |

| CORRECTIONAL COUNSELOR SIGNATURE | | DATE |
|---|---|---|
| D.L. FISHER, CCI        D. MEANS, CCII | | 11-15-04 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CULLER | H-31082 | CSP-COR D - 7 | 12/27/04 | |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 07/01/03 to 10/20/04 cont. | | ɩ | cont. **GROUP ACTIVITIES:** None noted during this period of review. **PSYCHIATRIC TREATMENT:** None noted during this review period. **PRISON BEHAVIOR:** "S" has remained disciplinary free for this period of review. **OTHER:** No laudatory or counseling chronos for this period of review. |

**ORDER:**

- [ ] BPT date advanced by _____ months
- [ ] PBR date advanced by _____ months.
- [ ] BPT was affirmed without change
- [ ] PBR was affirmed without change

**SPECIAL CONDITIONS OF PAROLE:**

- [ ] Previously imposed conditions affirmed
- [ ] Add or modify _____

- [ ] Schedule for Progress Hearing on appropriate institution calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CULLER | H-31082 | CSP-COR | WK OF 12/27/2004 | |

PAGE 3 of 3

D-8

BPT 1004 (REV. 7/86)

# EXHIBIT E

# MENTAL HEALTH EVALUATION

# FOR THE BOARD OF PRISON TERMS

## CSP-CORCORAN

### SUBSEQUENT HEARING/ DECEMBER 2004

## IDENTIFYING INFORMATION

**NAME: CULLER, JERRYAL**
**CDC#: H 31082**
**Date of Birth: 02/27/1958**
**Date of Interview: 10/04/04**
**Date of Report: 11/10/04**

Inmate Culler is a 46 year-old first termer who is serving a life sentence for Aggravated Mayhem with Use of a Deadly Weapon. The date of the commitment offense was 9/2/1991, and he was 33 years old at the time. He was received into CDC on 4/13/92 at San Quentin Reception Center. His MEPD was 5/4/99. He presently has 26 custody points.

## REFERRAL AND PROCEDURE

The inmate was referred for a psychological evaluation by the Board of Prison Terms for an assessment of overall psychological functioning to assist in making recommendations for parole consideration.

Prior to the evaluation, he was fully informed of its nature and purpose. He was also informed that any information he provided was subject to inclusion in the evaluation report, and would be available to the Board of Prison Terms. He was further advised that his participation was voluntary but that a report would still be generated if he decided not to participate. Inmate Culler verbally indicated that he understood the purpose of this evaluation and consented to participate.

The psychological evaluation included a clinical interview, a review of the central file, and a review of Mr. Culler's medical record. The most recent psychological evaluation available to this examiner was dated 10/23/00 and was signed by H. Ishida, Ph.D., Clinical Psychologist, San Quentin State Prison.

## FAMILY AND DEVELOPMENTAL HISTORY

Mr. Culler was born in Blythville, Arkansas to John Culler and Pearlene Cooper. He was the second of four children. His youngest sisters died in 1988, at age thirty, of lupus. His older brother drowned in 1991, one month before the inmate was incarcerated, at age thirty-six. The inmate and his immediate younger sister had the same father, who left the family when the inmate was two years old. His mother, who had an eighth grade education, worked at country clubs, as a maid, and at a saw mill. He describes his childhood as normal 'with a single mother and a step father.' His mother died in 1994 from cancer at the age of fifty-four. The inmate's father moved to San Francisco where he became a small business entrepreneur, a restaurant owner. He apparently felt close to his father since he visited him during school vacations during his childhood. The father died in 1987 from diabetes when he was in his fifties. The inmate had no developmental delays or serious illnesses as a child, other than whooping cough. Mr. Culler stated that he became rebellious about the age of sixteen.

Mr. Culler dropped out of school in the 9th grade, and he received a GED when he was 17 years old. He received an Associate of Arts Degree in Business and Psychology from Phillips County Community College in Arkansas. TABE test scores dated 12/27/99 show Total Battery = 9.8, Reading = 12.0, Math = 6.7, and Language = 11.0.

The inmate denied ever having been affiliated with a street gang, and there is no indication of such in his C-file. He started using marijuana at age 18, cocaine at social gatherings at the age of 20 to 28, and rock cocaine when he was 24 years old. He stated that the rock cocaine became a problem until he stopped using in 1989. He also stated he became a social drinker at age 21, but drank heavily for three months following his brothers death.

Mr. Culler married Debra Christopherson on 4/9/92 in Contra Costa Co. Jail after having been in a common law relationship for ten years. Together they have a son, Jerryal Jr. who was born 2/9/84. Mrs. Culler has a daughter from a prior relationship, who the inmate molested when she was ten years old. Mr. Culler stated that his relationship with his wife is "pretty strained." The last visit he received from her was in 2002. He explained that he wants a divorce, but his wife does not, "she wants to hold on to a comfort zone." He stated that he receives letters from her "all the time."

The inmate described his relationship with his son, who now is 20 years old, as good. He stated that his son feels abandoned by him and that he blames him for lack of judgment. The son who lives in Denver, Colorado, visited his father last year in San Quentin. His step daughter, now age 27, lives in Concord, writes and visits with her step-father on the telephone, according to Mr. Culler.

Mr. Culler has four children from three different women, all prior to his relationship with his wife. His first child was born when Mr. Culler was 13 years old. That daughter is now 32 years old, he also has twin daughters age 29, and a son, 28 years old. He knows

that they live in New York, Washington, and Chicago, but he has no contact with any of them.

## EMPLOYMENT/MILITARY HISTORY

Mr. Culler has no military history. He reported that he worked as a heavy equipment operator for 11 years prior to incarceration, and stated he is in good standing with Local 3 Operative Engineers Union. He also referred to having a business of auto detailing while on the street. The records indicate that he worked as a taxi driver, a chauffeur and as a small business entrepreneur as well.

## MEDICAL/MENTAL HEALTH HISTORY

The Unit Health Record indicates that Mr. Culler was treated for delirium due to Prednisone intoxication in 2000, for which he received Haldol for 45 days while hospitalized. He continues to be treated with Prednisone for Nephrotic Syndrome. He presently appears to be medically stable.

Mr. Culler reported that he started drinking socially at age 21. He stated that after his brother died he used alcohol heavily for three months while he was "in denial." He stated that he used powder cocaine socially from age 20, and later used rock cocaine which became a real problem before he quit "cold turkey" in 1989.

## CRIMINAL HISTORY

The Central file reflects that Mr. Culler has no juvenile record.

His adult criminal record started in 1988 when he was convicted of molesting a minor, his ten years old step-daughter. His record also includes violation of a restraining order, petty theft, 2nd degree burglary, and being under the influence of a controlled substance. He is serving his first prison term in CDC.

Mr. Culler denies any involvement or affiliation with street gangs.

Regarding his life crime, Mr. Culler stated that "the whole incident is behind a real mix-up." He stated that he was "hanging around where drinking took place, and I ended up arguing with two guys who were raping this woman. I told them to get off her, that's how it all happened." "I'm deeply remorseful for what I have done. I wish I could take it back. I have deep empathy for the victim. It was one of those situations where stubborn mentality and alcoholism contributed to an unfortunate incidence. There was nothing racist or criminal about it."

## INSTITUTIONAL FUNCTIONING AND PROGRESS

While incarcerated Mr. Culler has had several assignments. He was initially placed on the academic waiting list, before he was assigned to the Education Department at LAC. While at CSP-Ironwood he was assigned to the Facility Sergeant's work crew. In October of 1995 he was transferred to San Quentin where he was assigned to the Vocational Machine Shop, and he remained there until he became totally medically disabled on 10/25/98.

For a period of approximately three years Mr. Culler seems to have taken advantage of numerous self-help programs. He completed the Man Alive Program, the Katargeo program, and participated in a self-esteem Enhancement group. He also completed a Basic Alternative to Violence workshop, and later an Advanced Alternative to Violence workshop. He later, in 2000, participated in the Alternative to Violence workshop as a co-facilitator. He also completed a Friends Outside Parenting program. He accomplished these things during the time span of 1998 to 2000. When asked about current self-help activities, he stated," they said I didn't have to have any more self-help programs." He has participated in Alcoholics Anonymous on a continual basis as access has permitted.

Vocationally he has earned certificates in Machine Tool Technology and Business Management.

When Mr. Culler was asked about disciplinaries since his last BPT hearing, he stated that he has received two CDC 115s, one for disobeying a direct order (July '03), and one for battery on an inmate with a weapon (10/6/03). Regarding the latter, the inmate explained that he has requested a polygraph test, to which the Title 15 states he is entitled, but they stonewalled the appeal. He claimed the charge should be mutual combat rather than battery.

## MENTAL STATUS EXAMINATION

Mr. Culler presented as well groomed, alert, and oriented to all spheres. He came to the interview dressed in the yellow Ad Seg jump suit.. He was polite and appropriate in his interactions with this examiner.. Thoughts were logical and goal directed, and speech had a slight lisp. Capacity for insight and empathy is average. Recall for long- and short-term memory was grossly intact, and he stated "my memory is pretty sharp." His intellectual functioning is estimated in the average range.

His mood was within the normal range and expression of emotion was somewhat dulled. He stated that he has felt "pretty good, it varies depending on the moment." There were no signs of suicidal ideation, and he evidenced no indicators of responding to internal

stimuli such as auditory hallucinations or other perceptual disturbances. His coping abilities are adequate and he presented as stable.

## DSM IV DIAGNOSTIC IMPRESSION

Axis I:     Alcohol Dependence, in Institutional Remission
            Cocaine Abuse, in Institutional Remission
Axis II:    None
Axis III:   Nephropathy Syndrome
Axis IV:    Incarceration, Life Term
Axis V:     GAF = 70
            Highest GAF past year: 75

## ASSESSMENT OF DANGEROUSNESS

The inmate's level of dangerousness in a controlled environment is estimated to be average for a level II inmate. He has remained free of violence since incarceration until October '03. Since the inmate denies the charges of the most recent RVR, it is unwise to speculate why this incident happened. If indeed he is found guilty, the level of dangerousness that this inmate exhibits is above average..

He has made attempts to better himself in the past by participating in various groups such as self-esteem and alternative to violence. He has also upgraded himself vocationally in the past.

While it is difficult to generalize behavior from the structured and controlled correctional setting of a prison to that of a free society, this inmate's risk of violent recidivism appears to be average. The greatest risk factor for Mr. Culler is his history of alcohol dependence. Alcohol was a significant factor in the instant offense, and without internal convictions and external structures in this area, Mr. Culler may repeat series of poor judgment which may victimize himself and others. When speaking about his crime, Mr. Culler used the right words in an attempt to convey the appropriate emotional attitude, however, his statements sounded rehearsed and meaningless. He does not appear to have fully accepted the gravity of his crime. He appears to see himself as a victim of society by stating "I felt as though I was a slave in this country. I felt as though I was going to prison no matter what since it was a white victim; I felt as though I was betrayed."

## CONCLUSIONS AND RECOMMENDATIONS

1.     This inmate is competent and responsible for his own behavior. He knows right from wrong and understands what is expected of him. Decisions

6

regarding parole and housing can be based on custody issues rather than on mental health factors.

2.  This inmate has a history of alcohol and drug dependence which appear to be in institutional remission, but this will need to be verified upon placement in a less controlled setting. His history predisposes him to relapse of substance abuse, and chances for sustained sobriety can be improved by participation in a 12-step program.

3.  The inmate's level of dangerousness within prison and the risk of violent recidivism in the community are presently average provided he remains substance free. If the inmate is found guilty of battery on his cell mate with a weapon, his level of dangerous would be above average.

4.  He has the capacity to abide by institutional standards, and has demonstrated his ability to do so for extended time periods. He will benefit from continued employment that will provide him with structure in or out of prison.

5.  In or out of prison, the inmate will require greater than average amounts of supervision for some time until he has established a consistently non-violent and prosocial response style. He may benefit from participation in programs that address criminal thinking, victim awareness, taking responsibility, and anger management, as well as programs that promote prosocial behaviors. Ongoing participation in a 12-step program will further improve his chances to succeed.


Tone F. Blanchard, Ph.D.
Clinical Psychologist, C.F.
CSP-Corcoran


CC:   C-File
      Unit Health Record
      Control Copy

EXHIBIT   F

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                    )
JERRYAL CULLER )
_____)

CDC Number H-31082



COPY

INMATE

CALIFORNIA STATE PRISON, CORCORAN

CORCORAN, CALIFORNIA

APRIL 26, 2005

9:40 A.M.

PANEL PRESENT:

SHARON LAWIN, Presiding Commissioner
R. ESTRADA, Deputy Commissioner

OTHERS PRESENT:

JERRYAL CULLER, Inmate
BILL SCHMIDT, Attorney for Inmate
JACK WADDELL, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes        Transcript Memorandum

**Marsha Mees**        **Capitol Electronic Reporting**

ii

## INDEX

Page

Proceedings ...................................... 1

Case Factors .................................... 12

Pre-Commitment Factors .......................... 20

Post-Commitment Factors ......................... 35

Parole Plans .................................... 29

Closing Statements .............................. 55

Recess .......................................... 65

Decision ........................................ 66

Adjournment ..................................... 73

Transcriber Certification ....................... 74

--oOo--

1

1        **P R O C E E D I N G S**

2            **DEPUTY COMMISSIONER ESTRADA:**  We're on.

3            **PRESIDING COMMISSIONER LAWIN:**  All right.

4        Thank you.  This is a Subsequent Parole

5        Consideration Hearing for -- is it Jerryal?

6            **INMATE CULLER:**  Jerryal.

7            **PRESIDING COMMISSIONER LAWIN:**  Jerryal,

8        pardon me, J-E-R-R-Y-A-L, Jerome Culler, CDC

9        number H-31082.  Today is April 26, 2005.  We're

10       located at CSP, Corcoran and the time is 9:40.

11       Mr. Culler was received in CDC on April 13, 1992

12       from Contra Costa County, that was Contra Costa

13       case number 9129982, and he was received for

14       violation of Penal Code 205 and 12022(b), that's

15       aggravated mayhem with use of a deadly weapon,

16       count number three.  Term's life plus one year.

17       Minimum eligible parole date, May 15, 1999.

18       Mr. Culler, these hearings are tape recorded.  So

19       for voice identification purposes we're going to

20       go around the room and identify our voices for the

21       transcriber.  Each of us will state our first and

22       last name, spell our last name.  When we come to

23       you, we need for you to do that plus give us your

24       CDC number.  I'll begin and go to my right.

25       Sharon Lawin, L-A-W-I-N, Commissioner.

26            **DEPUTY COMMISSIONER ESTRADA:**  R. Estrada,

27       E-S-T-R-A-D-A, Deputy Commissioner, Board of

1   Prison Terms.

2       **DEPUTY DISTRICT ATTORNEY WADDELL:** My name is

3   Jack Waddell, W-A-D-D-E-L-L, Deputy District

4   Attorney of Contra Costa County.

5       **ATTORNEY SCHMIDT:** Bill Schmidt,

6   S-C-H-M-I-D-T, attorney for Mr. Culler.

7       **INMATE CULLER:** Jerryal Culler, C-U-L-L-E-R,

8   H-31082.

9       **PRESIDING COMMISSIONER LAWIN:** Thank you

10  very much. That identifies all parties in the

11  room with the exception of two correctional peace

12  officers and they are here for security purposes.

13  Mr. Culler, in front of you just under your

14  documents is an ADA statement. I need for you to

15  read that out loud please.

16      **INMATE CULLER:** The Americans With

17  Disabilities Act is a law to help people with

18  disabilities. Disabilities are problems that make

19  it harder for some people to see, hear, breathe,

20  talk, walk, learn, think, work or take care of

21  themselves than it is for others. Nobody can be

22  kept out of public places or activities because of

23  a disability. If you have a disability, you have

24  the right to -- for help to get ready for your BPT

25  hearing, get to the hearing, talk, read forms and

26  papers and to understand the hearing process. BPT

27  will look at what you asked for to make sure that

1   you have a disability that is covered by the ADA

2   and that you have asked for the right kind of

3   help.  If you don't get help or if you don't think

4   you got the kind of help you need, ask the BPT for

5   a 1074 Grievance Form.  You can also get help to

6   fill it out.

7        **PRESIDING COMMISSIONER LAWIN:**  Thank you.

8   Mr. Culler, did you understand that?

9        **INMATE CULLER:**  Yes, I did.

10       **PRESIDING COMMISSIONER LAWIN:**  That

11   statement was printed on a BPT 1073 Form that you

12   signed on March 9, 2005.  And at the time that you

13   signed the 1073 statement there's a box on it that

14   asked a counselor if you appeared to understand --

15   and they said that you did there as well.  That

16   1073 Form also asked if you have any disabilities

17   as defined by the Americans With Disabilities Act.

18   The box that reads I do have a disability is

19   checked, but there's no disability noted and it

20   states, I do not need help for my parole hearing.

21   I have a couple of questions for you in that

22   regard.  First of all, I do see that you're

23   totally medically disabled.  Is that still the

24   case?

25       **INMATE CULLER:**  Yes.

26       **PRESIDING COMMISSIONER LAWIN:**  All right.

27   And does that require any accommodations so that

4

1    you can participate in the hearing today such as

2    eyeglasses, any sort of a cane, wheelchair,

3    magnified -- hearing device, any accommodations

4    along those lines that you require?

5         **INMATE CULLER:**  No.

6         **PRESIDING COMMISSIONER LAWIN:**  Okay.  Did

7    you have any difficulty getting to the hearing

8    room here today?

9         **INMATE CULLER:**  No.

10         **PRESIDING COMMISSIONER LAWIN:**  Do you take

11    any medication on a regular basis that --

12         **INMATE CULLER:**  Yes.

13         **PRESIDING COMMISSIONER LAWIN:**  -- that would

14    prohibit you from participating in the hearing?

15         **INMATE CULLER:**  No.

16         **PRESIDING COMMISSIONER LAWIN:**  Is any of

17    that psychotropic medication?

18         **INMATE CULLER:**  No.

19         **PRESIDING COMMISSIONER LAWIN:**  Are you part

20    of Triple CMS?

21         **INMATE CULLER:**  No.

22         **PRESIDING COMMISSIONER LAWIN:**  Do you have

23    any loss of vision?

24         **INMATE CULLER:**  No.

25         **PRESIDING COMMISSIONER LAWIN:**  Do you have

26    any loss of hearing?

27         **INMATE CULLER:**  No.

5

1           **PRESIDING COMMISSIONER LAWIN:**  And when you

2     were going to school on the outside what was the

3     highest grade that you completed?

4           **INMATE CULLER:**  I got an AA in business

5     administration and a minor in psychology.

6           **PRESIDING COMMISSIONER LAWIN:**  Okay.  And

7     when was that?

8           **INMATE CULLER:**  It was in '78.

9           **PRESIDING COMMISSIONER LAWIN:**

10    Seventy-eight.  All right.  Thank you.  Anything

11    else about the Americans With Disabilities Act

12    then that you would like to state for the record?

13          **INMATE CULLER:**  No, that the court

14    stipulated and the BPT has stipulated that my

15    ability to not work will not be used against me to

16    deny me parole.

17          **PRESIDING COMMISSIONER LAWIN:**  I understand

18    that.  That has nothing to do with this question.

19    That has nothing to do with your needed

20    accommodations for this hearing.

21          **INMATE CULLER:**  No.

22          **PRESIDING COMMISSIONER LAWIN:**  Okay.  Thank

23    you.  Counsel, any comments regarding ADA?

24          **ATTORNEY SCHMIDT:**  No, Commissioner.

25          **PRESIDING COMMISSIONER LAWIN:**  Before we

26    proceed, did you have something you wanted to

27    place on the record, or you want to do that later?

6

1    **ATTORNEY SCHMIDT:**  It would be an objection

2    or a (inaudible) objection or -- Yes, I'd like to

3    place on the record that there apparently is a new

4    policy at CSP, Corcoran regarding meeting of the

5    inmates on the day of the hearing.  Although I was

6    accommodated when I met with the inmates who have

7    parole consideration hearings this week, I did not

8    -- when I came last week to meet with those

9    inmates, Mr. Culler was in the hospital.  I didn't

10   have an opportunity to meet with him.  And the new

11   policy says that the inmates are not allowed to

12   meet face-to-face or in the same room without

13   glass or bars on the day of the hearing.  The

14   inmate is not allowed to meet with the attorney.

15   So therefore it was extremely difficult for me to

16   have a conversation with Mr. Culler today.  I was

17   unable to, in any reasonable way, exchange

18   documents with him or to develop an attorney

19   client relationship.  So we'd just like to get on

20   the record that this new policy is disruptive to

21   meeting with clients.  But we have talked and

22   decided to go ahead with the hearing anyway today.

23   **PRESIDING COMMISSIONER LAWIN:**  All right.

24   Well your objection is so noted, and I will also

25   put on the record that it has been verified that

26   it is a fairly new change in procedure due to

27   safety concerns.  In speaking with our legal

1    division with our chief counsel our opinion is
2    that it doesn't inconvenience you to the extent
3    that you were unable to properly prepare for the
4    hearing and therefore we would not postpone it
5    because of that change in policy and that we would
6    proceed regardless. So I do understand your
7    position and it is on record, so noted, and we
8    will proceed anyway.

9        **ATTORNEY SCHMIDT:** Thank you.  Mr. Culler
10    has a concern; perhaps the Board could clarify the
11    reason why he's in year number three when he was
12    given a two year denial last time.

13        **PRESIDING COMMISSIONER LAWIN:** And the
14    reason is that the Board does have a backlog which
15    has climbed fairly recently due to lack of
16    Commissioners and so we are behind everywhere, not
17    just here, and this is nothing personal, it's not
18    you, it's the entire system that's backlogged.  So
19    you did have a two year denial.  You should have
20    been heard a year ago, April of 2004, but because
21    of scheduling you were not placed on calendar
22    until this point.  And I actually see you were
23    placed on calendar earlier but hearings were
24    cancelled, so this is the next available calendar.
25    So in terms of an objection, the remedy for that
26    is to hold the hearing at the earliest possible
27    time and that would be now.  So we are holding

8

1  this hearing.

2          **INMATE CULLER:**  Question.

3          **PRESIDING COMMISSIONER LAWIN:**  Yes.

4          **INMATE CULLER:**  Will it be credited if --

5          **PRESIDING COMMISSIONER LAWIN:**  No, there's

6  no credit.  You received a two year denial.  We're

7  hearing your case today in April of 2005 and

8  whatever denial we give you, if it is a denial,

9  would go from today's date forward.  If we give

10  you a date, it goes from today's date.  Anything

11  else before we move on?

12          **ATTORNEY SCHMIDT:**  No, Commissioner.

13          **PRESIDING COMMISSIONER LAWIN:**  All right.

14  Thank you.  We will proceed then.  Mr. Culler, the

15  purpose of our hearing today is to consider your

16  suitability for parole.  In reaching our decision

17  we are going to consider the crime that brought

18  you to prison, your background, your social

19  history and your behavior since your

20  incarceration.  We will go to your progress since

21  your last hearing.  We'll do that by using the

22  counselor's report, the psychological report and

23  any other information that has a bearing on your

24  suitability.  We have reviewed your Central File

25  and prior hearing transcripts and we'll give you

26  and Mr. Schmidt the opportunity to make

27  corrections to the record as we go.  You,

9

 1    Mr. Schmidt and Mr. Waddell will all have the
 2    opportunity to make a closing statement today.
 3    And this will go to your suitability for parole
 4    and length of confinement.  The law and the Board
 5    of Prison Terms' rules state that if the Panel
 6    finds your release would pose an unreasonable risk
 7    of danger to society then you will be denied a
 8    parole date.  You are not required today to
 9    discuss the commitment offense with the Panel;
10    you're not required to admit to the offense.  If
11    you choose not to speak to the Panel about the
12    crime, the fact that you're not talking about it
13    will not be held against you.  We do accept as
14    true the findings of the court.  We're not here to
15    retry your case.  Our responsibility is to decide
16    only on your suitability for parole.  You do have
17    a number of rights that you are afforded.  They
18    include the right to a timely notice, the right to
19    present relevant documents, and the right to do an
20    Olson Review.  Mr. Schmidt, have those rights of
21    your client been met thus far to the best of your
22    knowledge?
23         **ATTORNEY SCHMIDT:**  Yes, they have.
24         **PRESIDING COMMISSIONER LAWIN:**  One
25    additional right you have, Mr. Culler, is to a
26    fair and impartial Panel.  Now that you've seen
27    the two Panel members in front of you do you have

10

1  any objections to the members of the Panel?

2        **INMATE CULLER:**  No.

3        **PRESIDING COMMISSIONER LAWIN:**  Counsel, do

4  you have any objections to the members --

5        **ATTORNEY SCHMIDT:**  No objections.

6        **PRESIDING COMMISSIONER LAWIN:**  Any other

7  preliminary objections?

8        **ATTORNEY SCHMIDT:**  None.

9        **PRESIDING COMMISSIONER LAWIN:**  Will your

10  client be speaking with us today?

11        **ATTORNEY SCHMIDT:**  Yes, he will.

12        **PRESIDING COMMISSIONER LAWIN:**  Then as best

13  you can if you raise your right hand, I'll swear

14  you in.  Do you solemnly swear or affirm that your

15  testimony at this hearing will be the truth, the

16  whole truth and nothing but the truth?

17        **INMATE CULLER:**  Yes, I do.

18        **PRESIDING COMMISSIONER LAWIN:**  Thank you

19  very much.  Commissioner, is there any

20  confidential to be used today?

21        **DEPUTY COMMISSIONER ESTRADA:**  There's a

22  confidential file, but no information will be

23  used.

24        **PRESIDING COMMISSIONER LAWIN:**  Thank you.

25  And earlier I had marked a documents checklist as

26  Exhibit number one to make sure that everybody's

27  working with the same set of documents today.

11

1   Mr. Schmidt, have you received all the documents

2   on the checklist?

3        **ATTORNEY SCHMIDT:** Yes, I have.

4        **PRESIDING COMMISSIONER LAWIN:** Mr. Waddell?

5        **DEPUTY DISTRICT ATTORNEY WADDELL:** Yes, we

6   have received all those documents.

7        **PRESIDING COMMISSIONER LAWIN:** Thank you

8   both. Mr. Schmidt, any new documents for our

9   review today?

10       **ATTORNEY SCHMIDT:** None.

11       **PRESIDING COMMISSIONER LAWIN:** All right.

12  At the end of our hearing, Mr. Culler, you're

13  going to receive a copy of our decision. It's in

14  writing. It is only tentative until it goes

15  through the Board's decision review process. And

16  as you know once they have issued that decision

17  process regardless of what the decision is they

18  will send a copy of the final decision to you

19  along with the transcript. The regulations

20  changed May 1, 2004. There is no longer an

21  appeals process. You can file a grievance on

22  limited aspects of our decision. And the process

23  is explained or outlined in an administrative

24  directive which you should be able to locate in

25  the law library. It would be number AD 04 slash

26  01. Any other disagreements or dispute regarding

27  our decision that don't fall within that new

12

1   process would be filed directly with the court.

2   Any questions?

3           **INMATE CULLER:**  Not this time.

4           **PRESIDING COMMISSIONER LAWIN:**  All right.

5   Mr. Schmidt, I'm going to read the Statement of

6   Facts from the probation officer's report, pages

7   five and six if you have no objection.

8           **ATTORNEY SCHMIDT:**  Where does that start?

9           **PRESIDING COMMISSIONER LAWIN:**  Page five

10  under investigation.

11          **ATTORNEY SCHMIDT:**  No, objection.

12          **PRESIDING COMMISSIONER LAWIN:**  Paragraph

13  two.

14              "On September 2, 1991 at

15              approximately 8:36 p.m. the police

16              were summoned to 1121 Detroit Avenue.

17              It was reported that the victim, Fred

18              Eugene Upton, U-P-T-O-N, had been set

19              on fire by the defendant.  The

20              consensus seemed to be that the

21              victim, the defendant and several

22              others had congregated behind Phoenix

23              House at that address.  The victim

24              and the defendant had both been

25              drinking and a dispute arose.  A

26              number of witnesses state that the

27              defendant threw the contents of a cup

13

1      on the victim and set the victim on

2      fire.  It appears that the people

3      involved were homeless people who

4      found shelter at Phoenix House.  The

5      area behind the house, however,

6      appears to have been a favorite place

7      to talk or possibly drink.  Earlier

8      in the day the defendant apparently

9      had an argument or scuffles with some

10     of the other people there.  The

11     defendant was apparently the only

12     black person present and it seems

13     pretty clear that he was -- he was

14     addressed in racial terms.  It was

15     alleged that the victim had called

16     the defendant a nigger.  According to

17     one version of the story the

18     defendant left the area for a few

19     minutes and set the victim on fire

20     upon his return.  One witness

21     testified that at that point the

22     defendant jumped up and down and

23     screamed quote 'how was that for some

24     crazy nigger shit and he had a big

25     smile on his face' end of quote.  The

26     witness who made that particular

27     statement, Dennis Brown, B-R-O-W-N,

14

1            states that when he tried to grab the

2            defendant, the defendant bit him

3            twice on his hand.  When the

4            defendant was interviewed by the

5            police, he allowed that he had been

6            drinking during the day but he

7            insisted that he had not been drunk.

8            He denied setting the victim on fire.

9            At the preliminary examination the

10           victim stated that he had received

11           several skin grafts because of his

12           injuries in this incident."

13    And that concludes the Statement of Facts.

14    Mr. Culler, did you throw flammable liquid on

15    Mr. Upton?

16           **INMATE CULLER:**  Yes.

17           **PRESIDING COMMISSIONER LAWIN:**  Are you

18    responsible for his injuries?

19           **INMATE CULLER:**  Yes.

20           **PRESIDING COMMISSIONER LAWIN:**  Was it

21    gasoline?

22           **INMATE CULLER:**  Yes.

23           **PRESIDING COMMISSIONER LAWIN:**  And where had

24    you gotten the gasoline?

25           **INMATE CULLER:**  From a gas station.

26           **PRESIDING COMMISSIONER LAWIN:**  You went

27    there specifically to get the gasoline for what

15

1   purpose?

2           **INMATE CULLER:**  For a campfire.

3           **PRESIDING COMMISSIONER LAWIN:**  And why did

4   you throw it on Mr. Upton?

5           **INMATE CULLER:**  Because I only had two

6   (inaudible) the victim came up behind me.  The

7   incident had stemmed from one of the witnesses,

8   Dennis Brown, was raping a lady named Kim.  I

9   disrupted their rape and at the time me and a guy

10  named Apollo were arguing and I told Dennis to get

11  off of her.  He came to the door.  We started to

12  argue, went back and forth (inaudible) and Fred

13  Upton and another -- and another person came up

14  behind me, told me to quit my bitching old stupid

15  nigger or we're going to kick your ass.  And so at

16  that time with half a gallon of Vodka I choose to

17  use the gasoline as a method to back him off

18  because I figured that if he smelt the gas that he

19  would back off of me.  Within a second -- the guy

20  who was with him was smoking a cigarette -- flame

21  came off -- sparks came off of him, igniting the

22  gas.  So I did not have a chance to do it.  But

23  I'm not trying to deceive the Commissioner.  I was

24  going to do it.

25          **PRESIDING COMMISSIONER LAWIN:**  Do what?

26          **INMATE CULLER:**  I was going to light him on

27  fire, but I never actually got the chance to do

16

1    it.   But I did cause the incident.

2         **PRESIDING COMMISSIONER LAWIN:**   And according

3    to the reports you'd been drinking actually quite

4    heavily.   In primarily your statement -- your most

5    recent statement in the counselor's report you

6    indicated that you'd been drinking a lot that day.

7         **INMATE CULLER:**   Yes.

8         **PRESIDING COMMISSIONER LAWIN:**   It sounds

9    like you must have been really under the influence

10   according to -- this was your version in the April

11   2002 Board report because you talk about buying

12   bottle after bottle of Vodka.

13        **INMATE CULLER:**   Yes.

14        **PRESIDING COMMISSIONER LAWIN:**   How long had

15   you been drinking?   Was this early in the morning

16   until -- what -- late at night?

17        **INMATE CULLER:**   From about noon to about

18   7:30 we had drank I guess about -- it was about

19   seven people and we had drinked I guess about four

20   or five gallons or half-gallons of Vodka.   We

21   started off drinking fifths of Absolute Vodka and

22   ended up drinking Winston Vodka which was a

23   cheaper brand.

24        **PRESIDING COMMISSIONER LAWIN:**   And yet in

25   the probation officer's report, the statement that

26   I just read said you had -- you told the probation

27   officer that -- or rather, I apologize, you --

17

1    when you were interviewed by the police you

2    allowed that you'd been drinking but you insisted

3    you were not drunk.  Is that still your contention

4    today?

5         **INMATE CULLER:**  Well I had had time to --

6    Because I was -- during the period I went in and

7    out of consciousness and there was like a bucket

8    of water and so I put it over my head and a guy

9    named Bear told me to take a walk.  And in the

10   time that I took I guess I sobered up a little

11   bit.

12        **PRESIDING COMMISSIONER LAWIN:**  So this was

13   before the assault on Mr. Upton --

14        **INMATE CULLER:**  Yes.

15        **PRESIDING COMMISSIONER LAWIN:**  -- that you

16   had put your head in water?  Regardless, you feel

17   that you knew what you were doing at the time that

18   you threw the liquid on Mr. Upton --

19        **INMATE CULLER:**  Yes.

20        **PRESIDING COMMISSIONER LAWIN:**  -- was a

21   conscious decision?

22        **INMATE CULLER:**  I take full responsibility,

23   yes.

24        **PRESIDING COMMISSIONER LAWIN:**  Did you know

25   Mr. Upton?

26        **INMATE CULLER:**  I had seen him here and

27   there in the streets and I talked to him a couple

18

1    of times.

2         **PRESIDING COMMISSIONER LAWIN:**  Was your

3    dispute earlier in the day with him?

4         **INMATE CULLER:**  No.

5         **PRESIDING COMMISSIONER LAWIN:**  And this

6    dispute that you had earlier in the day, was it

7    all about this female?

8         **INMATE CULLER:**  No.

9         **PRESIDING COMMISSIONER LAWIN:**  What was it

10   about?

11        **INMATE CULLER:**  There was a guy named Chris

12   Carleton (phonetic) who a lady named -- I think

13   her name -- the last name was Jared, they were

14   fighting and I broke up their fight, and a police

15   officer was called to the area and I had blood on

16   me from the incident because she had beat him

17   pretty bad.  And I also got in the fight with

18   Chris Carleton for calling me a nigger in the

19   earlier (inaudible).

20        **PRESIDING COMMISSIONER LAWIN:**  Okay.  So

21   your previous argument had just been with

22   Mr. Carleton?  Or there were two -- Mr. Carleton

23   and someone else?

24        **INMATE CULLER:**  Mr. Carleton and Dennis

25   Brown.

26        **PRESIDING COMMISSIONER LAWIN:**  And Dennis

27   Brown.  All right.  And you did actually have a

19

1    lighter on your person at the time?

2    **INMATE CULLER:** Yes, Ma'am.

3    **PRESIDING COMMISSIONER LAWIN:** Is that what

4    you were going to use to set Mr. Upton on fire?

5    **INMATE CULLER:** Yes, Ma'am.

6    **PRESIDING COMMISSIONER LAWIN:** But you

7    didn't take it out of your pocket?

8    **INMATE CULLER:** I never did take it out.

9    **PRESIDING COMMISSIONER LAWIN:** How do you

10    feel today about this crime?

11    **INMATE CULLER:** I'm deeply remorseful for

12    what I've done. I've had a period of time where

13    I've tooken self-inventory on the matter. And if

14    done over, I would have done it differently and I

15    would have handled the situation in a more

16    constructive manner.

17    **PRESIDING COMMISSIONER LAWIN:** How so? How

18    would you have handled it differently?

19    **INMATE CULLER:** I would have probably still

20    tried to deal with the issue of the rape, but on

21    the issue with Mr. Upton being at my back, I would

22    have probably did something more in the line of

23    humor to diffuse the situation in order to get

24    myself out of a situation that I placed myself in.

25    So to that respect I would have not threw the

26    gasoline because I know now that that was just not

27    the manor in which to do things or to handle it

20

1   because in the past I had been passive and I've

2   had several contacts with the police before and

3   I've had no violence towards anyone before.

4       **PRESIDING COMMISSIONER LAWIN:**  Well let's go

5   to your background with the police.  You did have

6   a number of contacts as you mentioned.  I didn't

7   find anything as a juvenile.  But as an adult you

8   had been -- let's see.  Well, you were arrested,

9   the charges were dismissed on sale or

10  transportation of marijuana in 1981.  Then there's

11  an entry, July 9, 1987, battery, and I don't find

12  a disposition on that.

13      **INMATE CULLER:**  There's no conviction

14  because that was one where me and my common-law

15  wife at the time had a disagreement and we got

16  into a scuffle.

17      **PRESIDING COMMISSIONER LAWIN:**  According to

18  the probation officer's report the disagreement

19  was over what you thought was her infidelity and

20  so you began to choke her.

21      **INMATE CULLER:**  Yes.

22      **PRESIDING COMMISSIONER LAWIN:**  So ultimately

23  were those charges dropped?

24      **INMATE CULLER:**  They were never pursued.

25      **PRESIDING COMMISSIONER LAWIN:**  Okay.  Then

26  we have the 9-3-87 arrest and conviction for

27  molesting a minor.  Says you were given three

21

1    years court probation, counseling program, sent to

2    a counseling program, 90 days in the county jail

3    and you were to do some volunteer work.

4         **INMATE CULLER:**  Yes.

5         **PRESIDING COMMISSIONER LAWIN:**  And this was

6    a 10-year-old victim.

7         **INMATE CULLER:**  Stepdaughter.

8         **PRESIDING COMMISSIONER LAWIN:**  Your

9    stepdaughter.  She said you had inappropriately

10   touched her.

11        **INMATE CULLER:**  Yes.

12        **PRESIDING COMMISSIONER LAWIN:**  And this is

13   the daughter of Dolores --

14        **INMATE CULLER:**  Yes.

15        **PRESIDING COMMISSIONER LAWIN:**  -- James?

16        **INMATE CULLER:**  Yes.

17        **PRESIDING COMMISSIONER LAWIN:**  Then we have

18   a -- First of all, did you complete that

19   counseling program that they sent you to?

20        **INMATE CULLER:**  No.  I started, I looked

21   around, I went to San Francisco.  I went to

22   several places over in Walnut Creek to try to get

23   that in order, but I never did -- because of my

24   financial situation -- find any counseling that

25   would be free or that would be for indigent people

26   because at the time I had a severe problem with

27   alcohol and I was weaning myself off of crack

22

1    cocaine.

2    **PRESIDING COMMISSIONER LAWIN:**  Then we have

3    a September 21, 1988 arrest for entering a

4    noncommercial dwelling, violation of court order

5    to prevent domestic violence.  You were given

6    three years court probation and nine months in the

7    county jail.  Is that accurate?

8    **INMATE CULLER:**  Yes.

9    **PRESIDING COMMISSIONER LAWIN:**  And this

10   again was an incident with Ms. James (inaudible)

11   James?

12   **INMATE CULLER:**  Yes.  On that case we would

13   come together and if we had disputes she would use

14   the police as a security blanket.

15   **PRESIDING COMMISSIONER LAWIN:**  And there was

16   a restraining order that you violated?

17   **INMATE CULLER:**  Yes, Ma'am.

18   **PRESIDING COMMISSIONER LAWIN:**  You said at

19   some point that you had actually had a drug

20   problem and you wanted to go to jail.

21   **INMATE CULLER:**  Yes.

22   **PRESIDING COMMISSIONER LAWIN:**  Was that your

23   feeling at the time?

24   **INMATE CULLER:**  Yes.

25   **PRESIDING COMMISSIONER LAWIN:**  Then we have

26   October 11, 1988, disobeying a court order, that

27   was dismissed; a petty theft in '89 was dismissed.

23

1    February 5, 1990, auto theft, you received two

2    years court probation, 45 days in jail.  And then

3    we have March 8, 1990, burglary, under the

4    influence of controlled substance.  You received

5    two years court probation, 90 days in county jail.

6    Lastly, August 23, 1990, a vehicle theft, and two

7    years court probation, 45 days in jail.  This

8    looks like the February 5, 1990 case.  Is it one

9    in the same?

10          **INMATE CULLER:**  This was -- Actually I was a

11   car detailer and those were unauthorized uses of

12   the vehicle.  I went over the time limit and most

13   of my clients were realtors and they had to have

14   their car.  And because of my use of drugs and my

15   lack of understanding for another's property I

16   kept the cars maybe two and three hours over the

17   limit.  And when I arrived, the police were there.

18          **PRESIDING COMMISSIONER LAWIN:**  Okay.  My

19   question you didn't answer in all of that.  My

20   question was were these different cases or one in

21   the same?

22          **INMATE CULLER:**  No, they were different

23   cases.

24          **PRESIDING COMMISSIONER LAWIN:**  Okay.

25          **INMATE CULLER:**  Two different cars.

26          **PRESIDING COMMISSIONER LAWIN:**  All right.

27   Thank you.  And then we have the commitment

24

1   offense.  Any other convictions that I didn't

2   mention?

3         **INMATE CULLER:**  No, Ma'am.

4         **PRESIDING COMMISSIONER LAWIN:**  Well I found

5   your birth date to be February 27, 1958.  Is that

6   accurate?

7         **INMATE CULLER:**  Yes, Ma'am.

8         **PRESIDING COMMISSIONER LAWIN:**  And it says

9   that -- Let's see, what else did I find about you.

10  You were born in Blytheville, Arkansas.

11        **INMATE CULLER:**  Yes, Ma'am.

12        **PRESIDING COMMISSIONER LAWIN:**  Your parents,

13  John and Parlene, P-A-R-L-E-N-E.  Let's see,

14  you're one of four children?

15        **INMATE CULLER:**  Yes.

16        **PRESIDING COMMISSIONER LAWIN:**  Lost one

17  sister early on.  She was about 30, passing away

18  in 1988, and lost an older brother in 1991 due to

19  drowning.

20        **INMATE CULLER:**  Yes.

21        **PRESIDING COMMISSIONER LAWIN:**  So that

22  leaves you with one sibling --

23        **INMATE CULLER:**  Yes, Ma'am.

24        **PRESIDING COMMISSIONER LAWIN:**  -- at this

25  point.  Brother or sister?

26        **INMATE CULLER:**  Sister.

27        **PRESIDING COMMISSIONER LAWIN:**  Sister.  Are

25

1    you in contact with her?

2        **INMATE CULLER:**  Yes.

3        **PRESIDING COMMISSIONER LAWIN:**  Let's see.

4    Your mother worked at country clubs, at a sawmill,

5    and you were brought up by your mother and a

6    stepfather.

7        **INMATE CULLER:**  Yes.

8        **PRESIDING COMMISSIONER LAWIN:**  Lost your

9    mother in 1994.  Your father moved to San

10   Francisco.  Now is that your stepfather or

11   biological father?

12       **INMATE CULLER:**  My biological father moved

13   to San Francisco when I was two.

14       **PRESIDING COMMISSIONER LAWIN:**  Did you

15   continue to have contact with him as you were

16   growing up?

17       **INMATE CULLER:**  Yes, (inaudible) sometimes.

18       **PRESIDING COMMISSIONER LAWIN:**  And then he

19   passed away in 1987.

20       **INMATE CULLER:**  Yes.

21       **PRESIDING COMMISSIONER LAWIN:**  Let's see.

22   You dropped out of school in the ninth grade,

23   received a GED when you were 17, an A.A. in

24   Arkansas.  Have you ever provided any verification

25   of either your GED or A.A. degree to CDC?

26       **INMATE CULLER:**  No, Ma'am.

27       **PRESIDING COMMISSIONER LAWIN:**  Have you ever

· 26

1   requested it through the education department?

2       **INMATE CULLER:** I sent the letter to my

3   school and I didn't receive a reply.

4       **PRESIDING COMMISSIONER LAWIN:** Did you do

5   that through the education department?

6       **INMATE CULLER:** No.

7       **PRESIDING COMMISSIONER LAWIN:** Because you

8   can go to them and they'll request it, the

9   education department will request it. And that

10  way it gets sent to them directly and gets placed

11  in your file. That might be an avenue for you. I

12  think it's important for you to have that.

13  Started using marijuana about 18, cocaine, 20,

14  around 20, rock cocaine, 24. Rock cocaine was a

15  problem. And that you drank heavily following

16  your brother's death. It sounds like you were

17  drinking heavily at the time of the commitment

18  offense also.

19      **INMATE CULLER:** (Inaudible) when my brother

20  died, he died a month before I came to prison --

21  came to jail.

22      **PRESIDING COMMISSIONER LAWIN:** Okay. And it

23  says that you married Deborah in 1992 and she's

24  the woman -- a woman that you had a common-law

25  relationship --

26      **INMATE CULLER:** She's AKA Dolores James.

27      **PRESIDING COMMISSIONER LAWIN:** All right.

27

1   And that relationship was about 10 years -- for

2   about 10 years before you married.

3         **INMATE CULLER:**  Yes.

4         **PRESIDING COMMISSIONER LAWIN:**  You have a

5   son.

6         **INMATE CULLER:**  Yes.

7         **PRESIDING COMMISSIONER LAWIN:**  He was born

8   in 1984.  She has a daughter from a prior

9   relationship.  And do you still have a

10  relationship with your wife?  Are you still

11  married?

12        **INMATE CULLER:**  Yes, but she's moved out of

13  the State.  So has my son.

14        **PRESIDING COMMISSIONER LAWIN:**  Do you still

15  have a relationship with her?

16        **INMATE CULLER:**  I do have a writing

17  relationship with both to keep me abreast of my

18  son's activities and to let me know things that my

19  son doesn't let me know.

20        **PRESIDING COMMISSIONER LAWIN:**  So your

21  son's, what, 21 now?

22        **INMATE CULLER:**  Yes.

23        **PRESIDING COMMISSIONER LAWIN:**  And it says

24  that you have a total of four children.  So you

25  have the son.

26        **INMATE CULLER:**  I have six children.

27        **PRESIDING COMMISSIONER LAWIN:**  You have six?

28

1           **INMATE CULLER:**  Yes.

2           **PRESIDING COMMISSIONER LAWIN:**  And are you

3      in contact with all of your children?

4           **INMATE CULLER:**  Four I was in contact with

5      but due to their moving from place to place I lost

6      touch with the ones in New York, Washington and

7      the one in Chicago.

8           **PRESIDING COMMISSIONER LAWIN:**  Did you

9      contribute to any of these children's upbringing?

10          **INMATE CULLER:**  Yes.

11          **PRESIDING COMMISSIONER LAWIN:**  So they lived

12     with you at some point?

13          **INMATE CULLER:**  No, they would visit.  I

14     would see them.  I had financial support of them

15     up until the time that I experienced the episodes

16     with crack.

17          **PRESIDING COMMISSIONER LAWIN:**  Okay.  Let's

18     see.  We're also told that you worked as a heavy

19     equipment operator for 11 years prior to

20     incarceration through the Operating Engineers.

21          **INMATE CULLER:**  Yes, (inaudible).

22          **PRESIDING COMMISSIONER LAWIN:**  And that you

23     also had a business doing auto detailing that you

24     mentioned.  Worked as a taxi driver, a chauffer

25     and a small business entrepreneur.  What were you

26     doing at the time of the commitment offense as far

27     as employment?

29

1        **INMATE CULLER:**  Detailing, janitorial, and
2    because I was on the work list I would do heavy
3    equipment when they called me.  I was on an
4    on-call basis for that.

5        **PRESIDING COMMISSIONER LAWIN:**  Is there
6    anything else about your background that you would
7    like for us to know that I haven't put on the
8    record prior to prison?

9        **INMATE CULLER:**  That before all of this I
10   was a law-abiding citizen before my episode with
11   crack, and through my episode with crack I
12   maintained financial support for my family and
13   everything was stable.  Although me and my wife
14   had a rocky relationship, there was still a strong
15   family bond as it is today.

16       **PRESIDING COMMISSIONER LAWIN:**  Okay.
17   Anything else?

18       **INMATE CULLER:**  (Inaudible).

19       **PRESIDING COMMISSIONER LAWIN:**  Well let's go
20   to your future plans.  The counselor says that
21   upon your release your comment was that you
22   declined to state any current residence plans.
23   And as far as employment it says, please refer to
24   the stipulation and dismissal from the United
25   States District Court dated May 5, 2004.  So where
26   would you live upon release?

27       **INMATE CULLER:**  I would live in Contra

30

1    Costa, perhaps Pleasant Hill in some hotel or

2    something until I have a chance to get in touch

3    with my union because we have a good financial

4    plan for heavy equipment operators who are

5    (indiscernible).  I would go to them and try and

6    get a loan from them because I am still in good

7    standing with them.  And I also have a support

8    system through AVP who is a good support system

9    because they will offer me help too.  I was also a

10   co-facilitator in the Alternatives To Violence

11   program.

12        **PRESIDING COMMISSIONER LAWIN:**  Okay.  How

13   does that translate to residence plans?

14        **INMATE CULLER:**  As it says, my only option

15   would be to live in a hotel until I'm able to

16   establish some kind of -- some kind of living --

17   permanent living situation.

18        **PRESIDING COMMISSIONER LAWIN:**  Have you been

19   in contact with any transitional living or halfway

20   houses?

21        **INMATE CULLER:**  I've written several and

22   they stated that I would have to be out to -- for

23   them to offer any kind of assistance once they

24   found I was a life prisoner.

25        **PRESIDING COMMISSIONER LAWIN:**  Okay.  For

26   instance who have you written to?

27        **INMATE CULLER:**  I've written to a couple of

1  organizations in Contra Costa. I don't have those

2  -- I should have brought them -- on that issue.

3  At this time I couldn't give you a name of the

4  organizations that I've written. Due to my rush

5  to come to the Board, I guess I overlooked that.

6  **PRESIDING COMMISSIONER LAWIN:** Okay. Now

7  you are totally medically disabled. How's that

8  going to translate into work as a heavy equipment

9  operator? Is that going to hinder you?

10  **INMATE CULLER:** I was ordered by the court

11  not to address that issue.

12  **PRESIDING COMMISSIONER LAWIN:** I don't

13  recall that was in the stipulation. I thought

14  that the court -- there's a direction for the

15  Board, but it doesn't disallow us from questioning

16  you about what you're going to do on parole.

17  **INMATE CULLER:** I would reiterate, the court

18  --

19  **PRESIDING COMMISSIONER LAWIN:** So your

20  position is you choose not to answer the question?

21  **ATTORNEY SCHMIDT:** My understanding of the

22  court order was that the Board was not to consider

23  his employability either behind the bars or upon

24  release as a factor in determining suitability.

25  **PRESIDING COMMISSIONER LAWIN:** Okay. That's

26  your interpretation also. Okay. I don't have any

27  letters of support. Did you ask anyone to write you

32

1    a support letter?

2            **INMATE CULLER:**  No.

3            **PRESIDING COMMISSIONER LAWIN:**  Why not?

4            **INMATE CULLER:**  I was under the opinion that

5    through one of the representatives who was at the

6    conference that housing, food and all of those would

7    be covered under DOM and Title 15.

8            **PRESIDING COMMISSIONER LAWIN:**  What

9    conference?

10           **INMATE CULLER:**  I had a settlement conference

11   when I was in -- when the stipulation was entered

12   into that it went on record -- the representative

13   from the BPT stated that they would have some plan

14   for me on release for --

15           **PRESIDING COMMISSIONER LAWIN:**  I think you're

16   getting on dangerous ground, Mr. Culler, because BPT

17   doesn't do that.  You may have had a representative

18   from the CDC parole division who could make that

19   claim, but not the BPT.

20           **INMATE CULLER:**  Okay.  Okay.

21           **PRESIDING COMMISSIONER LAWIN:**  So be careful

22   with your facts.

23           **INMATE CULLER:**  I stand correct, but whoever

24   was there as the representative --

25           **PRESIDING COMMISSIONER LAWIN:**  Do you have

26   that in writing?

27           **INMATE CULLER:**  I can get it from the courts.

33

1    **PRESIDING COMMISSIONER LAWIN:** You'll need to
2    because there's nothing that I see relative to the
3    stipulation that has anything to do with housing.
4    It all has to do with your employability. And it is
5    a necessity for you to have a place to live. Now if
6    you have someone within the parole division who has
7    told you and has put it in writing that they will
8    provide for you, that's very important for you to
9    have at your parole hearing because that's rare for
10   -- I have seen it once before in about 5,000
11   hearings. I've seen it once before at Folsom where
12   a parole agent has actually put in writing that
13   there are going to get that, but it is not something
14   that is provided unless a person agrees that they
15   will assist you in gaining that. So if you have
16   someone -- If you have that resource, be sure and
17   follow up on it. Get it in writing. It's very
18   important. I mean that's gold to have somebody say
19   that they will go that extra mile for you, because
20   that's exactly what it is, going the extra step.

21   **INMATE CULLER:** Well I thought that Title 15
22   and DOM also provides for that -- for housing under
23   their provision for inmates who are indigent and who
24   are going to be reentered into society.

25   **PRESIDING COMMISSIONER LAWIN:** No. When you
26   are released from prison as a lifer, you get your
27   $200.00 and sent out the gate. So it's very

34

1    important for you to be successful on parole to have

2    a place to live.  We're not going to let you just

3    walk out the gates with no place to live.  So I

4    would recommend to you highly that you follow up on

5    that contact who said that they'll provide that for

6    you.

7          **INMATE CULLER:**  May I interject something?

8          **PRESIDING COMMISSIONER LAWIN:**  Uh-hmm.

9          **INMATE CULLER:**  I noted that there was an

10   inmate who was a molester who had gotten out of

11   prison, several of them, and the CDC did --

12         **PRESIDING COMMISSIONER LAWIN:**  They're not

13   lifers.

14         **INMATE CULLER:**  So lifers are different?

15         **PRESIDING COMMISSIONER LAWIN:**  There's a

16   different parole process, different parole process.

17   All right.  We did receive a response to 3042

18   Notices from Contra Costa County but it just said

19   that Mr. Waddell was going to be in attendance

20   today, but just for the record, we did receive the

21   letter from the District Attorney's Office.  And we

22   received no other written responses to those

23   notices.  So with that we're going to move on,

24   Mr. Culler.  If you turn your attention to

25   Commissioner Estrada, we're going to go to your

26   post-conviction.

27         **DEPUTY COMMISSIONER ESTRADA:**  Good morning,

35

1   Mr. Culler. Documents reviewed for post-conviction

2   information include your Central File, the life

3   prisoner's evaluation report prepared for the

4   April 2005 calendar by Correctional Counselor-I D.

5   Fisher, post-conviction progress reports covering a

6   period of March 8, 2002 to the present, reports

7   prepared by CC-I Fisher and the psychological

8   evaluation prepared for the December 2004 calendar

9   by Dr. Tony Blanchard. At the time of Mr. Culler's

10   last parole consideration hearing on April 23 the

11   year 2002 he was housed at San Quentin State Prison.

12   The Board took action to deny parole for two years

13   and recommended that the inmate remain

14   disciplinary-free and participate in self-help and

15   therapy. Now Mr. Culler, your classification score

16   at your last hearing was zero and your current

17   classification score is 26. Is that correct?

18       **INMATE CULLER:** Yes, with the exception to

19   the rules and rule change that was implemented where

20   all lifers were to go to 19.

21       **DEPUTY COMMISSIONER ESTRADA:** Okay. But your

22   present classification score is 26, correct?

23       **INMATE CULLER:** Twenty-four.

24       **DEPUTY COMMISSIONER ESTRADA:** Right here it

25   is 26.

26       **INMATE CULLER:** I have 24.

27       **DEPUTY COMMISSIONER ESTRADA:** Is that right?

36

1   Okay.  It did go down to 24, you're right.

2          **PRESIDING COMMISSIONER LAWIN:**  (Inaudible) 24

3   in one place and --

4          **DEPUTY COMMISSIONER ESTRADA:**  Yeah, 24.

5          **PRESIDING COMMISSIONER LAWIN:**  -- 26 in

6   another.

7          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Very

8   good.  Now your custody level at your last hearing

9   was Medium A and it's presently Max A.

10          **INMATE CULLER:**  Close B.

11          **DEPUTY COMMISSIONER ESTRADA:**  Close B?

12          **PRESIDING COMMISSIONER LAWIN:**  That's after

13   his release from SHU, right?

14          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Okay.

15   Very good.  Now during this reporting period you did

16   not upgrade vocationally, correct?  Nor

17   academically.  And I did review the C-File and as

18   already indicated there's no indication or proof

19   that you received your GED or you're A.A. in the

20   state of Arkansas.  And you were working for a short

21   period of time prior to (inaudible) as a porter,

22   correct?  Prior to going to --

23          **INMATE CULLER:**  Yes, I worked for (inaudible)

24   as a porter.

25          **DEPUTY COMMISSIONER ESTRADA:**  Okay.

26          **INMATE CULLER:**  And also in the infirmary.

27          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Now

37

1    during this reporting period you had no psychiatric

2    treatment, correct?

3           **INMATE CULLER:**  No.

4           **DEPUTY COMMISSIONER ESTRADA:**  And no

5    indication that you participated in self-help,

6    correct?

7           **INMATE CULLER:**  I continue to participate in

8    AA.  I never stopped.

9           **DEPUTY COMMISSIONER ESTRADA:**  When did you go

10   -- When did you begin?

11          **INMATE CULLER:**  I begun back in '98 for AA

12   and have went on to -- continuous basis.  As you

13   would note on the psych report and the counselor's

14   report, they both state that the AA was continuous.

15          **DEPUTY COMMISSIONER ESTRADA:**  How often do

16   you go?

17          **INMATE CULLER:**  It's once a week.

18          **DEPUTY COMMISSIONER ESTRADA:**  Okay.

19          **PRESIDING COMMISSIONER LAWIN:**  I think

20   theirs, however, is reported from you because there

21   weren't any chronos in your file to verify it, so

22   it's based on you reporting to them of your

23   attendance.

24          **DEPUTY COMMISSIONER ESTRADA:**  Yeah, because

25   there's nothing in the Central File regarding your

26   participation in AA or NA.

27          **INMATE CULLER:**  Well due to a lot of time

38

1    when it was cold I didn't go, okay, and so if you

2    don't go on certain days they don't give you

3    chronos, but when they changed it to daytime hours I

4    went continuously (inaudible).

5        **DEPUTY COMMISSIONER ESTRADA:**  There's not

6    even one chrono indicating that you participated in

7    AA.

8        **INMATE CULLER:**  Not one chrono?

9        **DEPUTY COMMISSIONER ESTRADA:**  Yeah, do you

10   have any?

11       **INMATE CULLER:**  Yes.

12       **DEPUTY COMMISSIONER ESTRADA:**  Good.  Very

13   good.

14       **ATTORNEY SCHMIDT:**  Since your last hearing.

15       **INMATE CULLER:**  Since my last hearing I don't

16   have any for that period.

17       **ATTORNEY SCHMIDT:**  These are all --

18   Commissioner, we've got quite a few from San

19   Quentin.

20       **DEPUTY COMMISSIONER ESTRADA:**  What year are

21   you talking about?

22       **ATTORNEY SCHMIDT:**  Ninety-eight through 2001.

23       **DEPUTY COMMISSIONER ESTRADA:**  Okay.  How

24   about since April of 2002.

25       **INMATE CULLER:**  April of 2002, I don't have

26   any.

27       **PRESIDING COMMISSIONER LAWIN:**  We have prior

39

1   chronos.

2           **DEPUTY COMMISSIONER ESTRADA:**  Yeah.

3           **ATTORNEY SCHMIDT:**  (Inaudible).

4           **DEPUTY COMMISSIONER ESTRADA:**  Yeah, but

5   nothing during this reporting period?

6           **INMATE CULLER:**  No, Sir.

7           **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Okay.

8           **PRESIDING COMMISSIONER LAWIN:**  Before you go

9   off that, Mr. Culler, were you able to participate

10  in AA when you were in SHU?

11          **INMATE CULLER:**  No, they didn't have --

12          **PRESIDING COMMISSIONER LAWIN:**  Okay.  And

13  that was for how long?

14          **INMATE CULLER:**  I said, no.

15          **PRESIDING COMMISSIONER LAWIN:**  How long -- I

16  know.  And how long was that?  How long were you in

17  SHU?

18          **INMATE CULLER:**  Nine months.

19          **PRESIDING COMMISSIONER LAWIN:**  Okay.  So

20  there is a nine-month break in your attendance.

21          **INMATE CULLER:**  No, they don't have AA here.

22  I've not noted that they have any AA programs here.

23          **PRESIDING COMMISSIONER LAWIN:**  So none at all

24  since you've come out of SHU either?

25          **INMATE CULLER:**  No.

26          **PRESIDING COMMISSIONER LAWIN:**  That's what

27  I'm trying to determine.

40

1          **INMATE CULLER:**  No.

2          **PRESIDING COMMISSIONER LAWIN:**  Okay.  So you

3    actually have not attended in at least 10, maybe 11

4    months?

5          **INMATE CULLER:**  Yes, Ma'am.

6          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  So prior

7    to October 2003, correct?

8          **INMATE CULLER:**  Yes.

9          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Okay.

10   Since you've arrived at state prison I see you've

11   had one, two, three, four, five, six 115's.  And

12   your last one was on October 6, 2003 for battery on

13   an inmate with a weapon.  You were assessed 360 days

14   forfeiture of credit and that's when you spent your

15   15-month SHU term.

16         **INMATE CULLER:**  Yes.

17         **DEPUTY COMMISSIONER ESTRADA:**  Okay.  From

18   what I can gather you were released on January 13 of

19   this year.

20         **INMATE CULLER:**  I was actually released, but

21   I was held over in Ad Seg because I'm a Level II

22   inmate and they didn't have any provisions to

23   release a Level II with a Close B status.

24         **DEPUTY COMMISSIONER ESTRADA:**  So when were

25   you released?  I have January 13.

26         **INMATE CULLER:**  January from ASU.

27         **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Okay.

41

1    Now according to the CC-I report by Fisher it

2    indicates that prior -- in summary it indicates

3    prior to your release you could benefit from

4    remaining disciplinary-free, maintaining and reduce

5    classification level and participate in therapy,

6    self-help group and formulating a residence plan.

7    Now in regards to the psychological report by

8    Dr. Blanchard -- indicates a diagnosis of Axis I,

9    Alcohol Dependence In Institutional Remission,

10   Cocaine Abuse In Institutional Remission. Axis II,

11   None. You have a GAF score of 70. Highest GAF

12   score during the past has been 75. In regards to

13   the assessment of dangerousness:

14              "The inmate's level of dangerousness

15              in a controlled environment is

16              estimated to be average for a Level

17              II inmate. He has remained free of

18              violence since incarceration until

19              October 2003. Since the inmate

20              denied the charges of the most recent

21              115, it is unwise to speculate why

22              this incident happened. If indeed he

23              is found guilty, the level of

24              dangerousness that this inmate

25              exhibits is above average. He has

26              made attempts to better himself in

27              the past by completing various

1           (inaudible) Self-Esteem and

2           Alternatives to Violence."

3           [Thereupon, the tape was turned over.]

4           **DEPUTY COMMISSIONER ESTRADA:**

5           "He has also upgraded himself

6           vocationally in the past. While it

7           is difficult to generalize behavior

8           from the structured and controlled

9           correctional setting of a prison to

10          that of a free society, this inmate's

11          risk of violent recidivism appears to

12          be average. The greatest risk factor

13          for Mr. Culler in his history -- is

14          his history of alcohol dependence.

15          Alcohol was a significant factor in

16          the instant offense and without an

17          internal conviction and an external

18          structure in this area Mr. Culler may

19          repeat -- series of poor judgment

20          which may victimize himself and

21          others. When speaking about his

22          crime, Mr. Culler used the right

23          words in an attempt to convey the

24          appropriate emotional attitude.

25          However, his statements sounded

26          rehearsed and meaningless. He does

27          not appear to have fully accepted the

43

1       gravity of his crime. He appears to

2       see himself as a victim of society by

3       stating quote: 'I felt as though I

4       was a slave in this country. I felt

5       as though I was going to prison no

6       matter what since it was a white

7       victim. I felt as though I was

8       betrayed.' End quote. Conclusion

9       and recommendations. The inmate is

10      competent and responsible for his own

11      behavior. He knows right from wrong

12      and understands what is expected of

13      him. Decisions regarding parole and

14      housing can be based on custody

15      issues rather than on mental factors.

16      This inmate has a history of alcohol

17      and drug dependence which appears to

18      be in institutional remission but

19      this will need to be verified upon

20      placement in a less controlled

21      setting. His history predisposes him

22      to relapse -- substance abuse -- and

23      chances for sustained sobriety can be

24      improved by his participation in a

25      12-step program. The inmate's level

26      of dangerousness within the prison

27      and the risk of violent recidivism in

44

1        the community are presently average

2        provided he remain substance free.

3        If the inmate is found guilty of

4        battery on his cellmate with a

5        weapon, his level of dangerousness

6        would be above average.  He has the

7        capacity to abide by institutional

8        standards and has demonstrated his

9        ability to do so for extended time

10       periods.  He will benefit from

11       continued employment that will

12       provide him with structure in or out

13       of prison.  In or out of prison the

14       inmate will require greater than

15       average amounts of supervision for

16       some time until he has established a

17       consistently nonviolent and

18       pro-social response style.  He may

19       benefit from participation in

20       programs that address criminal

21       thinking, victim awareness, taking

22       responsibility and anger management,

23       as well as programs that promote

24       pro-social behavior.  Ongoing

25       participation in a 12-step program

26       will further improve his chances to

27       succeed."

45

1    Now Mr. Culler, is there anything else you wish to

2    indicate that I may have missed?

3          **INMATE CULLER:**  No, I think that covered it

4    from what I understand from her interpretation.

5          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  And

6    with that I'll return to the Chair.

7          **PRESIDING COMMISSIONER LAWIN:**  Mr. Culler,

8    after having been disciplinary-free for such a

9    long period of time why did you put yourself in a

10·  position with getting into an altercation with

11   your cellie?

12·        **INMATE CULLER:**  I didn't put myself -- He

13   hit me first.  And I didn't use the weapon.  I

14   used my hand.  I did choke the inmate to keep him

15   from hitting me.  That was the only way.  They

16   said don't fight the inmate, but I didn't know

17   what other way to deal with (inaudible) and that's

18   the only thing I did was hold him until he

19   stopped.  And when he stopped, I let him go and

20   then he left.

21         **PRESIDING COMMISSIONER LAWIN:**  What about

22   this telephone cable?

23         **INMATE CULLER:**  There is no indication --

24   The evidence does not support that finding.

25         **PRESIDING COMMISSIONER LAWIN:**  That's not

26   what I'm asking.  I understand what the evidence

27   shows.  The 115 says that there was in fact -- but

46

1    your position is what, that you didn't use one?

2         INMATE CULLER:  That I didn't use one.  The

3    evidence doesn't support it.  It's

4    (indiscernible).  The investigation officer who

5    saw the incident agreed with my assessment.  I

6    never used a cord on that inmate.

7         PRESIDING COMMISSIONER LAWIN:  So you used

8    your hand --

9         INMATE CULLER:  Yes.

10        PRESIDING COMMISSIONER LAWIN:  -- to

11   strangle him?

12        INMATE CULLER:  That's what he stated too.

13   He said I tried to choke him.

14        . PRESIDING COMMISSIONER LAWIN:  Why did you

15   do that?

16        INMATE CULLER:  Because he hit me and we

17   were in a confined area.  That was the only thing

18   I could do to stop this inmate from hitting me.

19   As I stated before, I've worked for ISU.  There

20   was no reason for me to just attack this inmate

21   without a reason.  He hit me and I was defending

22   myself.  What was I supposed to do?  I don't

23   understand.  I know I was in a catch-22 situation,

24   but in defense of this I had to do what I did.

25   Not to minimize the impact, I chose to hold him.

26        PRESIDING COMMISSIONER LAWIN:  Since your

27   last hearing you've also had a number of 128's.

47

1    And the last one said -- it was September 27,

2    2003, this was the last three that you received

3    since your last hearing.  And in this one the

4    officer that wrote it, which is Karen Eby, E-B-Y,

5    says that you'd counseled previously for leaving

6    your job assignment without approval.

7         **INMATE CULLER:**  Yes.

8         **PRESIDING COMMISSIONER LAWIN:**  What's that

9    all about?

10        **INMATE CULLER:**  I worked up at operations

11    and investigations and they had a smoking area

12    that was down (inaudible).  I didn't tell her

13    every time that I left to go down to smoke, so I

14    am guilty of that offense.

15        **PRESIDING COMMISSIONER LAWIN:**  I see.  The

16    other one was your I.D. card was altered.

17        **INMATE CULLER:**  No, I had grown facial hair

18    and it violated the grooming standards.

19        **PRESIDING COMMISSIONER LAWIN:**  Okay.  The

20    other one was actually just a log of your 115.

21    All right.  I wanted you to have your say on that

22    115.  As with the court, we accept the findings of

23    the hearing officer, so you were found guilty of

24    that which causes the doctor's report to conclude

25    that with the guilty verdict that you're an above

26    average risk for future violence.  Do you believe

27    that's true?

48

1       **INMATE CULLER:**  No, Ma'am.  I have

2    demonstrated time and time again that I am worthy

3    of freedom.  I have did everything in my --

4    possible to comply with CDC.  The doctor said I

5    have demonstrated clearly that I can maintain a

6    level of assurance that I will not come back to

7    CDC because after this bout I am convinced that

8    going through and maintaining the right attitude

9    is necessary to stay out of here and I will do all

10   (inaudible) and do whatever is asked of me to

11   prove it.  I'm not asking CDC to believe me.  I'm

12   willing to do whatever is necessary to prove that

13   I deserve a chance.

14       **PRESIDING COMMISSIONER LAWIN:**  Well it's not

15   CDC you have to convince, it's the Board of Prison

16   Terms.

17       **INMATE CULLER:**  I understand that.

18       **PRESIDING COMMISSIONER LAWIN:**  Well I'm just

19   correcting you because you say you're convincing

20   CDC and I'm just telling you that it's not them

21   you have to convince.  The last hearing they

22   recommended to you that you participate in

23   self-help and you did not.  Why is that?

24       **INMATE CULLER:**  Because I wrote to

25   Sacramento.  In one of their -- they said that I

26   was no longer had -- in my winning of the 114 they

27   said I no longer had to participate in therapy

49

1    because I had demonstrated that I had accomplished

2    all the goals of therapy.

3        **PRESIDING COMMISSIONER LAWIN:** You've

4    confused me. The winning of what? A 114?

5        **INMATE CULLER:** Yeah, the 1040 that I

6    appealed on -- for CDC -- for the Board of Prison

7    Terms, one of the grants was that -- said that I

8    no longer needed therapy. They agreed.

9        **PRESIDING COMMISSIONER LAWIN:** So you

10   appealed your Board decision?

11       **INMATE CULLER:** Yes.

12       **PRESIDING COMMISSIONER LAWIN:** Was that the

13   2000 decision?

14       **INMATE CULLER:** Two thousand one.

15       **PRESIDING COMMISSIONER LAWIN:** Two thousand

16   one decision, and you appealed that and you say

17   that you won it?

18       **INMATE CULLER:** I won the case on -- that I

19   didn't need further therapy because I had

20   participated in --

21       **ATTORNEY SCHMIDT:** Can you find that?

22       **INMATE CULLER:** -- (inaudible) --

23       **DEPUTY COMMISSIONER ESTRADA:** (Inaudible).

24       **PRESIDING COMMISSIONER LAWIN:** I don't --

25       **ATTORNEY SCHMIDT:** I haven't seen that

26   document so I don't know.

27       **INMATE CULLER:** (Inaudible).

50

1         **PRESIDING COMMISSIONER LAWIN:**  Here we go.

2    Before we go on, I did want to read into the record

3    the stipulation and dismissal because it is quite

4    short and I just wanted to get on the record what it

5    actually says.

6              "It is hereby stipulated by

7              plaintiff, Jerryal Jerome Culler,

8              Sr., in pro per, and defendants

9              Hepburn, Angele, McCormick and Munoz

10             through their attorneys as follows:

11             One, defendants Hepburn, Angele,

12             McCormick, Munoz and Parole Board --

13             Parole Board Panel members without

14             admitting any allegation in

15             plaintiff's complaint stipulate that

16             they will not consider plaintiff's

17             disability, specifically his

18             nephropathy, N-E-P-H-R-O-P-A-T-H-Y,

19             as alleged in his complaint dated

20             April 9, 2001, including any

21             resulting inability to work as a

22             basis to deny his suitability for

23             parole at any future parole hearings

24             for which he may be eligible."

25    That's it.  And number two, plaintiff voluntarily

26    dismisses his complaint and action.  And then I do

27    see the next document is your appeal dated

51

1    August 3, 2000.  Is this the one you're talking
2    about?

3         **INMATE CULLER:**  Two thousand three,
4    February 11 --

5         **ATTORNEY SCHMIDT:**  That's the decision.  I
6    think she may be looking at a different date.

7         **PRESIDING COMMISSIONER LAWIN:**  Well, no,
8    this is the appeal; actually the 1040 Form is
9    dated August 3, 2000.  So this might not be the
10   one.

11        **ATTORNEY SCHMIDT:**  He has the decision here,
12   and it does appear to be granted.

13        **PRESIDING COMMISSIONER LAWIN:**  Okay.
14   Because the one I have --

15        **ATTORNEY SCHMIDT:**  Could we --

16        **PRESIDING COMMISSIONER LAWIN:**  Let's see.
17   And then I have April 8, 2001 is the next 1040.
18   Okay.  I have this.  This is actually just one
19   page of three in the decision and it says denied
20   in part.  The decision is actually denied in part.
21   The decision stays the same, meaning that the
22   denial stays the same.  And the appeal granted
23   portion reads:

24            "A review of the psychological
25            reports does not reveal any form of
26            mental health disorder, neither are
27            there any recommendations for mental

52

1          health treatment or therapy.

2          Therefore, all references in the

3          decision that the prisoner needs

4          therapy will be stricken from the

5          record."

6  And that's after the prisoner contends the Panel

7  failed to find evidence that he needs therapy.

8  That wasn't my question. My question was

9  self-help. I asked you if you had -- why you

10  hadn't participated in self-help because that's

11  what the last Panel recommended. Self-help is

12  different from therapy.

13      **INMATE CULLER:** Okay. Katargeo, I

14  participated in Katargeo.

15      **PRESIDING COMMISSIONER LAWIN:** Since your

16  last hearing?

17      **INMATE CULLER:** Yes, Katargeo.

18      **PRESIDING COMMISSIONER LAWIN:** Since the

19  last hearing?

20      **INMATE CULLER:** Yes.

21      **PRESIDING COMMISSIONER LAWIN:** Okay. I did

22  see you'd participated in Katargeo but I thought

23  it said 2000, '98 and 2000.

24      **INMATE CULLER:** The last one should have

25  been in 2000 --

26      **PRESIDING COMMISSIONER LAWIN:** Well the

27  Commissioner asked you earlier if he'd missed

53

1    anything and you said, no.

2         **INMATE CULLER:** I mean regarding --

3         **PRESIDING COMMISSIONER LAWIN:** Self-help

4    programming since your last hearing.

5         **INMATE CULLER:** I thought he was talking

6    about alcohol.

7         **PRESIDING COMMISSIONER LAWIN:** Oh, no, no,

8    no. Anything that you've done, any good guy

9    stuff, any self-help, it's important to put on the

10   record, so if you have something there to show

11   that you participated during this review period

12   now's the time to produce it. So anyway, this

13   denial or grant rather of his appeal actually just

14   talked about therapy which is --

15        **ATTORNEY SCHMIDT:** And actually it would

16   only apply to therapy up to -- the psych reports

17   -- up to that point. So if they came up with a

18   new psych report that said you needed therapy, it

19   would apply. But can I go back to the stipulation

20   just briefly? I believe -- And I'd like to get a

21   clarification from the Board on how they're going

22   to consider this, because what it says is -- the

23   way I interpret this -- that any resulting

24   inability to work as a basis to deny suitability

25   for parole, any basis cannot be considered.

26        **PRESIDING COMMISSIONER LAWIN:** Right.  We

27   will not be considering that at all --

54

1          **ATTORNEY SCHMIDT:**  Thank you.

2          **PRESIDING COMMISSIONER LAWIN:**  -- today's

3     hearing.

4          **DEPUTY DISTRICT ATTORNEY WADDELL:**  Even

5     though it doesn't relate to his alleged illness?

6          **PRESIDING COMMISSIONER LAWIN:**  No.  Because

7     we have entered into the stipulation saying that

8     we will not consider his inability to work.  His

9     contention was, as I understand it, that he had --

10    that he will be receiving SSI, is that it, or SS

11    -- disability.

12         **INMATE CULLER:**  Yes.

13         **PRESIDING COMMISSIONER LAWIN:**  And that will

14    be his income to support himself and essentially

15    we're saying that we will not consider -- or we

16    are saying we will not consider his inability to

17    work in considering his suitability.  So we will

18    not be, but I don't see anywhere that that does

19    not allow the discussion about his future plans

20    and it certainly has nothing to do with residence.

21         **INMATE CULLER:**  I understand that.

22         **PRESIDING COMMISSIONER LAWIN:**  Okay.

23         **INMATE CULLER:**  And for the record I would

24    submit that -- as in my last -- that I will

25    because I worked all my life.  And if this

26    disability allows me, I will gain employment

27    through my union and I will utilize my friend's

1    limousine service and become a chauffer, plus

2    supplement it with my small business, auto

3    detailing and janitorial.  I do not look for a

4    free ride from the State.

5        **PRESIDING COMMISSIONER LAWIN:**  Thank you.

6    Any questions, Commissioner?

7        **DEPUTY COMMISSIONER ESTRADA:**  No, no

8    questions.

9        **PRESIDING COMMISSIONER LAWIN:**  Mr. Waddell,

10   do you have any questions?

11       **DEPUTY DISTRICT ATTORNEY WADDELL:**  I have no

12   questions.

13       **PRESIDING COMMISSIONER LAWIN:**  Mr. Schmidt,

14   do you?

15       **ATTORNEY SCHMIDT:**  I have no questions.

16       **PRESIDING COMMISSIONER LAWIN:**  Then we'll go

17   back to closing.  Mr. Waddell.

18       **DEPUTY DISTRICT ATTORNEY WADDELL:**  Okay.

19   Thank you.  The District Attorney's Office does not

20   feel that Mr. Culler should be granted parole at

21   this particular point in time for the following

22   reasons.  This is a 205 PC with an enhancement, the

23   use of the deadly or dangerous weapon, to wit a

24   flammable liquid.  It was a jury verdict.  This was

25   a case where the victim was defiled and mutilated to

26   the extent he received second and third degree burns

27   requiring skin grafts.  The fact that he went to get

56

1    this cup of flammable substance after an argument

2    are elements of premeditation.  There's a trivial

3    motive here.  The alleged motivation on his part was

4    apparently to recuse this woman who was apparently a

5    homeless woman, also an alcoholic; however, I would

6    point out that he did have a jury trial.  And if the

7    jury believed his claim of defense of others, they

8    would have been -- found him not guilty because it

9    would be a legitimate defense under those

10   circumstances.  They did not, and so we have to

11   conclude, since we're not re-litigating the case,

12   that there was no legitimate claim of defense of

13   others presented to the jury which they felt to be

14   credible.  There was clearly potential injury for

15   persons other than -- to persons other than the

16   victim as a number of people similarly situated to

17   Mr. Culler -- basically a gathering of alcoholics

18   (inaudible) what it was by standards there -- that

19   could seriously have been injured based on his

20   conduct.  He clearly declined to take an

21   opportunity, a number of opportunities to cease or

22   withdraw from the crime.  This period of time,

23   according to his own statements, lasted over a

24   number of hours.  There were hostile engagements

25   throughout this period of time which should have

26   been a sign to him that he ought to just get out of

27   there and leave it alone.  He could have left early

1   on.   His statement concerning the level of the
2   drinking and intoxication, that (inaudible) his
3   credibility as do many of his comments.  You talked
4   to him about six people drinking four or five
5   half-gallons of Vodka.  I don't care which period of
6   time -- over a period of six hours there wouldn't be
7   anybody standing up.  So clearly I think he was
8   probably drinking less than he said he did and I
9   think it was not the -- not the compulsion to act as
10  he did as he is trying to tell us.  The inmate was
11  in fact on probation for auto theft.  He got two
12  years probation after a 1990 conviction.  So he was
13  on probation when he committed this particular
14  offense.  And the victim I suppose in a sense was
15  vulnerable in a sense that he, as well as everybody
16  else there, was apparently intoxicated, unable to
17  defend themselves.  The prior record.  We do have a
18  series of criminal acts in his adult history which
19  are escalating to a dangerous point.  Arrests for
20  battery on a girlfriend which did not result in a
21  conviction.  This 1987 arrest for domestic violence
22  shows a pattern of conduct (inaudible) violence.
23  which certainly can be considered by this Board, as
24  well as subsequent involvement and arrests for
25  violating court orders (inaudible) with the same
26  woman.   There was the incident of the molesting of
27  the stepdaughter which he got three years probation,

58

1    90 days county jail.  Arrest for petty theft, two
2    convictions for auto theft.  The 1990 conviction for
3    burglary and under the influence of narcotics.
4    Eight convictions of driving without a license
5    (inaudible) suspended license.  All in all he got
6    about five grants of adult probation and was on
7    probation at the time of this offense.  So he does
8    not -- at that time anyway -- appear to be amenable
9    to the services of the probation -- Although I
10   should -- in fairness he did not have formal
11   probation, these were court probation grants.  He
12   does have an unstable social history, clearly a
13   history of tremulous relationships with others, to
14   wit his girlfriend at that time.  He apparently had
15   a severe alcohol problem and was homeless at the
16   time.  Alcohol was a factor, a big factor in this
17   offense.  To his credit, although he dropped out of
18   school in the ninth grade, he did get a GED and
19   apparently, according to his statements, went onto
20   get an A.A. degree from the junior college.  Now
21   it's important for Mr. Culler to understand that up
22   to this point we've been taking this on his say-so,
23   but three years ago he was asked to provide
24   documentation of his degrees and attendance at the
25   community college.  He has not done so.  I have to
26   say that if he does not do so by the next hearing,
27   we're going to have to conclude that they in fact

59

1    did not happen, that that did not happen.  Because
2    all these (inaudible) of his advanced education
3    outside of perhaps the GED are based on
4    self-reporting which has not been collaborated by
5    anything that I've been able to find.  Maybe there's
6    something in the file, but I didn't see it in what I
7    was provided.  So that needs to be taken care of.
8    As far as institutional behavior is concerned, he's
9    got six 115's, the last one is 10-6-03, that was
10   since the last hearing, got multiple 128(a)'s
11   throughout his career and three more since the last
12   hearing.  That's basically the 115 that we're
13   talking about is why he's at Corcoran in the first
14   place.  We can't talk about his failure to upgrade
15   vocationally, but we can talk about his failure to
16   participate in self-help.  He has participated in
17   AA, but needs proof of his continuing commitment to
18   AA.  In view of the severe alcohol problem that he
19   had when he came into prison this is something that
20   needs to be ongoing and forever.  And the inmate
21   needs to make -- have chronos in the file that we
22   can see that show that he has in fact been
23   participating.  His excuses about, well, I didn't go
24   this day, I didn't go that day, when it's cold out
25   or whatever, that's not going to cut it.  There has
26   to be chronos showing a continuous participation in
27   this type of self-help, and not to be confused with

60

1    therapy.  Educational achievement, I already talked

2    about.  The psychiatric report.  There's problems

3    here.  He claims to take full responsibility for his

4    acts but then goes ahead and explains it away to

5    make it sound like an accident.  And again, as I

6    pointed out, if the jury had believed his claim of

7    defending this woman against rape, he would have

8    been found not guilty.  The 2000 psych report talks

9    about a guarded prognosis, uncertainty of support.

10   He may be unrealistic in his assessment of himself.

11   Also he talks about him being unpredictable

12   (inaudible) concerns about coping with stress.  Back

13   in 2002 when the Board could make those findings

14   they evaluated him as a moderate threat.  The recent

15   psychiatric report I have to -- we have to conclude

16   based on the findings to be true of the 115 show

17   that he's an above average threat if he is released.

18   Those are not good reports.  There has to be a

19   better report than that before we're willing to feel

20   he's considered for probation.  And the psychiatric

21   report makes it clear that they're taking this into

22   account.  Also, the alcohol, to reiterate:

23          "The greatest risk factor for

24          Mr. Culler is his history of alcohol

25          dependence and alcohol is a

26          significant factor in this case.

27          Without internal convictions and

61

```
 1          external structures, he may repeat a
 2          series of poor judgment which may
 3          victimize himself and others.  When
 4          speaking about his crime, Mr. Culler
 5          used the right words in an attempt to
 6          convey the appropriate emotional
 7          attitude.  However, his statements
 8          sounded rehearsed and meaningless.
 9          He does not appear to have accepted
10          the full gravity of his crime."
11     Again, this is a -- this is a problem for us
12     (inaudible) analysis.  And he also points out that
13     his history predisposes him to relapse to
14     substance abuse.  So that clearly is a problem and
15     I think it has to be addressed as part of the
16     parole plans as well.  And Mr. Culler has done
17     very little to convince certainly myself that he
18     has addressed this issue for purposes of parole.
19     He does not -- He does not have any plans for a
20     place of residence in Contra Costa County or
21     anywhere else (inaudible).  If he can be supported
22     on the -- by social services or some sort of
23     disability, that's fine.  But there's no
24     indication of any contact with outside agencies
25     for reentry support which is essential given his
26     lack of residence, no manifest support from
27     friends or family in the form of letters, that's
```

1    essential, no support from his family members.  So
2    all in all, I think that Mr. Culler has still got
3    a ways to go and we don't feel that parole should
4    be granted and we're asking for a two year denial
5    again.

6         **PRESIDING COMMISSIONER LAWIN:**  Thank you.
7    Mr. Schmidt, before you go on, did you find your
8    chrono for Katargeo or anything for Katargeo?

9         **INMATE CULLER:**  No, Ma'am.

10        **PRESIDING COMMISSIONER LAWIN:**  All right.
11   Counsel, closing.

12        **ATTORNEY SCHMIDT:**  Mr. Culler takes
13   responsibility for the crime.  You heard that here
14   today.  There was quite a bit of emphasis placed
15   by the DA on the fact that if the jury had
16   accepted the defense of others story that he would
17   have been found not guilty.  Well, defense of
18   others can fall short of a complete defense.  He
19   could still have been doing it in defense of the
20   -- as the District Attorney put it -- the
21   alcoholic that was getting raped and gone
22   overboard and still been found guilty of this
23   crime.  It's an interesting argument that he was
24   drunker or drank or was -- how was it put, that he
25   was -- he must have been very, very drunk when
26   Mr. Culler told the Board that he was in fact less
27   drunk, that he remembers everything and in fact he

63

1    had had time to sober up. So I don't know where

2    the argument that he was -- must have been

3    stumbling down drunk tends to show that he's not

4    suitable for parole. Prison is a dangerous and

5    violent place, especially San Quentin, Corcoran,

6    these older institutions. It's difficult not to

7    get a 115. You have to be proactive to avoid

8    them. If you do nothing, you're going to get a

9    115 and that's exactly what happened to

10   Mr. Culler. He's minding his business, he gets

11   jumped and he ends up with a 115. I hope the

12   Board will take that into account. He's gone to

13   AA when he could. It's not -- From what I'm

14   hearing from the inmates here at Corcoran, it's

15   not available, especially at Ad Seg. In terms of

16   housing or a job or -- I guess we're not going to

17   talk about a job, we would assume that he has

18   support -- financial support, well that financial

19   support would also go to housing. And I'll submit

20   based on that.

21       **PRESIDING COMMISSIONER LAWIN:** Thank you.

22   Mr. Culler, this is your turn to tell us today why

23   you believe you're suitable for parole.

24       **INMATE CULLER:** I believe that I have

25   demonstrated while in the system that I can follow

26   the rules that are set forth for me by the members

27   of this Board or by the parole officer, that I do

64

1    have a support system that is viable.  The local

2    (inaudible) have a support system.  I stand firm

3    on that, that I also will be able to have support

4    system through SSI which is granted -- which will

5    grant me (inaudible) housing.  Now again, as far

6    as the institutional remission on drugs and

7    alcohol, I've been in the system longer than I was

8    an alcoholic.  So I have experienced tremendous

9    mishaps.  I've watched my body expand from 130 to

10   260 and went through a lot of things that should

11   have drawn me back into some form of substance.

12   Therefore, that demonstrates that I had and will

13   continue to maintain sobriety no matter what

14   adversity that I experience.  So being in the

15   system and being able to get along with inmates

16   have demonstrated that I am pro-social.  I've not

17   had a fight.  I've not been before this in any

18   combative behavior in CDC, nor have I had any

19   bouts with drugs or any 115's on that.  My 115's

20   and 128's deal with trivial issues such as not

21   using a phone or as far as grooming or smoking or

22   disobeying a direct order when someone says go

23   this way and I went that way.  I do understand

24   (inaudible) taking in account that it shows that I

25   do have a problem with authority on that regard,

26   but also it should demonstrate from my conduct

27   that I will abide by the rules and regulations set

65

1    forth and I deserve to be given a chance to show

2    that I am worthy of being granted parole.  And I

3    hope this Panel takes that in consideration when

4    rendering their decision.

5              **PRESIDING COMMISSIONER LAWIN:**  Is that it?

6              **INMATE CULLER:**  Yes.

7              **PRESIDING COMMISSIONER LAWIN:**  Thank you.

8    We appreciate your comments.  We'll take a recess.

9    You can go out with the officers.  We'll bring

10   everyone back when we have decision.

11                          **R E C E S S**

12                            --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

66

1      **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  We're

4      on.

5          **PRESIDING COMMISSIONER LAWIN:**  Thank you.

6      All parties have returned to the room in the

7      hearing for Jerryal Culler.  Mr. Culler, the Panel

8      has reviewed all information received from the

9      public and relied on the following circumstances

10     in concluding that you're not suitable for parole

11     and would pose an unreasonable risk of danger to

12     society or a threat to public safety if released

13     from prison.  The commitment offense is one reason

14     for the denial.  It was aggravated mayhem.  It was

15     the throwing of gasoline or flammable fluid on the

16     victim, Fred Eugene Upton.  Mr. Upton suffered

17     severe burns according to the probation officer's

18     report.  He had skin grafts that were required.

19     It's very fortunate that he survived this attack.

20     It seems that he was actually caught on fire by a

21     cigarette that someone else in the vicinity was

22     smoking at the time that he was doused with this

23     liquid.  This crime certainly shows a lack of

24     regard for the life and suffering of others and

25     was carried out in a cruel fashion on a vulnerable

26     victim.  Even by the inmate's accounts, all the

27     **JERRYAL CULLER    H-31082    DECISION PAGE 1    4/26/05**

66

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER ESTRADA:** Okay. We're

4    on.

5    **PRESIDING COMMISSIONER LAWIN:** Thank you.

6    All parties have returned to the room in the

7    hearing for Jerryal Culler. Mr. Culler, the Panel

8    has reviewed all information received from the

9    public and relied on the following circumstances

10    in concluding that you're not suitable for parole

11    and would pose an unreasonable risk of danger to

12    society or a threat to public safety if released

13    from prison. The commitment offense is one reason

14    for the denial. It was aggravated mayhem. It was

15    the throwing of gasoline or flammable fluid on the

16    victim, Fred Eugene Upton. Mr. Upton suffered

17    severe burns according to the probation officer's

18    report. He had skin grafts that were required.

19    It's very fortunate that he survived this attack.

20    It seems that he was actually caught on fire by a

21    cigarette that someone else in the vicinity was

22    smoking at the time that he was doused with this

23    liquid. This crime certainly shows a lack of

24    regard for the life and suffering of others and

25    was carried out in a cruel fashion on a vulnerable

26    victim. Even by the inmate's accounts, all the

27    **JERRYAL CULLER    H-31082    DECISION PAGE 1    4/26/05**

1    parties there had been drinking.  It was a
2    volatile situation, excuse me, I don't mean it as
3    a pun, but it was because the inmate claims that a
4    woman was being raped, there were people who were
5    around the area, that the inmate tried to diffuse
6    the situation, tried to assist her and in doing so
7    he took it upon himself to douse Mr. Upton.  The
8    victim was vulnerable as I said because the inmate
9    claims they all had been drinking alcohol
10   throughout the day, although Mr. Culler was able
11   to sober up somewhat prior to the commitment
12   offense and he was aware -- and did take
13   responsibility for his actions here today.  The
14   motive for this crime is very trivial.  The victim
15   was not even one who was involved in this alleged
16   rape, again according to the inmate's claims, and
17   yet he ended up being the one who was severely
18   injured.  The second reason for our denial would
19   be the inmate's continued negative behavior in the
20   institution as evidenced by a recent 115 for
21   battery on an inmate with a weapon.  And again,
22   Mr. Culler, just as we accept as true the jury's
23   verdict we have to accept ·as true the hearing
24   officer's verdict which found you guilty.  This is
25   obviously a serious 115.  It is the last of six.
26   The inmate has also received two 128(a) counseling
27   **JERRYAL CULLER   H-31082   DECISION PAGE 2   4/26/05**

68

1   chronos since his last hearing, the last of those
2   September 17, 2003 for leaving job without
3   permission.  The next reason for our denial would
4   be the Panel's belief that the inmate has not
5   participated in sufficient levels of self-help as
6   evidenced by his lack of participation in anything
7   other than AA since his last hearing and even that
8   has been sporadic.  We do understand he has had a
9   SHU placement or Ad Seg placement in the interim,
10  but that again was brought on by his negative
11  behavior in the institution.  But it certainly
12  does limit his ability to program.  The next
13  reason for the denial would be Tony Blanchard's
14  report of November 10, 2004 where after concluding
15  the hearing on the 115 and the inmate was found
16  guilty of it the doctor states his level of
17  dangerousness would be above average, quoting on
18  the last page of that report.  And previously he
19  had indicated that if indeed he is found guilty
20  the level of dangerousness that this inmate
21  exhibits is above average.  That's clearly too
22  high a risk for this Panel to take.  The next
23  reason would be the fact that the inmate does not
24  have realistic residence plans.  He does not have
25  any specific plan for residence either in Contra
26  Costa or elsewhere.  Mr. Culler, the Penal Code
27  **JERRYAL CULLER   H-31082   DECISION PAGE 3   4/26/05**

```
 1    allows that the Panel who finds you suitable for
 2    parole can place you in any county in California
 3    where they believe you would be most successful.
 4    That might be Contra Costa County, but if there's
 5    another county, it's up to you to convince the
 6    Panel you would be more successful -- but it's
 7    very important that you have verification of a
 8    place to live.  Granted, you may get money from
 9    social security, you may get money from Operating
10    Engineers, but they're not going to give you a
11    place to live.  They may give you proceeds that
12    you can procure a place to live with, but you have
13    to have a place to live.  I recommend to you that
14    you write letters.  And if you get responses from
15    halfway houses or transitional living facilities,
16    that you bring them in with you even if they say,
17    no.  If they say you qualify but we won't hold a
18    bed, bring that letter in with you.  It's very
19    important to see that you have realistic plans for
20    a place to live.  And if you do in fact have a
21    parole agent who is going to find you a place to
22    live, get it in writing and bring it.  The next
23    reason for our denial would be the inmate's prior
24    criminal history.  He has failed prior attempts to
25    correct his criminality, that included probation,
26    counseling, county jail and he was on court
27    JERRYAL CULLER   H-31082   DECISION PAGE 4   4/26/05
```

70

1   probation at the time of the crime.  His

2   convictions had been for molesting a minor,

3   entering a noncommercial dwelling, violation of an

4   order to prevent domestic violence, auto theft,

5   second degree burglary, under the influence of a

6   controlled substance, again vehicle theft.  He

7   also had an unstable social history that involved

8   drug use, alcohol and cocaine.  Any he had a

9   tremulous relationship as evidenced by the court

10  ordered restraining order and the convictions, his

11  tremulous relationship with his spouse.  Based on

12  all of the above the Panel finds that the inmate

13  needs continued participation in self-help to

14  further develop those skills that will allow him

15  to remain clean and sober and to deal with the

16  stresses of living in prison, the stress of

17  society without getting -- actually in a

18  nondestructive manner.  And that means how to live

19  without getting 115's, how to follow the rules of

20  the society in which you're housed.  Until further

21  progress is made he continues to be unpredictable

22  and a potential threat to others.  In a separate

23  decision the hearing Panel finds the prisoner has

24  been convicted of aggravated mayhem.  It is not

25  reasonable to expect that parole would be granted

26  at a hearing during the following two years and

27  **JERRYAL CULLER   H-31082   DECISION PAGE 5   4/26/05**

71

1    the specific reasons for the two year denial are

2    first of all the crime.  The cruel fashion in

3    which it was carried out on a vulnerable victim.

4    Flammable liquid was thrown on him, gasoline.  He

5    caught on fire and received severe burns causing

6    the need for skin grafts.  This crime certainly

7    shows a lack of regard for the life and suffering

8    of others and the motive for the crime was very

9    trivial.  The second reason for the two year

10   denial would be the inmate's behavior in the

11   institution which he has displayed negative

12   behavior since his last hearing receiving a new

13   115 for battery on an inmate with a weapon,

14   bringing his total of 115's to six.  The third

15   reason would be the doctor's report which is not

16   supportive of release.  It states he's an above

17   average risk for future violence and does indicate

18   that there is a need for further self-help.  Next

19   would be the District Attorney's response to PC

20   3042.  Contra Costa County responded by attending

21   today and they are opposed to parole.  Next would

22   be the inmate's prior criminal history and his

23   unstable social history that involved not only

24   criminality but alcohol and cocaine use and the

25   fact that he had failed all prior attempts to

26   correct his criminality, including probation,

27   **JERRYAL CULLER    H-31082    DECISION PAGE 6    4/26/05**

1    counseling, county jail and was on probation at

2    the time of this crime.  And the Panel's belief

3    that the inmate has not participated in sufficient

4    levels of self-help.  We do commend you, however,

5    Mr. Culler, for the fact that you have not had any

6    disciplines since 2003, that you have participated

7    when you have been able to in AA.  But these

8    positive aspects of your behavior do not outweigh

9    the factors of unsuitability.  Our recommendations

10   to you are that you remain disciplinary-free, that

11   when it is available to you that you continue to

12   participate in self-help, that you stay

13   disciplinary-free and you earn positive chronos.

14   I would further recommend to you that you go to

15   education, get them to request verification of

16   your GED and your A.A. degree, and that you work

17   on your parole plans.  The living arrangements are

18   very important.  Again, just bring those letters

19   in.  I don't disbelieve you, that you've written

20   to places.  But you need verification.  You know

21   CDC as well as anybody in this room if not better.

22   And if it's not on paper, it's not there.  You

23   need to get verification of these items.  You were

24   doing a good program.  You had a lot of self-help

25   under your belt until this 115, and it's caused

26   you to you know -- a real step back and I hope

27   **JERRYAL CULLER   H-31082   DECISION PAGE 7   4/26/05**

73

1   that you can overcome that.  You should go to

2   post-Board classification and with your points get

3   transferred out of here, hopefully to a place

4   where you can get some programming.  And I wish

5   you good luck.  Commissioner, anything to add?

6        **DEPUTY COMMISSIONER ESTRADA:**  Good luck,

7   Mr. Culler.

8        **PRESIDING COMMISSIONER LAWIN:**  Officer, this

9   is his copy.  That concludes this hearing at

10  11:35.

11                    --oOo--

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON** _____ AUG 2 4 2005 _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **JERRYAL CULLER   H-31082   DECISION PAGE 8   4/26/05**